IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL DAVID CARRUTH,  )
                        )
        Petitioner,     )
                        )
v.                      )        CASE NO. 2:14-CV-1107-WKW
                        )              [WO]
JOHN Q. HAMM,           )
                        )
        Respondent.     )

## MEMORANDUM OPINION AND ORDER

In the early morning hours of February 18, 2002, Petitioner Michael David Carruth and his accomplice shot a twelve-year-old boy and slashed the throat of his father, leaving both covered with dirt in a shallow grave. The father survived his injuries, later testifying against Carruth and his accomplice at trial in Alabama state court. Carruth was convicted of four counts of first-degree murder, one count of attempted murder, one count of first-degree burglary, and one count of first-degree robbery. On December 3, 2003, he was sentenced to death.

Carruth now brings this federal habeas corpus action, asserting that his conviction and sentence were obtained in a manner contrary to the provisions of the United States Constitution. For the reasons stated below, Carruth is not entitled to relief on any of his claims, and his petition is due to be dismissed.

## TABLE OF CONTENTS

I. BACKGROUND ......................................................................................5

   A.   The Offense ....................................................................................5

   B.   Pretrial and Trial Proceedings.......................................................9

   C.   Direct Appeal ...............................................................................12

   D.   Collateral Challenges ..................................................................13

      1. *Leave to File a Petition for Writ of Certiorari Out of Time* ......................13

      2. *The Remaining Portions of the Rule 32 Petition*............................................15

      3. *The Present Petition for Writ of Habeas Corpus* ........................................15

II. JURISDICTION AND VENUE.........................................................15

III. STANDARD OF REVIEW ...............................................................16

   A.   Unexhausted Claims ....................................................................16

   B.   Exhausted Claims.........................................................................19

IV. DISCUSSION ......................................................................................23

   A.   Alleged Ineffective Assistance of Trial Counsel .......................24

      1. *Lack of Experience of the Trial Counsel*....................................................27

      2. *Failure to Ensure the Transcription of Off-the-Record Discussions*..........30

      3. *Failure to Exploit a Changing Account of the Crime* ................................32

      4. *Failure to Adequately Cross-Examine Several Witnesses* .........................34

      5. *Conceding Felony Murder* .........................................................................35

6. *Failure to Investigate and Failure to Present Evidence During the Guilt/Innocence Phase* ....................................................38

7. *Failure to Investigate and Failure to Present Evidence During the Penalty Phase* ...........................................................44

8. *Waiving Opening Statement in the Penalty Phase* ......................51

9. *Failure to Raise Additional Mitigating Circumstances* ..............54

10. *Ineffective Closing Statement in the Penalty Phase* ..................60

B. Alleged Ineffective Assistance of Appellate Counsel ................63

1. *Failure to Provide Any Grounds for a New Trial in the Motion for New Trial* ..................................................................64

2. *Failure to File a Petition for Writ of Certiorari in the Alabama Supreme Court* ..........................................................77

C. Alleged Errors in the Indictment ...........................................88

1. *Failure to Allege Essential Elements of the Offense* ...............93

2. *Constructive Amendment of the Indictment* ..........................96

D. Motion for Recusal ............................................................103

E. Motion for Change of Venue ................................................113

F. Alleged Errors in Jury Selection ...........................................126

1. *Racial Bias in Jury Selection* ...........................................126

2. *Erroneous Refusal to Excuse Unfit Juror* ...........................134

3. *Improper Grant of a Challenge for Cause* ...........................144

4. *Death-Qualifying the Jury* ...............................................155

3

G.    Alleged Juror Misconduct ...........................................................156

   1. *Hidden Bias of a Juror* ....................................................156

   2. *Premature Deliberations by the Jury* ................................158

H.    Alleged Prosecutorial Misconduct .............................................173

   1. *Assertion of Facts Not in Evidence* .................................175

   2. *Improper Argument in the Guilt/Innocence Phase* ...................180

   3. *Improper Argument in the Penalty Phase* ............................188

I.    Alleged Evidentiary Errors .......................................................194

   1. *Mention of Another Crime* ..............................................195

   2. *Admission of Photographic Evidence* .................................205

   3. *Hearsay Statements of a Co-Conspirator* ...........................211

J.    Alleged Errors in the Jury Instructions ...................................218

   1. *Definition of Burglary* ..................................................218

   2. *Definition of the "Heinous, Atrocious, or Cruel" Aggravating Circumstance* ...........................................................221

   3. *Explanation of the Balancing Test* ..................................226

   4. *Double-Counting Kidnapping, Burglary, and Robbery* ............230

K.    Alleged Unconstitutionality of Alabama's Capital Sentencing Scheme ..233

L.    Alleged Unconstitutionality of Alabama's Method of Execution ...........241

V. CONCLUSION ...............................................................................243

# I. BACKGROUND

## A.   __The Offense__

Petitioner Michael David Carruth was a bail bondsman.  His co-conspirator, Jimmy Lee Brooks, Jr., was in the business of repossessing cars.  (Doc. # 21-21 at 106, 148.)[1]  While conducting his business of repossessing cars some time before the offense, Brooks went with his father to the home of Forrest Fleming "Butch" Bowyer, who operated a used car lot, and witnessed Forrest Bowyer exchange cash with Brooks's father.  (Doc. # 21-21 at 108, 148.)

Knowing that a substantial sum of cash was maintained at the Bowyer residence, Brooks conspired with Carruth to rob Forrest Bowyer.

In the evening of February 17, 2002, a white Ford Crown Victoria—a vehicle model commonly known for its use by law enforcement—arrived at the Bowyer residence in Russell County, Alabama.  (Doc. # 21-21 at 79, 142.)  The vehicle interior was outfitted with a security partition between the front and rear of the vehicle, (Doc. # 21-21 at 190), and the exterior featured multiple extra antennas on the trunk area.  (Doc. #21-22 at 53.)  Out of the vehicle stepped Carruth, wearing a hat emblazoned with the word "narcotics" and a jacket with the word

---

[1] Except where otherwise noted, citations to the record use the pagination of the PDF version in the court's electronic filing system

"agent."  (Doc. # 21-21 at 104, 142.)  Carruth carried an air pistol, handcuffs, and a document with him.  (Doc. # 21-21 at 143–44, 157.)

When Forrest Bowyer answered the door and asked if he could help Carruth, Carruth produced the document, claiming it was a warrant for Forrest Bowyer's arrest.  As Carruth handed Forrest Bowyer the forged warrant, Carruth handcuffed him and told him that he had to be taken to the sheriff's office.  Forrest Bowyer, who was living only with his twelve-year-old son William Brett Bowyer, asked for permission to call someone to stay with his son.  Carruth insisted that no one could be called, roused Brett Bowyer, and placed the two Bowyers in the rear of the vehicle.  (Doc. # 21-21 at 143–46.)

Inside the vehicle, Brooks was sitting in the driver's seat.  Carruth seated himself in the passenger's seat.  The vehicle then left the Bowyer residence and began travelling toward the sheriff's office.  When the vehicle passed the sheriff's office, Forrest Bowyer asked why they were not turning in.  Carruth and Brooks said that they had to meet somebody down the road and started talking on the phone.  (Doc. # 21-21 at 147.)

The vehicle eventually pulled into a construction site approximately a quarter mile off the highway, where Brooks parked the vehicle and blinked the headlights as if signaling to someone.  Carruth and Brooks exited the vehicle, handcuffed Brett Bowyer in the rear of the vehicle, and walked Forrest Bowyer

6

about one hundred to two hundred yards in front of the car.  Carruth and Brooks demanded that Forrest Bowyer give them a safe with one hundred thousand dollars inside, which they insisted was located at the Bowyer residence.  Though no safe existed, Forrest Bowyer agreed to give them money that was stored at the residence.  Carruth and Brooks took Forrest Bowyer back to the vehicle, and Carruth drove the four back to the Bowyer residence.  (Doc. # 21-21 at 149–53.)  On the drive, Forrest Bowyer told Carruth and Brooks that he would give them more money if they would let him and his son go.  Carruth agreed.  (Doc. # 21-21 at 156.)

Once at the Bowyer residence, Carruth and Brooks again removed Forrest Bowyer from the vehicle, leaving Brett Bowyer in the rear.  Carruth and Brooks put a knife to the throat of Forrest Bowyer, who led them to a box in his closet containing approximately forty-seven thousand dollars in cash.  (Doc. # 21-21 at 153–54.)  Carruth and Brooks also took a pistol from the closet.  Carruth and Brooks put Forrest Bowyer back into the vehicle, and the four travelled back to the construction site, where they parked at a different location.  (Doc. # 21-21 at 157–159.)

Carruth took Forrest Bowyer out of the vehicle once again and began walking him away from the front of the vehicle.  Without warning, Carruth turned to Forrest Bowyer and cut the side of his throat with a knife, saying "that's sharp,

isn't it?"  Carruth then pushed Forrest Bowyer down to his hands and knees, took the knife again, and cut Forrest Bowyer across his throat.  Carruth then sat on Forrest Bowyer's back and told him to "be quiet and go to sleep."  (Doc. # 21-21 at 160–61.)

Brooks then removed Brett Bowyer from the vehicle and brought him to where his father laid.  Carruth and Brooks interrogated Brett Bowyer regarding the whereabouts of the nonexistent safe.  When Brett Bowyer asked them not to hurt his father, Brooks said that Brett Bowyer "better start worrying about what's going to happen to you and not your daddy."  After some time, Brooks took Brett Bowyer away.  When Brooks returned, Carruth continued to hold Forrest Bowyer down while Brooks delivered a third cut to his throat.  (Doc. # 21-21 at 164–65.)

Carruth and Brooks then began digging a shallow grave with a shovel and bringing bags back and forth to the grave.  When they had finished, Carruth told Brooks:  "I've done one, now you do one."  Brooks then shot Brett Bowyer, who fell into the grave.  When Brett Bowyer made gurgling noises, Brooks commented that "the little m-f doesn't want to die" and shot him two more times.  (Doc. # 21-21 at 167–69.)

Carruth and Brooks then picked up Forrest Bowyer and threw him into the grave on top of his son.  Carruth and Brooks retrieved the handcuffs and debated shooting Forrest Bowyer.  Ultimately, Carruth stated that Forrest Bowyer would

not survive anyway and that another shot would only draw attention.  (Doc. # 21-21 at 170–71.)  Carruth and Brooks then covered the bodies with dirt.  (Doc. # 21-23 at 51.)  After collecting their equipment and talking for a few minutes, Carruth and Brooks left the scene.  (Doc. # 21-21 at 171.)

Forrest Bowyer waited until he was certain Carruth and Brooks had left.  Then he dug himself out of the grave, checked to see if his son was showing any signs of life, and walked to the highway holding his neck with both hands.  Forrest Bowyer flagged down a passing motorist for assistance and met with police in the early morning hours of February 18th.  (Doc. # 21-21 at 171–72.)

Carruth was stopped by police behind the wheel of the white Ford Crown Victoria mere hours later.  (Doc. # 21-22 at 54–55.)  On Carruth's person was twenty-two thousand nine hundred dollars in cash, a black patch with the word "agent" on it, and other items.  (Doc. # 21-22 at 76–77.)  Brooks was arrested later that day.  (Doc. # 21-22 at 99.)  Forrest Bowyer identified Carruth and Brooks as his attackers.

## B.    Pretrial and Trial Proceedings

On April 16, 2002, Carruth was indicted on four counts of capital murder by a grand jury in Russell County, Alabama:  murder during a kidnapping, murder during a robbery, murder during a burglary, and murder of a victim less than fourteen years of age.  (Doc. # 21-1 at 94.)  Each count asserted a different theory

as to why the killing of Brett Bowyer was a capital offense.  Carruth was also separately indicted that day with attempted murder, (Doc. # 21-5 at 42), robbery, (Doc. # 21-8 at 13), and burglary, (Doc. # 21-10 at 184).

Carruth was arraigned on May 29, 2002.  At arraignment, Robert Lane and Jeremy Armstrong were appointed to represent Carruth, and Carruth entered a plea of not guilty.  (Doc. # 21-1 at 49.)

The case was initially assigned to Judge George Green.  Carruth moved for Judge Green to recuse himself because Judge Green's signature appeared on the forged warrant Carruth had presented to Forrest Bowyer.  (Doc. # 21-1 at 131.)  When Judge Green denied the motion, the Alabama Court of Criminal Appeals issued a writ of mandamus ordering recusal.  (Doc. # 21-21 at 145.)  *Ex parte Brooks*, 847 So. 2d 396 (Ala. Crim. App. 2002).  The case was reassigned to Judge Albert Johnson.  Carruth then moved for Judge Johnson to recuse himself from the case due to prior interactions between Judge Johnson and Carruth when Carruth was carrying out his duties as a bail bondsman.  (Doc. # 21-1 at 147–52.)  This motion was denied, and the subsequent petition for writ of mandamus to the Court of Criminal Appeals was denied without opinion.  (Doc. # 21-11 at 51.)  Several other pretrial motions were filed, including a motion for change of venue due to pretrial publicity.  (Doc. # 21-1 at 51–54, Doc. # 21-3 at 86–90.)  The motion for change of venue was denied.

10

Voir dire began on September 29, 2003.  (Doc. # 21-16 at 77, 96.)   The guilt/innocence phase began on October 6, 2003.  (Doc. # 21-21 at 86.)   On October 9, 2003, Carruth was found guilty of all offenses.  (Doc. # 21-25 at 143–48.)

The penalty phase began the following day.  After an opening statement from the prosecution, the defense declined to make an opening statement, and then the prosecution declined to present any additional evidence.  The defense read a stipulation into the record that Carruth had no significant prior criminal history and that this should be considered as a mitigating factor.  The defense then rested.  (Doc. # 21-25 at 173–74.)   The prosecution waived the right to present first in closing arguments.  (Doc. # 21-25 at 174–75.)

The defense argued that Carruth should not be sentenced to death because he did not shoot Brett Bowyer and never possessed the murder weapon.  The defense also noted that Carruth did not have any family members present to testify on his behalf.  (Doc. # 21-25 at 176–78.)   After the prosecution's rebuttal, the court instructed the jury, giving instructions on four aggravating factors:  the murder was committed during a robbery, the murder was committed during a burglary, the murder was committed during a kidnapping, and the murder was especially heinous, atrocious, or cruel.  (Doc. # 21-25 at 189–91.)  After deliberation, the jury

unanimously recommended that Carruth be sentenced to death.  (Doc. # 21-26 at 4.)

On December 3, 2003, a sentencing hearing was held.  Other than a report on Carruth's medical status, neither side presented evidence at the sentencing hearing.  (Doc. # 21-26 at 10.)  The court found the existence of all four aggravating factors, sentenced Carruth to death for the capital crimes, and sentenced him to life for each of the remaining three convictions.  (Doc. # 21-26 at 13–30.)[2]  The court granted trial counsel's motion to withdraw and appointed Stephen Guthrie to represent Carruth on appeal.  (Doc. # 21-26 at 32.)

## C.   <u>Direct Appeal</u>

Carruth raised two issues in his brief on appeal:  whether the trial court wrongly denied the second motion for recusal and whether the trial court wrongly denied the motion for change of venue.  (Doc. # 21-26 at 60.)  On August 26, 2005, the Court of Criminal Appeals addressed and rejected both arguments, affirming the convictions for capital murder and the sentence of death.  However, the court reversed Carruth's convictions and sentences for robbery and burglary as violative of double jeopardy principles.  (Doc. # 21-26 at 273–85.)  *Carruth v. State*, 927 So. 2d 866 (Ala. Crim. App. 2005).

---

[2] Brooks was later sentenced to death as well.  *See Brooks v. State*, 973 So. 2d 380 (Ala. Crim. App. 2007).

Carruth filed an application for rehearing on September 16, 2005.  (Doc. # 21-26 at 218.)  The application was denied on October 14, 2005.  (Doc. # 21-26 at 269.)  Carruth did not file a timely petition for writ of certiorari in the Alabama Supreme Court.  (Doc. # 21-28 at 148.)

### D.   Collateral Challenges

On October 25, 2006, Carruth filed a petition in the trial court seeking relief from his capital convictions and death sentence under Rule 32 of the Alabama Rules of Criminal Procedure—the method for collaterally challenging convictions and sentences in Alabama state court.  (Doc. # 21-27 at 8–91.)  Carruth also filed a motion for appointment of counsel.  (Doc. # 21-27 at 92–94.)  On October 30, 2006, Glenn Davidson was appointed to represent Carruth.  (Doc. # 21-27 at 95.)  On July 2, 2007, Carruth filed an amendment to the petition.  (Doc. # 21-27 at 154.)

#### 1.   *Leave to File a Petition for Writ of Certiorari Out of Time*

The first relief requested in Carruth's Rule 32 petition was leave to file an out of time petition for writ of certiorari in the Alabama Supreme Court.  On August 2, 2007, the trial court granted this relief and reserved the remaining issues in the Rule 32 petition for resolution after the conclusion of the direct appeal.  (Doc. # 21-27 at 166.)  The state appealed this order, (Doc. # 21-28 at 2), and the

trial court stayed proceedings pending resolution of the appeal.  (Doc. # 21-31 at 63.)

On October 18, 2007—while the Rule 32 appeal was pending—Carruth filed a motion in the Alabama Supreme Court for an extension of time under Rule 2(b) of the Alabama Rules of Appellate Procedure.  (Doc. # 21-28 at 63.)  This motion was denied on February 28, 2008.  (Doc. # 45-1.)

On May 30, 2008, the Alabama Court of Criminal Appeals reversed the trial court's grant of Rule 32 relief.  Rehearing was denied on August 15, 2008.  (Doc. # 21-28 at 129.)  *State v. Carruth*, 21 So. 3d 764 (Ala. Crim. App. 2008).  Carruth filed a petition for writ of certiorari in the Alabama Supreme Court on August 29, 2008.  (Doc. # 21-28 at 136.)  The Alabama Supreme Court initially granted review, (Doc. # 21-31 at 56), but ultimately declined to issue the writ.  (Doc. # 21-30 at 33.)  *Ex parte Carruth*, 21 So. 3d 770 (Ala. 2009).[3]  Carruth next filed a petition for writ of certiorari in the United States Supreme Court.  (Doc. # 21-30 at 11.)  Carruth's petition was denied on November 30, 2009.  (Doc. # 21-30 at 137.)  *Carruth v. Alabama*, 558 U.S. 1052 (2009).

---

[3] The Alabama Supreme Court originally affirmed the Court of Criminal Appeals but withdrew that opinion and quashed the writ instead.  (Doc. # 21-30 at 37.)

14

### 2.     *The Remaining Portions of the Rule 32 Petition*

On May 27, 2011, Carruth moved to lift the stay in the trial court.  (Doc. # 21-31 at 67.)  On August 3, 2011, the stay was lifted.  (Doc. # 21-31 at 76.)  The trial court heard oral argument and then, on February 21, 2012, dismissed nearly all of Carruth's Rule 32 petition.  (Doc. # 21-31 at 186.)  On September 17, 2012, the trial court conducted an evidentiary hearing on the remaining claims.  (Doc. # 21-33.)  The trial court denied the remaining claims on December 26, 2012.  (Doc. # 21-32 at 152.)  The Court of Criminal Appeals affirmed on March 14, 2014, and denied rehearing on April 25, 2014.  (Doc. # 21-36 at 78, 111.)  *Carruth v. State*, 165 So. 3d 627 (Ala. Crim. App. 2014).  On October 17, 2014, the Alabama Supreme Court denied Carruth's petition for writ of certiorari.  (Doc. # 21-36 at 233.)

### 3.     *The Present Petition for Writ of Habeas Corpus*

Carruth filed the present petition for writ of habeas corpus in this court on October 23, 2014.  (Doc. # 1.)  Carruth has since filed an amended petition, which is now the operative pleading.  (Doc. # 34.)  The Commissioner of the Alabama Department of Corrections has responded to the amended petition.  (Doc. # 42.)

## II.  JURISDICTION AND VENUE

Jurisdiction and venue over Carruth's petition for writ of habeas corpus are proper under 28 U.S.C. § 2241(d) because Carruth was convicted and sentenced in

state court in Russell County, Alabama, which is within the Middle District of Alabama.

### III.  STANDARD OF REVIEW

A federal court may issue a writ of habeas corpus for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).  "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

In reviewing state proceedings, the federal court applies different standards of review depending on whether the petitioner properly presented his claim to the state courts and whether the state courts addressed the claim.

### A.  <u>Unexhausted Claims</u>

A petitioner in state custody must exhaust the remedies available to him in the state courts before he can bring his claim in a federal habeas corpus action.  28 U.S.C. § 2254(b)(1).  A remedy is "available" if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* § 2254(c).  This exhaustion requirement generally permits federal courts to consider only those claims that the petitioner has marshalled through "one complete round of the State's established appellate review process."  *O'Sullivan v.*

16

*Boerckel*, 526 U.S. 838, 845 (1999).   This includes filing a petition for discretionary review in the highest court of the state.  *Id.*

So long as a state process exists, follows "firmly established and regularly followed" rules, *Ford v. Georgia*, 498 U.S. 411, 424 (1991), and is not "ineffective to protect the rights" of the petitioner, 28 U.S.C. § 2254(b)(1)(B)(ii), the petitioner must navigate the state appellate process according to its own rules.  "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."  *Coleman v. Thompson*, 501 U.S. 722, 732, (1991).  A habeas petitioner who fails to properly present a claim to the state court and who therefore loses the right to raise the claim within state procedures is said to have "procedurally defaulted" the claim, and is no longer able to raise it in either state or federal court. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).

This rule of procedural default is not absolute.  To overcome the bar, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.  Under the first branch of this test, attorney negligence is generally not good cause to excuse procedural default.  *Id.* at 753.  The performance of an attorney will only be relevant if the procedural default can be attributed to the

deficient performance of constitutionally required counsel, *see Coleman*, 501 U.S. at 756, or "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding" but the prisoner did not have effective counsel in his first collateral proceeding. *See Martinez*, 566 U.S. at 14; *see also Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

Under the second branch, a "fundamental miscarriage of justice" occurs only when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To meet this standard, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.*

If exhaustion principles bar relief on a claim, an underlying lack of merit can be discussed as an additional reason for denying the writ: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005); *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (per curiam). "Judicial economy might counsel giving the [merits] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).

**B.** <u>**Exhausted Claims**</u>

When a state prisoner petitions a federal court for a writ of habeas corpus on grounds that were considered and rejected by the state courts, review is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA establishes a "highly deferential standard for evaluating state-court rulings, [and] demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under the AEDPA standard of review, a petitioner is not entitled to habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

19

Under the "contrary to" clause, a federal court may grant relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish that the state court's decision is "contrary to" clearly established Supreme Court precedent—"a state court need not even be aware of [the relevant] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making this inquiry should ask whether the state court's application of clearly established Supreme Court precedent was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010); *Wiggins*, 539

20

U.S. at 520–21.   An "unreasonable" application is different from a merely "incorrect" one.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003).

The Supreme Court has summarized these two clauses in simple terms:  "[A] state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  A legal principle is "clearly established" for AEDPA purposes if it was found in the holdings—as opposed to the dicta—of a Supreme Court decision that existed at the time of the relevant state-court decision.  *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (holding that the AEDPA "prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established."").

The AEDPA also significantly restricts the scope of federal habeas review of state court findings of fact.  A federal court cannot contradict state court findings merely because it "would have reached a different conclusion in the first instance." *Williams*, 529 U.S. at 410.  Rather, the state court must have reached an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" in order for a federal court to grant habeas relief on that basis.  28 U.S.C. § 2254(d)(2).  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), that is not sufficient grounds for a federal habeas court to supersede the trial court's findings.  *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341–42 (2006).  The state court's findings are "presumed to be correct," and the petitioner has the burden of rebutting these findings "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).[4]

Deference alone, of course, does not end the inquiry.  *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("The standard is demanding but not insatiable.").

---

[4] The precise interplay between Sections 2254(d)(2) and (e)(1) is still subject to some debate.  *See Collins*, 546 U.S. at 339.

22

For any claims or issues properly presented to the state courts but left unaddressed, this court conducts a *de novo* review. *Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). If a procedural default is excused or ignored, *de novo* review similarly applies. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). If reviewed *de novo*, a fact pleading standard is applied. 28 U.S.C. § 2242 requires a petition for writ of habeas corpus to "allege the facts concerning the applicant's commitment or detention." Rule 2(c)(2) of the Rules Governing Section 2254 Cases similarly requires a petitioner to "state the facts supporting each ground" in his petition. *See also Romanello v. Wainwright*, 363 F.2d 28, 28 (5th Cir. 1966)[5] (per curiam) (affirming dismissal where "no facts were alleged" that could merit a hearing on the claim); Wright & Miller, Fed. Prac. & Proc.: Juris. 3d § 4268.3 (saying that "fact pleading" is required for habeas corpus petitions, even though "a far less exacting pleading requirement is made for ordinary civil actions"); *see also Mayle v. Felix*, 545 U.S. 644, 646 (2005) (acknowledging this particularity requirement).

## IV. DISCUSSION

Carruth raises more than seventy constitutional claims in his one-hundred-twenty-six-page petition, from errors in the indictment to cruel and unusual

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981.

punishments.  Some claims were exhausted in the state courts, but most have not been.  The claims can be generally grouped into thirty-four categories, each of which is discussed below.

## A.   <u>Alleged Ineffective Assistance of Trial Counsel</u>

Petitioner alleges that his trial counsel were ineffective in many ways.  Some of his claims of ineffective assistance are tied to broader topics discussed in other sections of this memorandum opinion.  However, he has raised several claims of ineffective assistance of counsel that stand alone.  Specifically, the claims discussed in this section are Carruth's claims that his trial counsel lacked the requisite experience, (Doc. # 34 at 43, ¶ 104), failed to ensure that a complete record was made, (Doc. # 34 at 45–46, ¶ 111), failed to exploit a changing account of the crime, (Doc. # 34 at 49, ¶ 121), failed to adequately cross-examine several witnesses, (Doc. # 34 at 50–51, ¶ 125), conceded felony murder, (Doc. # 34 at 51–52, ¶ 127), failed to investigate and present evidence in both the guilt/innocence and penalty phases, (Doc. # 34 at 46–49, 52–53, 56–59, ¶¶ 112–119, 128, 130, 133–43), waived opening statement in the penalty phase, (Doc. # 34 at 59, ¶ 144), failed to raise additional mitigating circumstances, (Doc. # 34 at 53–54, ¶¶ 131–32), and delivered an ineffective closing argument in the penalty phase, (Doc. # 34 at 60, ¶ 145).

A claim of ineffective assistance of counsel arises under the Sixth Amendment to the United States Constitution and is governed by the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* laid out a two-part test for assessing such claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

In assessing the performance of counsel, the court is deferential to the real-time decisions of the attorney. *Id.* at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (quotation marks omitted)); *Cullen*, 563 U.S. at 189. "An incomplete or ambiguous record concerning counsel's performance . . . is insufficient to

25

overcome the presumption of reasonable performance."  *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1265 (11th Cir. 2022).

In assessing the prejudicial effect of an error, the standard is also high.  *See Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002).  A petitioner must show more than "some conceivable adverse effect on the defense from counsel's errors."  *Strickland*, 466 U.S. at 682.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  "[W]hen a petitioner challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695 (quotation marks omitted) (alteration adopted)).

Under limited circumstances, a showing of prejudice will be unnecessary.  If a criminal defendant is completely denied counsel or if his counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."  *United States v. Cronic*, 466 U.S. 648, 659 (1984).  So

too if the prosecution interferes with the assistance of counsel, *Strickland*, 466 U.S. at 692; *Cronic*, 466 U.S. at 659 & n.25, or if counsel had a conflict of interest at the time of the representation. *Id.*; *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980). In these extreme circumstances, prejudice is presumed. *Id.*

*Strickland*'s deference to counsel, of course, must be looked at through the overall deference to the analysis done by the state court: "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

## 1.   *Lack of Experience of the Trial Counsel*

Carruth alleges that his appointed counsel lacked the experience necessary to try a death penalty case. He asserts that Armstrong had only been practicing law for four years when he was appointed to represent Carruth, "though Alabama law requires five years' experience." He asserts that Lane's experience was in probate and civil law, rather than criminal law. Carruth alleges that his defense was prejudiced by this inexperience because "both Armstrong and Lane failed to develop and present evidence of statutory and non-statutory mitigating circumstances to the jury during the penalty phase of Carruth's trial." (Doc. # 34 at 43, ¶ 104.)

This claim was raised in Carruth's first amendment to his Rule 32 petition. Carruth's petition cited only an Alabama statute generally requiring five years' experience in criminal law for capital cases. Carruth argued that his counsel's lack of experience "resulted in Mr. Carruth being denied the effective assistance of counsel." (Doc. # 21-27 at 155–57.) The trial court dismissed this claim, holding that it did not contain a clear and specific statement of the grounds upon which relief is sought. (Doc. # 21-31 at 188–89.) Carruth amended the claim to further expound the ways in which he believed more experienced counsel would have acted differently. (Doc. # 21-32 at 43–48.)

In the hearing on the Rule 32 petition, Armstrong testified that he had been practicing law for more than four years prior to his appointment, with substantial experience in criminal law, including experience in the capital litigation division of the Alabama Attorney General's Office. (Doc. # 21-33 at 48–49.) By the time of Carruth's trial, Armstrong had passed the five-year mark. (Doc. # 21-33 at 58–59.) Lane had been practicing law for far longer than Armstrong. (Doc. # 21-33 at 87.)

After the hearing, the trial court denied the claim, saying: "Both the record and this court's knowledge of the petitioner's trial attorneys refute this [claim]." (Doc. # 21-32 at 152.) Neither Carruth's brief to the Court of Criminal Appeals nor his petition for writ of certiorari discussed this issue.

28

There are glaringly obvious problems with this claim. First, Carruth did not pursue the claim in his Rule 32 appeal. The claim is therefore procedurally defaulted.[6] And since Carruth has not presented any grounds to excuse the default, the claim is barred by 28 U.S.C. § 2254(b)(1).

Second, Carruth identifies no federal constitutional basis for this claim. The only source of law cited by Carruth in support of this claim is an Alabama statute. Federal law placed no restriction on the minimum experience or preparation that a lawyer must have before trying a criminal case. In fact, federal law "presume[s] that the lawyer is competent" unless his conduct shows otherwise. *Cronic*, 466 U.S. at 658. Even just one day of preparation can be enough. *See United States v. Mills*, 760 F.2d 1116, 1122 n.8 (11th Cir. 1985).

Carruth's complaints with his attorneys' *conduct* are discussed below. His complaint regarding their *qualifications*, however, is not sufficiently grounded in federal constitutional law to justify relief.

Third, even if federal law did require a baseline level of experience before an attorney could try a capital case, the trial judge found that Armstrong and Lane had the requisite experience. (Doc. # 21-32 at 152.) This finding was not an

---

[6] "[I]f the petitioner simply never raised a claim in state court, and it is obvious that the unexhausted claim would now be procedurally barred due to a state-law procedural default, the federal court may foreclose the petitioner's filing in state court; the exhaustion requirement and procedural default principles combine to mandate dismissal." *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999) (citing *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

"unreasonable determination of the facts in light of the evidence presented in the State court proceeding" and therefore cannot be disturbed.  28 U.S.C. § 2254(d)(2).

This claim is due to be dismissed.

### 2. *Failure to Ensure the Transcription of Off-the-Record Discussions*

Carruth alleges that his trial counsel were ineffective because they "failed to ensure a complete appellate record by ensuring that a transcription of all proceedings in this case were accurately transcribed."  Specifically, Carruth notes that "[a]t numerous points during both phases of the trial, discussions were held off the record."  (Doc. # 34 at 45–46, ¶ 111.)

This claim was raised in Carruth's original Rule 32 petition.  (Doc. # 21-27 at 27–28, ¶ 40.)  The trial court dismissed this claim, holding that it did not contain a clear and specific statement of the grounds upon which relief is sought.  (Doc. # 21-31 at 188–89.)  Although the trial court granted leave to amend, Carruth's ensuing amendments did not mention this claim.  (Doc. # 21-31 at 195–Doc. # 21-32 at 10, 43–76.)  Carruth did not elicit any evidence supporting this claim at the evidentiary hearing.  (Doc. #21-33 at 10–143.)  Neither Carruth's brief to the Court of Criminal Appeals nor his petition for writ of certiorari raised this issue.

Since Carruth did not pursue the claim in his Rule 32 appeal, the claim is procedurally defaulted.  And because Carruth has not presented any grounds to excuse the default, the claim is barred by 28 U.S.C. § 2254(b)(1).

Even looking past the procedural default, this claim has questionable merit. Although there is a broad importance in ensuring a complete record, *see Dobbs v. Zant*, 506 U.S. 357, 359 (1993); *Gardner v. Florida*, 430 U.S. 349, 361 (1977) (plurality opinion), the United States Constitution certainly does not erect a complete bar to off-the-record discussions. Petitioner cites seven off-the-record discussions in his brief. (Doc. # 21-16 at 122, 124, 127; Doc. # 21-19 at 21, 30, 31; Doc. # 21-20 at 70.) Each of these seven discussions occurred during jury selection. Some discussions were prompted by defense counsel, some by the prosecutor, and some by the court. The context surrounding these discussions gives the distinct impression that the conversation involved nothing more than deliberating on the best way to proceed with jury selection. *See Collier v. Turpin*, 177 F.3d 1184, 1194 (11th Cir. 1999) ("[W]e look to the transcript . . . of the trial for evidence that might shed light on what [was] actually said . . . off the record."). This conclusion is buttressed by the statements made by the court at oral argument on the Rule 32 petition:

> If there was anything . . . that would have affected or impacted this trial, it would be on the record. Now, I don't know if it was, "can we approach the bench, I've got to take a leak," or that kind of stuff, and that is probably more than likely the type of conversation that would have transpired.

(Doc. # 21-34 at 46.)

31

With a dearth of information on what transpired during these discussions, Carruth's petition for writ of habeas corpus fails to identify any error made by trial counsel and fails to identify any way in which Carruth was prejudiced by the lack of record. *See Strickland*, 466 U.S. at 694. Carruth therefore fails to adequately plead a claim, and this claim is due to be dismissed.

### 3.    *Failure to Exploit a Changing Account of the Crime*

Carruth next alleges that his trial counsel were ineffective because they failed to take advantage of what Carruth contends was inconsistency in Forrest Bowyer's testimony. Specifically, Carruth contends that:

> The State relied on Forrest Bowyer's testimony to argue that even though Carruth did not shoot [Brett Bowyer], he was the mastermind of the offense and ordered Jimmy Brooks to shoot [Brett Bowyer]. Forrest Bowyer's initial statements, however, did not consistently identify Carruth as the mastermind of the event. Nonetheless, trial counsel failed to effectively exploit the fact that his account of the crime had changed.

(Doc. # 34 at 49, ¶ 121.)

This claim was raised in Carruth's original Rule 32 petition. (Doc. # 21-27 at 32–33, ¶ 51.) The trial court dismissed this claim, holding that it did not contain a clear and specific statement of the grounds upon which relief is sought. (Doc. # 21-31 at 188.) Carruth did not elicit any evidence supporting this claim at the evidentiary hearing. (Doc. #21-33 at 10–143.) Neither Carruth's brief to the Court of Criminal Appeals nor his petition for writ of certiorari raised this issue.

32

Since Carruth did not pursue the claim in his Rule 32 appeal, the claim is procedurally defaulted. And because Carruth has not presented any grounds to excuse the default, the claim is barred by 28 U.S.C. § 2254(b)(1).

Forrest Bowyer's trial testimony did not identify either Carruth or Brooks as the "mastermind" of the robbery or of Brett Bowyer's murder. The only comment Forrest Bowyer made regarding the planning phase of the murder was that Brooks knew money was stored in the Bowyer home. (Doc. # 21-21 at 108, 148.) The prosecutor later argued that Carruth was the mastermind of the crime. However, the prosecutor based this argument on Carruth's conduct before the robbery, not on Forrest Bowyer's testimony. (Doc. # 21-24 at 200–01.)

Forrest Bowyer did testify that Carruth had told Brooks, "I've done one, now you do one." (Doc. # 21-21 at 168.) However, Carruth fails to identify any "initial statement" that contradicted or was inconsistent with this account. In fact, Carruth fails to provide any citation to the record to support this claim. From the court's review of the record, there appears to be no first-person affidavit or pretrial testimony of Forrest Bowyer in the record. Police accounts of Forrest Bowyer's retelling of the crime omit all statements from Carruth or Brooks, (Doc. # 21-1 at 72), but at least some pretrial media reports include the "I've done one, now you do one" statement. (Doc. # 21-3 at 118.)

Carruth has failed to set forth any facts to support this claim. He has failed to show how Forrest Bowyer's testimony changed, and he has failed to show how further cross-examination would have resulted in a not guilty verdict. This claim is due to be dismissed.

### 4.   *Failure to Adequately Cross-Examine Several Witnesses*

Carruth asserts that his trial counsel were ineffective because they failed to conduct any cross examination of "several law enforcement witnesses, including Deputy Darrell Powell, Lieutenant Mike Taylor, and John Case," and because they "conducted only a cursory cross-examination of Laverne Sutton, Lisa Blanton, Eric Matthews, Tina Riley, Jodi Sellers, Heath Taylor, and Phyllis Rollan." (Doc. # 34 at 50–51, ¶ 125.)

This claim was raised in Carruth's original Rule 32 petition. (Doc. # 21-27 at 34, ¶ 55.) The trial court dismissed the claim, holding that it did not contain a clear and specific statement of the grounds upon which relief is sought. (Doc. # 21-31 at 188.) Carruth did not elicit any evidence supporting this claim at the evidentiary hearing. (Doc. #21-33 at 10–143.) Neither Carruth's brief to the Court of Criminal Appeals nor his petition for writ of certiorari raised this issue.

Since Carruth did not pursue the claim in his Rule 32 appeal, the claim is procedurally defaulted. And because Carruth has not presented any grounds to excuse the default, the claim is barred by 28 U.S.C. § 2254(b)(1).

The decision to cross-examine or not cross-examine a witness is a tactical decision "well within the discretion of a defense attorney." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). To meet *Strickland*'s burden, a habeas petitioner complaining of his trial counsel's lack of cross-examination must show "a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial." *Id.* (quoting *Messer*, 760 F.2d at 1090).

Carruth does not identify any material that his trial counsel could have used for cross-examining the law enforcement witnesses or the other witnesses mentioned in this claim. Carruth's bare assertion that the lack of cross-examination constituted ineffective assistance is not sufficient.

This claim is due to be dismissed.

### 5.   *Conceding Felony Murder*

Carruth's trial counsel began his closing argument in the guilt/innocence phase by saying, "This was a plan between Mike Carruth and Jimmy Lee Brooks to burglarize, rob and kidnap Butch Bowyer." (Doc. # 21-25 at 64.) He argued, however, that Brooks had planned the event, (Doc. # 21-25 at 64), and that Brooks had shot Brett Bowyer without any forewarning to Carruth. (Doc. # 21-25 at 65–66.) After presenting his theory of the evidence, Carruth's trial counsel conceded that Carruth was guilty of assault, robbery, burglary, and felony murder, but he

maintained that the lack of intent to kill Brett Bowyer should lead to a verdict of not guilty on the capital murder charges. (Doc. # 21-25 at 78–83.)

An attorney may decide as a trial tactic to concede guilt on some or all charges and instead focus on something else, such as presenting evidence of mitigating circumstances. *See Florida v. Nixon*, 543 U.S. 175, 189 (2004); *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1251 (11th Cir. 2011). Doing so does not constitute ineffective assistance of counsel. *Nixon*, 543 U.S. at 189; *Harvey*, 629 F.3d at 1251.

What Carruth claims in his petition, however, is that his trial counsel conceded guilt to felony murder without consulting Carruth or obtaining his consent. (Doc. # 34 at 51–52, ¶ 127.) A failure to consult, of course, would violate the attorney's "duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Nixon*, 543 U.S. at 187. An attorney need not obtain "affirmative, explicit acceptance" of the strategy, but a lawyer should at least discuss the matter and obtain a tacit acceptance. *Id.* at 188.

Carruth raised this claim in his original Rule 32 petition. (Doc. # 21-27 at 35–36, ¶ 57.) The trial court ordered a hearing on the claim. (Doc. # 21-31 at 189.) At the hearing, Carruth's trial counsel testified that he had, in fact, discussed the strategy with Carruth. Carruth's trial counsel recounted many hours of

36

discussion with Carruth regarding the evidence and trial strategy. (Doc. # 21-33 at 79.) In their discussions, Carruth's trial counsel reviewed the "insurmountable" evidence that Carruth was involved in the crime. (Doc. # 21-33 at 82.) Carruth's trial counsel explained his trial strategy as follows: "[I]f I could get him into a felony murder situation with no priors, I've got him in a life situation, the option of parole. I was trying to get him out of the death penalty. That's the only option we had, and I discussed that thoroughly with [Carruth]." (Doc. # 21-33 at 84–85.) Carruth's trial counsel continued to discuss this strategy with Carruth over multiple meetings prior to trial. (Doc. # 21-33 at 85.) Carruth never voiced any objection to the strategy. (Doc. # 21-33 at 93–94.)

The trial court denied Carruth's claim that his counsel failed to discuss trial strategy with him, saying that "[t]his was refuted by trial counsel during the evidentiary hearing." (Doc. # 21-32 at 152.) Neither Carruth's brief to the Court of Criminal Appeals nor his petition for writ of certiorari raised this issue.

Since Carruth did not pursue this claim in his Rule 32 appeal, the claim is procedurally defaulted. And because Carruth has not presented any grounds to excuse the default, the claim is barred by 28 U.S.C. § 2254(b)(1).

Even were it not barred, the claim is meritless. The trial court's determination that Carruth's counsel did, in fact, discuss the strategy with Carruth is "presumed to be correct," and Carruth has the burden of rebutting the

37

presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Other than Carruth's bare assertion that his counsel "failed to consult with [him] or obtain his consent to the strategy," Carruth has not presented any facts or made any citation to the record demonstrating that the trial court's decision was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In fact, there was no evidence presented in the state court proceeding tending to support this claim.

This claim is due to be dismissed.

### 6.   *Failure to Investigate and Failure to Present Evidence During the Guilt/Innocence Phase*

Carruth brings several claims regarding his trial counsel's lack of investigation and corollary failure to present evidence.  The claims related to the guilt/innocence phase are discussed in this section.

Carruth alleges that his trial counsel "failed to make an independent investigation of the State's case."  (Doc. # 34 at 46, ¶ 112.)  He alleges that his trial counsel "failed to adequately interview Carruth's family members, friends, and acquaintances . . . despite the fact that these witnesses possessed information that would have been helpful to his defense."  Carruth alleges that these sources possessed "evidence based on which a jury would find that co-defendant Jimmy Brooks was the mastermind of the crime and that Carruth did not intentionally kill [Brett Bowyer]."  (Doc. # 34 at 46, ¶ 113.)

Carruth alleges that his trial counsel "did not meet or attempt to interview the State's witnesses," and lists a non-exclusive list of eighteen witnesses that he says his trial counsel ought to have interviewed.   (Doc. # 34 at 46–47, ¶ 114.) Carruth does not indicate what evidence interviewing these witnesses might have revealed, though he asserts that the jury would have found "that Jimmy Brooks was the mastermind of the crime and that Carruth did not intentionally kill Brett Bowyer." (Doc. # 34 at 47, ¶ 115.)

Carruth asserts that his trial counsel were ineffective for "failing to procure the necessary expert assistance to effectively challenge the State's case." (Doc. # 34 at 47–48, ¶ 116.)   Carruth claims that "an investigator or social worker . . . would have helped counsel challenge the State's evidence and establish that Jimmy Brooks was the mastermind of the offense and that Carruth did not intentionally kill [Brett Bowyer]." (Doc. # 34 at 48, ¶ 117.)   He also claims that "an expert on eyewitness identification would have assisted trial counsel in establishing that Forrest Bowyer's testimony was unreliable."   He asserts that the eyewitness testimony was unreliable because of "the trauma the witness was experiencing." (Doc. # 34 at 48–49, ¶ 118.)   Carruth also argues that his trial counsel should have hired "an expert to review, test, and evaluate the scientific reliability of the State's forensic evidence against Carruth." (Doc. # 34 at 49, ¶ 119.)

While those claims do not identify any specific evidence of innocence that further investigation would have revealed, Carruth does identify one witness who could have testified with specific information:  Carruth asserts that his ex-wife Catherine O'Neal owned Carruth's bail bond business and "had information about Jimmy Brooks' access to the computer, handcuffs, and other equipment from the business used in the crime."  (Doc. # 34 at 46–47, ¶ 114.)  Carruth asserts that an investigation of O'Neal and his bonding business "would have provided leads to other individuals with information about Jimmy Brooks' involvement in drug trafficking."  (Doc. # 34 at 46–47, ¶ 114.)  Carruth later asserts that O'Neal "could have testified to Forrest Bowyer's involvement in drug trafficking, Jimmy Brooks' financial problems, and the fact that Carruth's 'jumpbag' containing many of his tools for apprehending individuals who jump bond, including badges, handcuffs, and puncture resistant gloves, had gone missing shortly before the crime and had to be replaced."  (Doc. # 34 at 52, ¶ 128.)

These claims were presented in Carruth's original Rule 32 petition.  (Doc. # 21-27 at 28–32, 36, ¶¶ 41–48, 58.)[7]  Except for the claim regarding the potential

---

[7] A similar claim was also made in Carruth's first amendment to his petition.  (Doc. # 21-27 at 155–57.)

testimony of O'Neal,[8] the trial court dismissed each of these claims as failing to contain a clear and specific statement of the grounds upon which relief is sought. (Doc. # 21-31 at 188.)[9]

At the evidentiary hearing, Carruth's trial counsel testified that he had had phone contact with O'Neal on multiple occasions before Carruth's trial, but that O'Neal had fled the state to avoid civil liability relating to the collapse of the jointly owned bonding business.  O'Neal refused to disclose her out-of-state location and told Carruth's trial counsel that she would not return to the state to testify.  (Doc. # 21-33 at 95–97.)

The trial court denied the O'Neal claim without comment.  (Doc. # 21-32 at 153.)  Carruth's brief to the Court of Criminal Appeals did not raise any of these claims.  (Doc. # 21-35 at 2–76.)  Since Carruth did not pursue these claims in his Rule 32 appeal, the claims are procedurally defaulted.  And because Carruth has not presented any grounds to excuse the default, the claims are barred by 28 U.S.C. § 2254(b)(1).

---

[8] While the trial court did proceed to an evidentiary hearing on the claim regarding O'Neal's testimony, the court dismissed the portion of the claim offering testimony on Forrest Bowyer's alleged involvement in drug trafficking.  (Doc. # 21-31 at 188–89.)

[9] The trial court granted leave to amend the claims relating to the investigation of family, friends, and acquaintances and questioning the prosecution witnesses.  (Doc. # 21-31 at 188–89.) However, Carruth's ensuing amendments did not reassert these claims.  (Doc. # 21-31 at 195– Doc. # 21-32 at 10, 43–76.)

41

An attorney's failure to investigate can be an error under the *Strickland* analysis. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). However, a petitioner still has the burden of proving that the error was prejudicial. *Id.* at 691–92. With the exception of O'Neal's testimony, Carruth has not identified any particular evidence of innocence that would have come to light after further investigation. Carruth has therefore failed to allege facts that would support a finding of prejudice. Since the prosecution's case was almost entirely based on the testimony of Forrest Bowyer, Carruth's trial counsel subjected the case to "meaningful adversarial testing" through cross-examining Forrest Bowyer and developing an independent explanation of what Forrest Bowyer saw and heard. Thus, this is not a situation where prejudice can be presumed. *See Cronic*, 466 U.S. at 659.

As for the eyewitness identification expert, the strategic choice of conceding that Carruth was present at the time of the event diminished the usefulness of any expert testimony challenging Forrest Bowyer's identification of Carruth. Witness strategy is well within the discretion of the trial counsel, *Waters v. Thomas*, 46

42

F.3d 1506, 1512 (11th Cir. 1995), and expert testimony on the subject of eyewitness identifications has limited value in the first place. *See Johnson v. Wainwright*, 806 F.2d 1479, 1485–86 (11th Cir. 1986). Cross-examination can serve to meet the same ends. *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1985). Amid the cross-examination of Forrest Bowyer were repeated tests of his memory, (Doc. # 21-21 at 184–Doc. # 21-22 at 35), questions regarding the lighting at the scene, (Doc. # 21-22 at 24–25), and questions regarding his ability to view Carruth at the time of the killing of Brett Bowyer, (Doc. # 21-22 at 33). Carruth has not identified with reasonable particularity any further value that an expert could have provided.

With regard to the potential O'Neal testimony, Carruth's trial counsel had investigated and talked with O'Neal, but O'Neal was uncooperative and unavailable. "Counsel cannot be said to be ineffective for failing to call an unavailable witness." *Williamson v. Moore*, 221 F.3d 1177, 1181 (11th Cir. 2000).

Carruth has not shown prejudice stemming from his trial counsel's lack of investigation, and he has not shown deficient performance in his trial counsel's failure to obtain testimony from O'Neal.

These claims are due to be dismissed.

### 7. *Failure to Investigate and Failure to Present Evidence During the Penalty Phase*

Carruth similarly alleges that his trial counsel were deficient in his investigation and presentation of evidence during the penalty phase of his trial. Carruth asserts that several witnesses could have provided testimony in mitigation, that Carruth's institutional and medical records would have provided mitigating evidence, and that expert testimony on mitigating circumstances would have prevented a sentence of death. (Doc. # 34 at 53–59, ¶¶ 130, 133–43.)

Carruth raised these claims in his original Rule 32 petition. (Doc. # 21-27 at 37–42, ¶¶ 60–70.) The trial court dismissed each claim as failing to contain a clear and specific statement of the grounds upon which relief is sought, but the court did grant leave to amend the allegations. (Doc. # 21-31 at 188.) Carruth's third amendment to his petition added more details regarding the proposed evidence.

Specifically, the amendment identified as possible witnesses Carruth's parents, daughter, and older brother; a former employer of Carruth's; a former co-worker of Carruth's; and five individuals who knew Carruth during or near his time in high school. (Doc. # 21-32 at 48–75.) Their testimony broadly included the following information: Carruth had medical issues as an infant. His treatments included surgery to close the frontal lobe of his brain. (Doc. # 21-32 at 51–52.) Carruth recovered from these issues and possessed exceptionally high mental abilities as a child. (Doc. #21-32 at 52.) Carruth was well-mannered as a youth

44

and graduated at the top of his class in high school.  (Doc. # 21-32 at 53, 56, 63, 66–70.)  Carruth married and had two children but went through an emotional divorce that affected him for some time afterward.  (Doc. # 21-32 at 53, 58.)  Carruth was a skilled and dedicated businessman—sometimes dedicated to a fault.  (Doc. # 21-32 at 58, 62, 64–65.)  On more than one occasion, Carruth provided emotional or financial assistance to family members in their times of need.  (Doc. # 21-32 at 55, 60.)

The amendment also specified that Carruth's jail records would have established that Carruth could adjust to life in jail, (Doc. # 21-32 at 71–72); Carruth's medical records would have shown that he was being treated for anxiety and depression, (Doc. # 21-32 at 72–74); and Carruth's school records would have shown that he was an excellent student with outstanding achievements, (Doc. # 21-32 at 74–75).

At the evidentiary hearing, Carruth's trial counsel explained his prior experience preparing two capital murder defenses, which included assembling mitigation evidence.  (Doc. # 21-33 at 50–55.)  In preparation for Carruth's trial, Carruth's trial counsel did investigate mitigating evidence.  (Doc. # 21-33 at 104.)  Funds were obtained for a psychologist and a general investigator, (Doc. # 21-33 at 60), and that the possibility of retaining a mitigation expert was considered.  (Doc.

# 21-33 at 102.)  Carruth's trial counsel interviewed Carruth, Carruth's mother, Carruth's son, and Carruth's ex-wife.  (Doc. # 21-33 at 59–60, 62–63.)

According to Carruth's trial counsel, two events ultimately led to the lack of mitigation evidence during the penalty phase of Carruth's trial.  First, Carruth's conversations and feedback with his trial counsel placed a limited scope on the investigation of mitigating circumstances.  Carruth told his trial counsel that the investigation would be fruitless, and Carruth requested that his counsel not talk to his daughter.  (Doc. # 21-33 at 65, 71.)  Carruth's input to his trial counsel was clear:  "I don't want my family involved, I had a great childhood, there's nothing there."  (Doc. # 21-33 at 99.)  Carruth reported that he had no history of mental health issues, (Doc. # 21-33 at 100), and his trial counsel accordingly did not attempt to obtain Carruth's medical or mental health records.  (Doc. # 21-33 at 106.)  Carruth's trial counsel confirmed the benign nature of Carruth's childhood with his mother and other family members, then declined to expend further resources on the investigation.  (Doc. # 21-33 at 97.)

Second, although Carruth's trial counsel had arranged for at least three of Carruth's family members to testify during the penalty phase, (Doc. # 21-33 at 64), they refused to testify at the last minute, saying that they did not want to be involved in the "media circus" surrounding Carruth's trial.  (Doc. # 21-33 at 69–73.)

46

During the Rule 32 evidentiary hearing, Carruth also called a capital mitigation specialist, but the trial judge excluded the testimony as hearsay. (Doc. # 21-33 at 107–16.)   Carruth nonetheless proffered the mitigation specialist's testimony for the record, which consisted of a recitation of the witnesses and documents mentioned in the amendment to the Rule 32 petition and a confirmation that the witnesses and documents had told the mitigation specialist what was alleged in the amendment. (Doc. # 21-33 at 117–24.)

After the hearing, the trial court denied Carruth's claim, holding that the lack of mitigation evidence during the penalty phase of his trial was caused by Carruth's statements to his trial counsel. (Doc. # 21-32 at 152–53.)

On appeal, Carruth only briefed one mitigation issue to the Alabama Court of Criminal Appeals, arguing that the exclusion of the hearsay testimony of the mitigation expert was error.   (Doc. # 21-35 at 73–75.)   In introducing this argument, Carruth mentioned that the underlying claim was an ineffective assistance of counsel claim "for failure to develop and make any penalty phase presentation of mitigation evidence," (Doc. # 21-35 at 73), but Carruth only argued that Alabama evidentiary law ought to be changed to allow hearsay testimony in Rule 32 proceedings.

The Court of Criminal Appeals declined to change the evidentiary rule. (Doc. # 21-36 at 109, 229–31.) *Carruth*, 165 So. 3d at 654.  In his petition for writ

of certiorari, Carruth presented a different argument to the Alabama Supreme Court, arguing that the testimony was not offered for the truth of the matter asserted and therefore not hearsay.   (Doc. # 21-36 at 117–18, 156–58.)   The petition was denied.  (Doc. # 21-36 at 233.)

The only claim that Carruth has marshalled through "one complete round of the State's established appellate review process," *see O'Sullivan*, 526 U.S. at 845, is the claim that the Rule 32 court improperly excluded the hearsay testimony of his mitigation expert.  That claim, of course, is not a claim that can be brought in this action, *see Estelle*, 502 U.S. at 67; *Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983), and Carruth has accordingly omitted any such argument from his petition for writ of habeas corpus.

A constitutional claim is said to have been resolved on "independent and adequate" state law grounds in these situations.[10]  *See Walker v. Martin*, 562 U.S.

---

[10] The applicability of the evidentiary rule, standing alone, is not intertwined with the constitutional question, and Carruth has not provided any allegations tending to show that the evidentiary rule was applied in an arbitrary manner.  Thus, the evidentiary rule can serve as an independent and adequate ground for adjudicating the claim.  *See Frazier v. Bouchard*, 661 F.3d 519, 524 (11th Cir. 2011).  The state courts "clearly and expressly" relied on the state evidentiary rule in rejecting Carruth's claims.  *See Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991); *see also Harris v. Reed*, 489 U.S. 255, 262 (1989).  The reasoning of the Alabama Supreme Court can be inferred from the decision of the Court of Criminal Appeals.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018).

The *admissibility* of Carruth's evidence obviously had serious implications on the *sufficiency* of the evidence for his constitutional claim—but they are nonetheless separate issues.  Only the former was placed before the appellate courts, and only the latter is "intertwined" with the constitutional question.

307, 316 (2011).  Since the federal claims did not survive through the appeal process, the claims are procedurally defaulted.  And because Carruth has not presented sufficient grounds to excuse the default,[11] the claims are barred by 28 U.S.C. § 2254(b)(1).

Even if these claims were not barred, they are nonetheless meritless.  "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.  Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case."  *Wiggins*, 539 U.S. at 533.  *Strickland* only requires a reasonable investigation, and it recognizes that the reasonableness of an investigation can depend on the input of a defendant:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.

---

[11] Paragraph 155 of Carruth's petition for writ of habeas corpus contains a general citation to *Martinez*, 566 U.S. 1, as an excuse for any procedurally defaulted claim in paragraphs 103 through 154.  (Doc. # 34 at 64–65, ¶ 155.)  Because this is an ineffective assistance of counsel claim, and because the procedural default of this claim arguably stems from events that occurred in the trial-level Rule 32 proceeding—namely, the failure to obtain non-hearsay testimony—an argument based on *Martinez* could be possible.  To sufficiently present this excuse, Carruth must allege facts sufficient to show that his Rule 32 counsel was deficient under the standards set by *Strickland* and that the lost claim is "substantial."  *See Martinez*, 566 U.S. at 14.  However, Carruth has made no factual allegations regarding his Rule 32 counsel's efforts to obtain non-hearsay testimony, and certainly none tending to show deficient performance.  The claim is also not substantial for the reasons explained above the line.  Thus, the *Martinez* excuse fails.  Carruth is not entitled to a hearing to develop this *Martinez* claim.  *See Shinn v. Ramirez*, 596 U.S. ___, ___, 142 S. Ct. 1718, 1734 (2022) ("[A] federal habeas court may not . . . consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel.").

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland*, 466 U.S. at 691.

The trial court found that the lack of mitigation evidence was due to Carruth's statements, not due to deficient performance on the part of Carruth's trial counsel.  (Doc. # 21-32 at 152–53.)  Even taking Carruth's allegations regarding the content of the mitigating records and testimony as true, Carruth has not alleged *any* non-conclusory facts countering the Rule 32 court's conclusion, much less facts sufficient to show that the conclusion was "an unreasonable determination of the facts."  28 U.S.C. § 2254(d)(2).  Considering the effort undertaken by Carruth's trial counsel, (Doc. # 21-33 at 59–60, 62–63, 97, 102, 104), and the statements made by Carruth, (Doc. # 21-33 at 65, 71, 99, 100), there is no factual basis for concluding that the investigation was unreasonable.

Trial counsel certainly cannot be blamed for Carruth's family members refusing to testify at the last minute.  Trial counsel had no reason to believe that a subpoena was necessary to obtain the testimony of the family members.  Issuing a subpoena to the family members would have been difficult because they lived out of state, and unnecessary because they had already indicated that they would testify.  (Doc. # 21-33 at 64.)  The unavailability of the witnesses was beyond their control.  *See Williamson*, 221 F.3d at 1181.

In short, Carruth's petition has not demonstrated either that his trial counsel were deficient in his investigation and presentation of mitigating evidence or that any prejudice stemmed from his counsel's performance.

These claims are due to be dismissed.

### 8.    *Waiving Opening Statement in the Penalty Phase*

Carruth next claims that his trial counsel were deficient because they "failed to make an opening argument to the jury at the penalty phase."  Carruth asserts that "where all the prosecution's evidence had already been presented and counsel already knew what aggravating factors the State would be relying on, there could be no benefit to not presenting an opening argument."  (Doc. # 34 at 59, ¶ 144.)

Carruth presented this claim in his original Rule 32 petition.  (Doc. # 21-27 at 42, ¶ 71.)  The trial court dismissed the claim as insufficiently pleaded.  (Doc. # 21-31 at 188.)  At the evidentiary hearing, Carruth did not elicit any evidence

supporting this claim other than confirming that no opening statement was given. (Doc. # 21-33 at 59.)

Carruth raised this claim on appeal.  Carruth's one-sentence argument to the Court of Criminal Appeals opined that the claim was "sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven."  (Doc. # 21-35 at 53.)  The Court of Criminal Appeals disagreed, noting:

> Carruth did not assert what arguments he believed counsel should have made in an opening statement for his sentencing phase. Additionally, Carruth did not claim that, had counsel made such an argument, he would not have been sentenced to death.  Rather, Carruth only claimed that choosing not to present an opening argument was not justified by any reasonable strategy.

(Doc. # 21-36 at 98.)  *Carruth*, 165 So. 3d at 643.  Carruth again argued that this claim was properly pleaded in his unsuccessful petition for writ of certiorari.  (Doc. # 21-36 at 121–22, 161–63.)  Carruth has therefore exhausted this claim.[12]

Carruth has failed to allege facts sufficient to show that the Alabama court's resolution of his claim was "contrary to or involved an unreasonable application of" *Strickland*.  28 U.S.C. § 2254(d)(1); *Brown*, 544 U.S. at 141.  The allegations

---

[12] A dismissal under a state pleading standard inherently involves "an evaluation of the merits of the underlying federal claim." *Frazier*, 661 F.3d at 525.  When a state court dismisses a claim as insufficiently pleaded, the state pleading standard is "intertwined" with the federal claim and the state issue cannot serve as an "adequate and independent" basis for dismissal. *Id.*

presented in Carruth's Rule 32 petition and in his petition for writ of habeas corpus fall well below the level of a *Strickland* violation.

An attorney should not casually waive the opportunity to make an opening statement, but it is not an unheard-of trial strategy. Without further facts showing that the waiver was both error and prejudicial, the mere fact of waiver does not constitute ineffective assistance of counsel. *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1985); *United States v. Costa*, 691 F.2d 1358, 1364 (11th Cir. 1982).

"The purpose of an opening statement is to outline the evidence the party intends to present." *Costa*, 691 F.2d at 1364. As the penalty phase began, Carruth's counsel intended to present only a short stipulation. After the state's abbreviated opening, and with neither side presenting any complicated measure of evidence, it was clear that the penalty phase would consist primarily of argument. (Doc. # 21-25 at 170–75.) It would have been odd for Carruth's trial counsel to delve into an explanation of what the evidence would show before immediately arguing what the evidence did show thirty seconds later. It would have only served to highlight the lack of evidence presented, confuse the jury, and undermine his credibility.

The Alabama Court of Criminal Appeals correctly identified the serious issues with Carruth's allegations: Carruth never alleges what his trial counsel could have accomplished with an opening statement, and he never alleges that he

has suffered prejudice from the lack of opening statement. Carruth fails to state a claim under *Strickland* , and this claim is due to be dismissed.

### 9.   *Failure to Raise Additional Mitigating Circumstances*

Carruth next asserts that his trial counsel ought to have raised two additional mitigating circumstances in the penalty phase of his trial. (Doc. # 34 at 53–54, ¶¶ 131–32.) Under Alabama law, a jury in the penalty phase of a capital trial is asked to weigh aggravating and mitigating circumstances. Ala. Code § 13A-5-46. Alabama law provides a finite list of aggravating circumstances, Ala. Code § 13A-5-49, but an open-ended list of mitigating circumstances. Ala. Code §§ 13A-5-51, -52. Weighing the aggravating and mitigating circumstances does not consist of "a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison." Ala. Code § 13A-5-48. The separate categories of aggravating or mitigating evidence are simply helpful for an organized consideration of all the relevant circumstances. *Id.*

While it was stipulated that Carruth had "no significant history of prior criminal activity," (Doc. # 21-25 at 173–74); Ala. Code § 13A-5-51(1), Carruth asserts that his trial counsel should have argued that Carruth was a minor accomplice in Brooks's crime, Ala. Code § 13A-5-51(4), and that there were other "aspect[s] of a defendant's character or record" or "[an]other relevant mitigating

circumstance" that could have been argued in mitigation.  *See* Ala. Code § 13A-5-52.

This claim was not raised in either Carruth's Rule 32 petition or the three amendments to the petition.  (Doc. # 21-27 at 8–90, 154–64; Doc. # 21-31 at 195–Doc. # 21-32 at 10, 43–76.)   Because the claim was not raised, it has been procedurally defaulted.  *See Bailey*, 172 F.3d at 1303.  And since Carruth has not presented any sufficient grounds to excuse the default,[13] the claim is barred by 28 U.S.C. § 2254(b)(1).

The first mitigating circumstance that Carruth proposes is that he "was an accomplice in the capital offense committed by another person and his participation was relatively minor."  Ala. Code § 13A-5-51(4).  Carruth alleges that this mitigating circumstance could have applied because "[t]he evidence presented at trial showed that Brooks committed the capital offense, that Carruth was his

---

[13] As discussed in footnote 11, Carruth invokes *Martinez* as an excuse for any procedurally defaulted claim.  Because this is an ineffective assistance of counsel claim, and because the procedural default of this claim stems from events that occurred in the trial-level Rule 32 proceeding—namely, the failure to make the claim in the Rule 32 petition—an argument based on *Martinez* could be possible.  But Carruth has not alleged facts sufficient to conclude that the omission of this claim was an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" or that his counsel's assistance fell below the standard of "reasonably effective assistance."  *Strickland*, 466 U.S. at 687.  Indeed, since Carruth's Rule 32 counsel challenged the investigation and presentation of mitigating circumstances and the closing argument in the penalty phase, (Doc. # 21-27 at 37–42, ¶¶ 60–70, 72), it would have been rather redundant to challenge the trial counsel's failure to invoke additional mitigating circumstances.  Also, this claim is not substantial for the reasons explained above the line.  Accordingly, the *Martinez* excuse falls short.  Carruth is not entitled to a hearing to develop this *Martinez* claim.  *See Martinez*, 596 U.S. ___ at ___, 142 S. Ct. at 1734.

accomplice, and that Carruth's participation in the capital offense was relatively lesser than Brooks's." (Doc. # 34 at 54.)

There are two critical errors with this claim. First, "relatively lesser" is not the same thing as "relatively minor." Alabama courts have consistently refused to find the presence of this mitigating circumstance when a defendant was a major participant in the crime, albeit not the trigger man or the primary aggressor. *See Hosch v. State*, 155 So. 3d 1048, 1086 (Ala. Crim. App. 2013); *Beckworth v. State*, 946 So. 2d 490, 530–31 (Ala. Crim. App. 2005); *Price v. State*, 725 So. 2d 1003, 1012, 1035 (Ala. Crim. App. 1997), *aff'd sub nom. Ex parte Price*, 725 So. 2d 1063 (Ala. 1998); *see also Smith v. Dunn*, No. 2:15-CV-0384-AKK, 2019 WL 4338349, at *3 (N.D. Ala. Sept. 12, 2019), *aff'd sub nom. Smith v. Comm'r, Ala. Dep't of Corr.*, 850 F. App'x 726 (11th Cir. 2021). Carruth's participation in the crime was far too substantial for him to be considered a "relatively minor" participant.

The second critical error with this claim is that his trial counsel *did raise* this mitigating circumstance. Carruth's trial counsel argued to the jury that a sentence of life without parole was appropriate because "Michael David Carruth did not shoot and kill Brett Bowyer." (Doc. # 21-25 at 176.) He asked the jury: "Can you sentence the man, who actually didn't pull the trigger, who actually did not kill little William Brett Bowyer, to death?" (Doc. # 21-25 at 178.) He also noted that

56

"Michael David Carruth never procured, and he never possessed the murder weapon that killed Brett Bowyer." (Doc. # 21-25 at 178.) Carruth's trial counsel thus raised all the evidence of Carruth's lesser participation in his argument to the jury.

In instructing the jury, the trial court said that Alabama law "provides a list of some of the mitigating circumstances you may consider, but that list is not a complete list of the mitigating circumstances you may consider." The court then read the full list provided in the statute, including the "relatively minor" mitigating circumstance. (Doc. # 21-25 at 193.) The court also instructed the jury: "In addition to the mitigating circumstances as previously specified, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that a defendant offers as a basis for a sentence of life imprisonment without parole instead of death." (Doc. # 21-25 at 194–95.) There are no further charges in the Alabama Pattern Jury Charges that the trial court could have given on the "relatively minor" mitigating circumstance. *See* Alabama Pattern Jury Instructions—Criminal Proceedings, *Capital Murder: Penalty Phase*.

In its oral and written pronouncements of the sentence, the trial court analyzed all of the statutory mitigating circumstances, regardless of whether they were raised by the defendant. (Doc. # 21-26 at 27–30, 47–50.) Under the

"relatively minor" mitigating circumstance, the trial court said:  "The Defendant had an accomplice in the commission of this capital offense; however, the Defendant's participation was not relatively minor.  Indeed, the evidence reflects the Defendant was as culpable if not more so than his accomplice."  (Doc. # 21-26 at 48.)  Under the heading "Additional Mitigating Circumstances," the trial court said:

> Counsel for the Defendant argues that the Defendant did not procure the murder weapon, never possessed the murder weapon and was not the one who pulled the trigger of the murder weapon as an additional mitigating circumstance.  The court is not moved by this argument. The evidence was that the Defendant told his accomplice 'I've done one, now you do one.'  Therefore, the court finds that the fact that the Defendant was not the triggerman nor did he procure or possess the murder weapon not to be an additional mitigating circumstance.

(Doc. # 21-26 at 49.)

In sum, Carruth's trial counsel identified all the evidence that "co-defendant Brooks committed the capital offense, that Carruth was his accomplice, and that Carruth's participation in the capital offense was relatively lesser than Brooks," and he argued that that evidence should support a sentence of life without parole. Carruth's trial counsel might not have said that he was arguing the "relatively minor" mitigating circumstance in doing so, but the categories of mitigating circumstances are simply tools to organize the evidence.  *See* Ala. Code § 13A-5-48.   There is no advantage to invoking additional statutory mitigating

circumstances under § 13A-5-51 when the same evidence and arguments can be introduced under § 13A-5-52.

Carruth has not alleged facts sufficient to conclude that his trial counsel's failure to specifically invoke the "relatively minor" mitigating circumstance was an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" or that his counsel's assistance fell below the standard of "reasonably effective assistance." *Strickland*, 466 U.S. at 687. Even if it were error, the trial court's instructions to the jury and the trial court's analysis at sentencing fostered sufficient consideration of the "relatively minor" mitigating circumstance that there was no resulting prejudice to Carruth.

Carruth also says that his trial counsel should have argued the catchall mitigating circumstance in the penalty phase. The entirety of Carruth's allegations to support this claim are as follows:

> Counsel failed to present the mitigating circumstance allowed by Ala. Code § 13A-5-52: "any aspect of a defendant's character or record . . . that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death." Significant evidence could have been marshaled and presented by experienced trial counsel to establish the mitigating circumstances allowed by law.

(Doc. # 34 at 54, ¶ 132.)

This allegation is insufficient in multiple respects. First, the record clearly shows that Carruth's trial counsel did utilize the catchall mitigating circumstance.

59

Carruth's trial counsel argued that the lack of family support in the proceedings should be held in mitigation. Also, to the extent that the arguments relating to Carruth's lesser role in the crime were not made under Ala. Code § 13A-5-51(4), then they must have been made under § 13A-5-52. (Doc. # 21-26 at 49.)

Second, assuming that Carruth is complaining about an underutilization of the catchall rather than a lack of utilization, he does not allege what specific evidence "could have been marshaled and presented." In fact, Carruth's trial counsel raised all the mitigating evidence available to him during the penalty phase. Carruth therefore fails to allege facts sufficient to show that his trial counsel made any error or that any error resulted in prejudice to his case.

These claims are due to be dismissed.

### 10.   *Ineffective Closing Statement in the Penalty Phase*

Carruth next argues that his trial counsel's final closing argument was ineffective. Carruth alleges that his counsel "failed to present a case for life, and instead made arguments contrary to Carruth's interests." In particular, Carruth says that his counsel "made the damaging argument to the jury in closing that it is understandable if the Bowyer family wants to kill Carruth. This argument suggested that revenge against Carruth was proper and made it easier for the jury to vote for death, because even Carruth's own counsel thought that was understandable." (Doc. # 34 at 60, ¶ 145.)

Carruth raised this claim in his initial Rule 32 petition.  (Doc. # 21-27 at 42–43, ¶ 72.)  The court dismissed this claim, holding that it did not contain a clear and specific statement of the grounds upon which relief is sought.  (Doc. # 21-31 at 188–89.)  Carruth's one-sentence argument to the Court of Criminal Appeals opined that the claim was "sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven."  (Doc. # 21-35 at 53.)  The Court of Criminal Appeals disagreed, holding that "the record does not support Carruth's characterization of counsel's statement."  (Doc. # 21-36 at 99.)  *Carruth*, 165 So. 3d at 643.  After quoting the closing argument made by Carruth's trial counsel, the Court of Criminal Appeals stated:

> A review of counsel's statement reveals that counsel was not suggesting that revenge against Carruth was understandable.  Rather, counsel stated that he could understand how people could feel that way before the evidence was presented at trial.  Counsel then argued that death was not the appropriate sentence in light of the evidence that Carruth was not the one who actually shot Brett Bowyer.  Accordingly, Carruth's argument was without merit and the [trial] court was correct to summarily dismiss it for failing to state a claim for which relief could be granted.

(Doc. # 21-36 at 99.)  *Carruth*, 165 So. 3d at 644.

In his petition for writ of certiorari, Carruth raised this claim in a section outlining the issues in the case, saying that the Court of Criminal Appeals had based its decision "on a misapprehension of the facts and misapplication of the

law," (Doc. # 21-36 at 122), but Carruth failed to provide any argument in support of this claim in the argument section of his petition.  (Doc. # 21-36 at 155–67.) Generally, any claim placed before an appellate court without supporting argument is waived.  *See Taylor v. State*, 157 So. 3d 131, 140–45 (Ala. Crim. App. 2010); *Rowe v. Schreiber*, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998).  A petition for writ of certiorari in the Alabama Supreme Court is required to contain "[a] direct and concise argument amplifying the grounds relied on for allowance of the writ."  Ala. R. App. P. 39(d)(6).  It is questionable whether Carruth's cursory mention of this claim was sufficient to present the claim to the Alabama Supreme Court. However, it is unnecessary to address exhaustion here because the claim is meritless.

Carruth's trial counsel prepared a strategy for trial.  Part of his strategy was to increase the credibility of the defense by acknowledging the uncomfortable facts of his client's conduct.  (Doc. # 21-33 at 91.)  Carruth's trial counsel acknowledged the loss suffered by the Bowyer family in his closing argument, and he acknowledged that the family and the public naturally had an emotional reaction to that loss.  Carruth's trial counsel said that directing such a reaction toward Carruth was understandable if one "didn't know all the facts."  (Doc. # 21-25 at 177.)  Carruth's trial counsel then explained that the facts showed that Brooks was the triggerman and not Carruth.  (Doc. # 21-25 at 177–78.)  Rather than

encouraging feelings of revenge against Carruth, the closing argument instead attempted to cut through such feelings to focus on the facts of Carruth's conduct and their gravity relative to Brooks's conduct.

This court's understanding of the closing argument is exactly the same as the understanding reached by the Alabama Court of Criminal Appeals.  (Doc. # 21-36 at 99); *Carruth*, 165 So. 3d at 644.  The closing argument was coherent and not detrimental to Carruth's interests.  Carruth's trial counsel were not deficient in his performance, and no prejudice resulted to Carruth from his performance.

The allegations in Carruth's habeas petition are clearly contradicted by the trial record.  Carruth's allegations fail to identify any portion of the record that demonstrate error in the conclusion reached by the Court of Criminal Appeals, much less that the conclusion was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Because Carruth's allegations fail to cite sufficient facts to support this claim, the claim is due to be dismissed.

**B.    Alleged Ineffective Assistance of Appellate Counsel**

Petitioner alleges that his appellate counsel's performance failed to meet the standards set by the United States Constitution in many ways, two of which are not tied to an underlying claim and will be addressed here.  First, Carruth asserts that

his appellate counsel was ineffective when he "filed a motion for a new trial, but failed to cite a single ground in support of the motion." (Doc. # 34 at 63–64, ¶ 153.) Second, Carruth asserts that appellate counsel was ineffective when he failed to file a petition for writ of certiorari in the Supreme Court of Alabama. (Doc. # 34 at 7–26, ¶¶ 26–64.)

A criminal defendant has the right to the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387, 397 (1985). This right stems from the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Smith v. Robbins*, 528 U.S. 259, 276 (2000).

When analyzing the performance of appellate counsel, courts use the same *Strickland* analysis explained above. *See Woods v. Etherton*, 578 U.S. 113, 119 (2016) (per curiam). The Constitution requires deference to the tactical decisions of appellate counsel in much the same way as deference is accorded to trial counsel. *Smith v. Murray*, 477 U.S. 527, 534 (1986). The Constitution does not require appellate counsel "to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

## 1. *Failure to Provide Any Grounds for a New Trial in the Motion for New Trial*

Carruth asserts that by filing a motion for new trial but failing "to cite a single ground in support of the motion," his appellate counsel had abandoned him

within the meaning of *Cronic*, 466 U.S. at 692.  He alleges that his appellate counsel "did not notify Carruth that he did not intend to pursue the motion, did not consult Carruth about the motion, and did not satisfy the requirements of *Anders v. California*, 386 U.S. 738 (1967), in withdrawing."  Carruth asserts that, if a showing of prejudice is needed, the merits of his other claims should be grounds for a finding of prejudice.  (Doc. # 34 at 63–64, ¶ 153.)

The history of this claim is befuddling.

On December 3, 2003, at the conclusion of Carruth's sentencing hearing, Carruth's trial counsel entered an oral notice of appeal and a request that different counsel be appointed for the purposes of appeal.  (Doc. # 21-26 at 31.)  The trial court orally appointed different counsel for the appeal.  (Doc. # 21-26 at 31–32.)  Carruth's trial counsel then addressed the court:

> I know it will be [appellate counsel]'s place to do this, but I'm going to do this in advance for him and he may consider this, but if different counsel is appointed for the direct appeal, the Rules of Criminal Procedure allow for the suspension of thirty days to file a motion for new trial until the trial transcript is completed.  We ask that the thirty-day time limit to file a motion for new trial be suspended until [appellate counsel] can get a copy of the trial transcript and be given a reasonable time to allow him to read the transcript to file a motion for new trial. . . . and that's something that the Alabama Supreme Court and Court of Criminal Appeals is allowing now in death penalty cases when new counsel is appointed.

(Doc. # 21-26 at 32–33.)  The trial court responded, "I have no problem granting that motion."  (Doc. # 21-26 at 33.)  On December 8, 2003, the trial court entered a written order granting the extension of time.  (Doc. # 47-1 at 59.)

The trial court's written order cited *Ex parte Jackson*, 598 So. 2d 895 (Ala. 1992), as a basis for this extension of time.  *Jackson* states, in relevant part:

> We recognize that when an attorney is appointed to represent a defendant on appeal, it is unlikely that the reporter's transcript will be made available to him before the 30-day period within which to file a motion for a new trial has expired.  Although some grounds for a new trial may be discovered in the absence of a transcript, the absence of a transcript may prevent appointed appellate counsel from ascertaining all of the grounds to support a motion for a new trial.  Therefore, we hold that if the trial court appoints new counsel to represent the defendant on appeal, the trial court shall note that fact on the case action summary sheet, and shall also note that the time within which to file a motion for a new trial is extended in such case, provided the following occurs:  If newly appointed counsel files a motion with the court within 14 days after his appointment, requesting that the running of the time within which to file a motion for a new trial be suspended until such time as the reporter's transcript is prepared and filed, then in that event, the 30-day period within which to file a motion for a new trial shall be computed from the date the reporter's transcript is filed, which date shall be entered on the case action summary sheet, rather than from the date of the pronouncement of sentence, as provided for in Rule 24, Ala. R. Crim. P.  Appellate counsel will then have the means to raise all appropriate issues before the trial court.  We believe that this exception to the rule that "[a] motion for a new trial must be filed no later than thirty (30) days after sentence is pronounced," Rule 24.1(b), Ala. R. Crim. P., is an appropriate accommodation of the interest of the judiciary in having the benefit of the trial court's development of the issues and the interest of the defendant in fully presenting any meritorious argument regarding those issues.

> Although Rule 31(a), Ala. R. App. P., requires an appellant to "serve and file his brief within 28 days (4 weeks) after the date shown on the copy of the certificate of completion of the record on appeal," where the procedure described herein is applicable, an appellant shall serve and file his brief within 28 days (4 weeks) after the trial court's ruling on a motion for a new trial. This exception to Rule 31(a) will avoid the possibility that an appellant's brief will be due before the trial court's ruling on a motion for a new trial.

598 So. 2d at 897–98.

However, apparently unknown to either the trial court or Carruth, *Jackson* had been overruled by *Ex parte Ingram*, 675 So. 2d 863 (Ala. 1996). In *Ingram*, the Alabama Supreme Court explained that *Jackson* had only extended the time for a motion for new trial to accommodate claims of ineffective assistance of counsel and thereby reduce the volume of ineffective assistance claims on collateral review. 675 So. 2d at 864.[14] Lamenting "[t]he confusion and intractable problems that have ensued following . . . *Jackson*," the Alabama Supreme Court in *Ingram* concluded that the suspension of time for filing a motion for new trial was not a good solution and overruled *Jackson*. *Id.* at 865.

Seemingly oblivious to this change in the law, Carruth's appellate counsel did not file a motion for new trial within the thirty-day period for doing so.

---

[14] A claim can be presented in a Rule 32 petition only if it "cannot reasonably be presented in a new trial motion filed within the thirty days allowed." *Id.* at 866. Since *Ingram*, ineffective assistance claims are typically reserved for Rule 32 petitions if a defendant is appointed new counsel for direct appeal and it takes more than thirty days to obtain a transcript of the proceedings. *V.R. v. State*, 852 So. 2d 194, 202 (Ala. Crim. App. 2002).

On June 16, 2004, the record was certified complete for the purposes of appeal, (Doc. # 47-1 at 61), and a briefing notice was issued by the Court of Criminal Appeals the following day.  (Doc. # 45-4 at 2.)  Only then did Carruth's appellate counsel take action:   On July 7, 2004, Carruth's appellate counsel prepared two motions—one to be filed in the trial court and one in the Court of Criminal Appeals.

The motion in the trial court, entitled "Appellant's Motion for New Trial," simply stated:

> On or about December 8, 2003, the judge of this Honorable Court prepared an order allowing the defendant Michael David Carruth extra time to file his motion for a new trial by staying the time for the appellant to file his motion for 30 days after the certificate of completion of the record.
>
> The defendant now, pursuant to that order, files this motion for a new trial in this case.

(Doc. # 47-1 at 64.)  The stamp on the motion indicates that it was received by the trial court and filed on July 12, 2004.  (Doc. # 47-1 at 64.)

The motion in the Court of Criminal Appeals, entitled "Appellant's First Motion to Supplement the Record on Appeal," explained the procedural history, requested that "the record not be certified complete until the Motion for New Trial is ruled upon by the [trial] court," and requested that the time for his appellate brief begin to run "when the record is complete, *i.e.*, after a ruling on the appellant's

Motion for New Trial."  The stamp on the motion indicates that it was received and filed on July 13, 2004.  (Doc. # 47-1 at 57.)

Attached to the appellate motion was a document identified as "[t]he appellant's Motion for a New Trial . . . filed on July 7, 2004."  (Doc. # 47-1 at 57.) This document, however, materially differed from the actual motion for new trial filed in the trial court.  First, the title on the document was slightly altered to "Defendant's Motion for New Trial."  Second, the body of the document provided some minimal argument for a new trial where the actual motion filed in the trial court failed to provide any:

> On or about December 8, 2003, the judge of this Honorable Court prepared an order allowing the defendant Michael David Carruth extra time to file his motion for a new trial by staying the time for the defendant to file his motion for 30 days after the certificate of completion of the record.  The defendant's attorney visited the defendant in prison in Atmore, Alabama and after discussions with him, determined initial rationale for his Motion for New Trial to be as follows:
>
> 1.  It is questionable that the trial court judge, the Hon. Albert L. Johnson, should have stayed on the case, especially in light of his prior contact with the defendant.
>
> 2.  There was not sufficient evidence to convict on the death penalty cause of action.
>
> 3.  The weight of the evidence was against a jury verdict in favor of the State.
>
> For the above articulated reasons, the defendant respectfully requests a new trial in this matter.

(Doc. # 47-1 at 62.)  Unlike the actual motion, (Doc. # 47-1 at 64), this document did not bear a stamp from the clerk of the trial court indicating that it was filed. (Doc. # 47-1 at 62.)

In the morning of July 12, 2004, the Court of Criminal Appeals denied the appellate motion, finally explaining the legal error that had been made:

> [T]he [Alabama] Supreme Court, in *Ex parte Ingram*, 675 So. 2d 863 (Ala. 1996), abolished the procedure set out in *Ex parte Jackson* for extending the time to file a motion for new trial.  Consequently, the trial court had no authority to extend the 30-day time for the appellant to file a motion for new trial, and any action on the appellant's late motion for new trial will be void.

(Doc. # 45-4.)  That afternoon, the trial court denied the motion for new trial without elaboration.  (Doc. # 45-3.)

Although the legal error had been corrected, the factual error introduced by the counterfeit motion and the order remained lurking in the background.

In his Rule 32 petition, Carruth raised only one complaint regarding this debacle, solely taking issue with his appellate counsel's failure to state any grounds for relief in the motion for new trial.  (Doc. # 21-27 at 47–48, ¶ 80.)  The trial court summarily dismissed this claim, holding that it did not contain a clear and specific statement of the grounds upon which relief is sought.  (Doc. # 21-31 at 188–89.)  Carruth's one-sentence argument to the Court of Criminal Appeals opined that the claim was "sufficiently specific to warrant further proceedings and stated a claim

which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. # 21-35 at 62–63.)

Because it had denied the motion to supplement the record in the direct appeal, the Court of Criminal Appeals had no official record of the motion for new trial. Instead, it investigated Carruth's claim by looking at the documents already in its possession from the previous appeal, thus falling into the trap:

> Carruth also claimed that appellate counsel was ineffective for failing to "cite a single ground in support of" Carruth's motion for a new trial. However, the record directly refutes this claim. On July 7, 2004, appellate counsel filed a motion for a new trial in which he stated the following:
>
> "The defendant's attorney visited the defendant in prison in Atmore, Alabama and after discussions with him, determined initial rationale for his Motion for New Trial to be as follows:
>
> "1. It is questionable that the trial court judge, the Hon. Albert L. Johnson, should have stayed on the case, especially in light of his prior contact with the defendant.
>
> "2. There was not sufficient evidence to convict on the death penalty cause of action.
>
> "3. The weight of the evidence was against a jury verdict in favor of the State."
>
> ([Citation to the document attached to the appellate motion].) Accordingly, appellate counsel did allege grounds in support of Carruth's motion for a new trial. Therefore, the claim in paragraph 80 of his petition was meritless and the [trial] court was correct to summarily dismiss it. *See* Rule 32.7(d), Ala. R. Crim. P.

(Doc. # 21-36 at 105.) *Carruth*, 165 So. 3d at 650–51 (footnote omitted).

In his petition for writ of certiorari, Carruth raised this claim in a section outlining the issues in the case, providing a formulaic basis for issuing certiorari:

> [The Court of Criminal Appeals] has misapprehended the full scope of Carruth's claim and as a result has reached an incorrect conclusion. The court failed to address the other factual assertions and arguments incorporated by reference in this claim and the fact that the trial court failed to give full and fair consideration of every basis of Carruth's claim. As a result, the court's decision is incorrect and certiorari should issue.

(Doc. # 21-36 at 132–33.) Carruth did not provide any argument in support of this claim in the argument section of his petition, (Doc. # 21-36 at 155–67), and he did not explain the factual error that had been made by the Court of Criminal Appeals.

There are three items that need to be addressed before proceeding to a discussion of the merits of Carruth's claim. First, it is questionable that Carruth's formulaic statement of grounds for certiorari was sufficient to present this claim to the Alabama Supreme Court. *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6). Second, even assuming that Carruth's petition did exhaust his claim, Carruth's claim is exceedingly narrow. Out of all the twists and turns in the handling of the motion for new trial, Carruth has only argued that his appellate counsel should have provided a basis for relief in the motion. Any other potential claims were abandoned in the Rule 32 petition and cannot be salvaged through *Martinez* because *Martinez* does not apply to claims of ineffective assistance of appellate counsel, *Davila v. Davis*, 582 U.S. ___, ___, 137

S. Ct. 2058, 2063 (2017), and they have been doubly abandoned by Carruth's failure to argue them in his petition for writ of habeas corpus. Third, the state court's misapprehension of the facts does not automatically entitle Carruth to a writ of habeas corpus. Instead, this court simply "must undertake a *de novo* review of the claim" to the extent it was exhausted. *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1250 (11th Cir. 2013); *see also, e.g.*, *Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1293 (11th Cir. 2013) (Restani, J., concurring).

Now turning to the claim presented: The claim fails because appellate counsel's failure to state any grounds in support of the motion for new trial did not result in any prejudice to Carruth.[15]

First, the lack of content in the motion did not prejudice Carruth because the motion was doomed to fail anyway. *Cf. Diaz v. United States*, 298 F. App'x 858, 861 (11th Cir. 2008) (holding that no prejudice had been shown because the proposed content for the motion for new trial would not have led to relief). By the time the motion for new trial was filed, the thirty-day period for filing the motion

---

[15] On the deficient performance prong, the court declines to resolve Carruth's argument that the procedures of *Anders v. California*, 386 U.S. 738, 744 (1967), should apply to motions for new trial. *See Pennsylvania v. Finley*, 481 U.S. 551, 554–55 (1987) ("*Anders* did not set down an independent constitutional command that all lawyers, in all proceedings, must follow these particular procedures."). Nonetheless, an inquiry into whether counsel was deficient for failing to take advantage of a procedural mechanism, such as a motion for new trial, inherently requires an inquiry into the claims that could have been pressed in the motion. Thus, the analysis is best resolved on the prejudice prong.

had elapsed, barring any relief.  (Doc. # 45-4.)  Even if Carruth's appellate counsel had provided extensive argument in the motion, the trial court had no choice but to deny the motion.

Second, even if Carruth had timely filed the motion for new trial, he has failed to demonstrate that additional content in the motion would have changed the course of these proceedings.  To the extent that Carruth's claims were fully argued and decided on the merits by the trial court in a pretrial motion, trial objection, or, later, in the Rule 32 proceeding, Carruth has not explained how re-raising the claim in a motion for new trial would have been more successful in convincing the trial court.  And to the extent that Carruth's claims were *not* previously argued and decided, the trial court was probably barred from considering them anyway.  *See Williams v. State*, 710 So. 2d 1276, 1293 (Ala. Crim. App. 1996) ("[A] new trial will not be granted for matters pertaining to rulings, evidence, or occurrences at a trial . . . unless timely and sufficient objections, requests, motions, or exceptions have been made and taken.  Any grounds which might have been afforded by such matters are presumed to have been waived, except where such matters were unknown to applicant until after verdict and could not have been discovered by the exercise of reasonable diligence, and except in instances of fundamental errors which of themselves invalidate the trial." (quoting *Fuller v. State*, 365 So. 2d 1010,

1012 (Ala. Crim. App. 1978))), *aff'd sub nom. Ex parte Williams*, 710 So. 2d 1350 (Ala. 1997).

The Rule 32 court did dismiss several claims because they should have been raised in the original trial-level proceedings.[16]  However, nearly[17] all of the claims could not have been raised in a motion for new trial.  *See Williams*, 710 So. 2d at 1293 (matters that could have been objected to at trial cannot be raised for the first time in a motion for new trial); *Ex parte Eaton*, 675 So. 2d 1300, 1301 (Ala. 1996) (procedural defects cannot be raised for the first time in a motion for new trial if they were previously known to the movant); *Davis v. Davis*, 474 So. 2d 654, 656

---

[16] Specifically, the Rule 32 court dismissed the following claims because they could have been but were not raised in the trial court:  errors in the indictment; improper withholding of favorable evidence; jury selection errors, including racial bias in the jury selection, granting the prosecution's challenge of a juror for cause, and death-qualifying the jury; prosecutorial misconduct, including mentioning facts not in evidence, introducing a prejudicial victim impact statement, and improper closing argument; the admission of the hearsay statements of Jimmy Brooks and the subsequent reliance on those statements at sentencing; admission of prejudicial and inflammatory photographs; errors in the jury instructions; the unconstitutionality of Alabama's capital sentencing scheme; and the unconstitutionality of Alabama's method of execution.  (Doc. # 21-31 at 189–92.)  Other than the claim regarding the improper withholding of favorable evidence, Carruth cites each of these as "nonfrivolous grounds for a new trial that, if raised, would have undermined the validity of Carruth's conviction and sentence."  (Doc. # 34 at 63–64, ¶ 153.)

[17] A claim under *Brady v. Maryland*, 373 U.S. 83 (1963), that the prosecution has withheld favorable evidence can be asserted in a motion for new trial without a prior objection. *See State v. Ellis*, 165 So. 3d 576, 578 (Ala. 2014); *Savage v. State*, 600 So. 2d 405, 407 (Ala. Crim. App. 1992).  However, Carruth has not alleged any facts to support this claim in his petition for writ of habeas corpus, and he does not cite it as a basis for a finding of prejudice. The meager facts presented in Carruth's Rule 32 petition, even if they were asserted here, could not serve as a basis for relief.  (Doc. # 21-27 at 82, ¶ 146.)

(Ala. 1985) (same); *Saunders v. State*, 10 So. 3d 53, 112 (Ala. Crim. App. 2007) (a new trial is not proper relief for a challenge to the method of execution).

Carruth's speculation that a better motion for new trial "would have undermined the validity of Carruth's conviction and sentence" is not a sufficient factual allegation to support a claim of prejudice.

Carruth also argues that this claim merits relief without any proof of prejudice. He argues that the failure to file a motion for new trial amounted to the "constructive denial of the assistance of counsel" that must be treated as *per se* prejudicial under *Cronic*, 466 U.S. 648.

A petitioner has the burden of proving that *Cronic* applies, and "the burden of proof under *Cronic* is a very heavy one." *Stone v. Dugger*, 837 F.2d 1477, 1479 (11th Cir. 1988) (en banc) (emphasis omitted) (quoting *Smith v. Wainwright*, 777 F.2d 609, 620 (11th Cir. 1985)). *Cronic* requires a presumption of prejudice "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659.[18] The presumption "applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." *Castillo*, 722 F.3d at 1287 (main opinion) (quoting *Stano v. Dugger*, 921 F.2d

---

[18] *Cronic* also lists other exceptions to *Strickland*'s prejudice requirement, but none is applicable here. *See Castillo*, 722 F.3d at 1287.

1125, 1153 (11th Cir. 1991) (en banc)).  The presumption only applies if counsel's failure is "complete."  *Bell*, 535 U.S. at 697.  In other words, if "counsel fails to oppose the prosecution throughout the proceeding as a whole, instead of merely failing to do so at specific points."  *Castillo*, 722 F.3d at 1287 (quoting *Bell*, 535 U.S. at 697) (quotation marks omitted).

The overall performance of Carruth's appellate counsel was not so deficient that he failed to provide any opposition to the prosecution.  Appellate counsel's brief, (Doc. # 21-26 at 51), and application for rehearing, (Doc. # 21-26 at 218), proficiently challenged the trial court's handling of the recusal motion and the motion for change of venue—two of the most serious issues in this case.  It cannot be said that Carruth "was in effect denied any meaningful assistance at all."  *Castillo*, 722 F.3d at 1287.  *Cronic* is thus inapplicable to this claim, and Carruth's failure to provide facts sufficient to prove prejudice spells the end of the inquiry.

### 2.  *Failure to File a Petition for Writ of Certiorari in the Alabama Supreme Court*

The right to appellate counsel is limited to appeals taken by right.  *See Douglas v. California*, 372 U.S. 353, 356 (1963).  There is no federal constitutional right to counsel for discretionary appeals.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.  Thus, we have rejected suggestions that we

establish a right to counsel on discretionary appeals."); *Ross v. Moffitt*, 417 U.S. 600, 610 (1974).

Carruth's appellate counsel acted unprofessionally and counter to the best interests of his client by failing to update his address with the court; failing to inform, consult, or counsel Carruth when the application for rehearing was unsuccessful; and failing to either file a petition for writ of certiorari or ask the Alabama Supreme Court for more time to file the petition. That behavior cannot be commended. But during a discretionary appeal, the United States Constitution provides no guarantee as to the quality of counsel, and the court must revert back to the general rule: "[T]he attorney is the prisoner's agent, [and] under 'well-settled principles of agency law,' the principal bears the risk of negligent conduct on the part of his agent." *Martinez*, 566 U.S. at 10.

Carruth identifies two theories as to why his counsel's deficiencies ran afoul of the Constitution. (Doc. # 34 at 7–26, ¶¶ 26–64.) First, Carruth argues that review by the Alabama Supreme Court—or at least the filing of a petition for writ of certiorari—is a necessary step in a criminal appeal and is not discretionary. (Doc. # 34 at 8–9, ¶¶ 28–30.) Because Carruth's appointed counsel failed to provide adequate representation in this allegedly mandatory part of the appellate process, Carruth argues that his constitutional right to counsel was denied.

Second, Carruth argues that his appointed counsel failed to provide adequate representation before the Alabama Court of Criminal Appeals, where Carruth undisputedly had the right to counsel.  Carruth's theory is that an appellate lawyer's responsibilities include the "duty to inform Carruth when his appeal . . . had been denied and to consult with him about any further appeals."  (Doc. # 34 at 9, ¶ 32.)  Because Carruth's appellate counsel failed to provide these closing duties to Carruth, Carruth asserts that his right to appellate representation was violated.

These claims suffer from yet another complicated history.

On December 10, 2003, Carruth's appellate counsel entered a notice of appearance using an address on Twentieth Street North in Birmingham, Alabama. (Doc. # 47-1 at 87.)  On February 5, 2004, appellate counsel notified the court of an updated address on Cliff Road in Birmingham, Alabama.  (Doc. # 47-1 at 82.) This Cliff Road address appeared on Carruth's appellate brief.  (Doc. # 21-26 at 51.)  The Court of Criminal Appeals issued its opinion on August 26, 2005.  (Doc. # 21-26 at 269.)  On September 16, 2005, Carruth's appellate counsel filed an application for rehearing again using the Cliff Road address.  (Doc. # 21-26 at 218.)

On October 14, 2005, the Court of Criminal Appeals denied the application for rehearing.  (Doc. # 21-26 at 269.)  Under Rule 39(c)(2) of the Alabama Rules

of Appellate Procedure, Carruth then had fourteen days to file a petition for writ of

certiorari in the Alabama Supreme Court.  No petition was filed.  (Doc. # 21-28 at

148.)  The certificate of judgment was issued on November 2, 2005.  (Doc. # 42 at

20.)  Ala. R. App. P. 41(a)(1).

Carruth alleges that no petition was filed because his appellate counsel had

changed his address a second time and did not inform either the Court of Criminal

Appeals or Carruth.  (Doc. # 34 at 7–8, ¶ 27.)  While the state generally does not

dispute that Carruth's appellate counsel was at fault for the failure to file a petition

for writ of certiorari, the exact details are once again somewhat muddied.  (Doc. #

42 at 20 n.27.)

On January 26, 2006, Carruth's appellate counsel filed a letter in the Court

of Criminal Appeals, saying:

> Please resend me a copy of the Order denying my Application for
> Rehearing on this case.  I have not received this Order and I just heard
> from an Attorney who has spoken to my client and has noted that he
> has not received any word either.  Please resend this Order Denying
> the Application so that I may petition the Supreme Court for a Writ Of
> Cert.  Please note my address has changed and that is perhaps the
> reason I did not receive notice of any kind on this case.  My new
> address is:  [address on Richard Arrington, Jr., Boulevard South in
> Birmingham, Alabama].

(Doc. # 47-1 at 89.)

Then, on June 6, 2006, Carruth's appellate counsel filed a motion in the

Alabama Supreme Court styled as a "Motion for Ruling on Petition for Writ of

Certiorari." (Doc. # 47-1 at 90.) The motion alleged that a petition for writ of certiorari had been filed "on February 16, 2006," and requested a prompt ruling on the petition. But Carruth's appellate counsel once again had either misunderstood, misremembered, or misrepresented the true state of the case file. The clerk of the Alabama Supreme Court responded to Carruth's appellate counsel, informing him that there was no record of any such petition having been filed. (Doc. # 42 at 20.)

Carruth's appellate counsel did not file a motion for extension of time or make any other effort to obtain review of Carruth's claims in the Alabama Supreme Court. Nor, apparently, did he inform his client that any of this had taken place. Carruth alleges that he finally learned of the demise of his appeal when he received a letter from counsel for the state dated October 3, 2006, informing him that he had until November 2, 2006, to file a Rule 32 petition. (Doc. # 34 at 8, ¶ 27; Doc. # 42 at 20.) Counsel for the state also sent a copy of the letter to a nonprofit group that frequently provides advocacy for death row inmates. The nonprofit helped get Carruth's Rule 32 process started. (Doc. # 42 at 20–21.)

In Carruth's Rule 32 petition, he provided two arguments as to why an extension of time should be granted for the filing of a petition for writ of certiorari. First, he argued that an extension of time should be granted under Rule 32.1(f) of the Alabama Rules of Criminal Procedure, which allows the trial court to grant relief if "[t]he petitioner failed to appeal within the prescribed time . . . and that

failure was without fault on the petitioner's part."  Ala. R. Crim. P. 32.1(f).  (Doc.

# 21-27 at 12–16, ¶ 10–16.)   Second, Carruth argued that he was denied the

effective assistance of counsel under the United States Constitution because of:

> Counsel's failure to notify Mr. Carruth or the court . . . about his
> change of address, his failure to notify Mr. Carruth of the denial of his
> application for rehearing, his failure to consult with Mr. Carruth about
> the appeal, and his failure to either file a petition or notify petitioner
> that he would not file a petition with the Alabama Supreme Court and
> that Mr. Carruth needed to file a Petition on his own.

(Doc. # 21-27 at 20–21, ¶ 26.)

On August 2, 2007, without identifying which claim had gained traction, the

trial court granted relief, saying:

> To the extent this court has jurisdiction, . . . Carruth is granted
> permission to file an Out of Time Petition for Writ of Certiorari to the
> Alabama Supreme Court.
>
> All Rule 32 issues are reserved by this court and shall be addressed
> subsequent to ruling by the Supreme Court of Alabama on . . .
> Carruth's Petition for Writ of Certiorari.

(Doc. # 21-27 at 166 (quotation marks omitted).)

The state appealed this order, arguing that Rule 32.1(f) does not apply to

petitions for writ of certiorari, there is no right to the effective assistance of counsel

in a petition for writ of certiorari, and the trial court should not have granted relief

solely on the allegations in the Rule 32 petition and without any proof of the

underlying facts.  (Doc. # 21-28 at 15–16.)

While the state's appeal was pending, and perhaps noticing that the Court of Criminal Appeals was unlikely to permit Rule 32 to be used for extending time for certiorari, *see Elliott v. State*, 768 So. 2d 422 (Ala. Crim. App. 1999), Carruth deployed another procedural mechanism to achieve these ends. Specifically, Carruth filed a motion in the Alabama Supreme Court for an extension of time under Rule 2(b) of the Alabama Rules of Appellate Procedure. (Doc. # 21-28 at 63.) Although Carruth's motion in the Alabama Supreme Court did accuse his appellate counsel of violating state law—specifically, Rule 39(a)(2) of the Alabama Rules of Appellate Procedure—Carruth's motion did not allege that his appellate counsel was deficient under *Strickland*, nor did he invoke any other federal basis for relief. (Doc. # 21-28 at 63–69.) On February 28, 2008, the Alabama Supreme Court denied the motion without elaboration. (Doc. # 45-1.)

The Rule 32 route subsequently came to an end in the Court of Criminal Appeals, where the case was reversed and remanded. The Court of Criminal Appeals explained that certiorari is a discretionary review and that Rule 32.1(f) does not apply to discretionary proceedings. *See Elliott*, 768 So. 2d 422. (Doc. # 21-28 at 130–31.) *Carruth*, 21 So. 3d at 766–67. The Court of Criminal Appeals also explained that the failure to seek certiorari review was not unconstitutional because there is no constitutional right to the effective assistance of counsel at the

certiorari stage of the proceedings.  (Doc. # 21-28 at 132–33.)  *Carruth*, 21 So. 3d at 767–69.  Rehearing was denied on August 15, 2008.  (Doc. # 21-28 at 129.)

Carruth filed a petition for writ of certiorari in the Alabama Supreme Court on August 29, 2008.  (Doc. # 21-28 at 136.)  The Alabama Supreme Court granted the petition, (Doc. # 21-31 at 56), and issued an opinion affirming the Court of Criminal Appeals.  (Doc. # 21-30 at 37; Doc. # 42 at 23 n.44.)  However, it later withdrew the opinion and issued a substituted opinion.  (Doc. # 21-30 at 33.)  *Carruth*, 21 So. 3d 770.  The substituted opinion explained that a motion under Rule 2(b) of the Alabama Rules of Appellate Procedure was the only appropriate method for obtaining an extension of time for filing a petition for writ of certiorari.  The court held that an extension of time for filing a petition was not proper relief under Rule 32 of the Alabama Rules of Criminal Procedure.  (Doc. # 21-30 at 34–35.)  *Carruth*, 21 So. 3d at 772.  The court therefore quashed the writ of certiorari.

Carruth next filed a petition for writ of certiorari in the United States Supreme Court.  (Doc. # 21-30 at 11.)  Carruth's petition was denied on November 30, 2009.  (Doc. # 21-30 at 137.)  *Carruth v. Alabama*, 558 U.S. 1052 (2009).

On remand, the state argued that Carruth's Rule 32 claim only sought an extension of time for certiorari as relief, and, in light of the new appellate precedent restricting that relief to a Rule 2(b) motion, the matter had already been decided against Carruth.  (Doc. # 21-31 at 84–86.)  The state also argued that the

claim should be denied because there is no right to the effective assistance of counsel at the certiorari stage. (Doc. # 21-31 at 86–88.) The trial court agreed, dismissing whatever remained of the claim. (Doc. # 21-31 at 187.) Carruth did not raise this issue either in his brief to the Court of Criminal Appeals or in his petition for writ of certiorari to the Alabama Supreme Court.

This claim has not been exhausted. The first remedy sought by Carruth is "review of his conviction and sentence by the Supreme Court of Alabama." (Doc. # 34 at 24, ¶ 60.) The Court of Criminal Appeals and the Alabama Supreme Court have agreed that a motion under Rule 2(b) of the Alabama Rules of Appellate Procedure is the only way to obtain this remedy in the state courts. (Doc. # 21-28 at 132–33; Doc. # 21-30 at 34–35.) *Carruth*, 21 So. 3d at 767–69, 772. However, when Carruth traversed this procedural route, he did not invoke any federal basis for relief. Any federal claim underlying Carruth's first claimed remedy is therefore unexhausted, procedurally defaulted,[19] and—because Carruth has presented no sufficient grounds to excuse the default—barred by 28 U.S.C. § 2254(b)(1).

The second remedy sought by Carruth is an order vacating his conviction and sentence. (Doc. # 34 at 7–26, 125.) This remedy, if it was ever sought in

---

[19] Carruth's only way to raise the federal issue today would be to petition the Alabama Supreme Court for a rehearing on the Rule 2(b) motion. However, the time to file such a motion for rehearing expired two weeks after the ruling on the Rule 2(b) motion. *See* Ala. R. App. P. 40(c). Also, new arguments cannot be raised for the first time in a motion for rehearing. *See Water Works & Sewer Bd. of City of Selma v. Randolph*, 833 So. 2d 604, 608 (Ala. 2002).

Carruth's Rule 32 proceeding, was abandoned by Carruth's failure to raise the claim in his second Rule 32 appeal. It was not sufficient for Carruth to raise his federal claims in the first Rule 32 appeal, because only an extension of time for certiorari was contemplated in that appeal. Because the federal claims underlying Carruth's second claimed remedy were not pressed in the proper appeal, the claims are unexhausted, procedurally defaulted, and—because Carruth has presented no sufficient grounds to excuse the default—barred by 28 U.S.C. § 2254(b)(1).[20]

Even if these claims were exhausted, neither of Carruth's arguments has any merit. First, it is a question of state law whether certiorari review or the filing of a petition for writ of certiorari is mandatory or discretionary. The state courts have concluded that it is discretionary, *see Carruth*, 21 So. 3d at 769, and this court has no power to correct any error in that decision. *Estelle*, 502 U.S. at 67. Any federal claim that certiorari review *ought* to be mandatory is not supported by clearly established Supreme Court precedent.

Carruth's argument about the closing duties of an appellate lawyer is also not supported by clearly established Supreme Court precedent. While the Supreme Court has required *trial* lawyers to fulfill certain closing duties under *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000), *Roe* is distinguishable. *Roe* required a

---

[20] *Martinez* does not apply to claims of ineffective assistance of appellate counsel. *Davila*, 582 U.S. at ___, 137 S. Ct. at 2063.

smooth handoff from trial to appeal—two stages where the Constitution requires appointed counsel.  At issue here is the handoff from initial appeal to certiorari review—only one of which involves constitutionally required counsel.  Because of this, neither *Roe* nor any other Supreme Court precedent directly supplies the answer to Carruth's argument, and the Alabama state courts therefore cannot have contradicted any clearly established Supreme Court precedent.

This view is shared by most federal appellate courts.  *See Folkes v. Nelsen*, 34 F.4th 258, 280 (4th Cir. 2022) ("Supreme Court case law thus supports the conclusion that the constitutional right to appellate counsel is satisfied in advance of the appellate court's decision and that counsel's role ends upon issuance of that decision."); *Ahumada v. United States*, 994 F.3d 958, 961 (8th Cir.) (holding that appellate counsel's failure to notify the defendant of the deadline and process for a discretionary petition did not run afoul of the constitutional right to appellate counsel), *cert. denied*, 142 S. Ct. 135 (2021); *Pena v. United States*, 534 F.3d 92, 96 (2d Cir. 2008) (per curiam) ("[The defendant's] claim that the filing of . . . a petition [for discretionary review] should be considered the last step in his first appeal as of right—not the first step of the subsequent discretionary appeal [is] . . . ingenious, but wrong."); *Jackson v. Johnson*, 217 F.3d 360, 365 (5th Cir. 2000) (holding that there is no right to counsel "after the appellate court has passed on the claims"); *Miller v. Keeney*, 882 F.2d 1428, 1432 (9th Cir. 1989) (holding that

advising the defendant about discretionary review is not required because the "opportunity for direct appeal, and thus the defendant's constitutional right to counsel, has come to an end").[21]

Because the decision of the Alabama state courts did not contradict clearly established Supreme Court precedent, Carruth is not entitled to relief on his claims.

These claims are due to be dismissed.[22]

## C.   Alleged Errors in the Indictment

The Sixth Amendment guarantees a criminal defendant the right "to be informed of the nature and cause of the accusation" against him.  U.S. Const. amend. VI.   This guarantee applies to the states through the Fourteenth Amendment's due process clause.  *Faretta v. California*, 422 U.S. 806, 818 (1975) (The Sixth Amendment's "nature and cause" clause is "part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States."); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle

---

[21] The Sixth Circuit, relying only on its own precedent and an analogy to *Roe*, is the only federal court of appeals to hold that appellate counsel is constitutionally required to provide closing duties to a defendant.  *See Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 434 (6th Cir. 2006).

[22] Carruth repeatedly identifies elsewhere in his petition the performance of his appellate counsel as cause to excuse the procedural default of other claims.  However, because his claims regarding the performance of his appellate counsel are meritless, they cannot serve as cause to excuse his default.  They are also insufficient cause because they are unexhausted.  *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding that claims raised to excuse the procedural default of other claims must themselves be exhausted or excused from exhaustion).

of procedural due process is more clearly established than that notice of the *specific* charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."); *In re Oliver*, 333 U.S. 257, 273–74 (1948) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence. . . .").

Carruth alleges two general errors in his indictments that he says deprived him on constitutionally required notice.  First, he alleges that his "murder during the course of a burglary" charge (Count 2) in the capital murder indictment failed to specify the crime that was intended to be committed within the dwelling, and that the trial court's jury instructions impermissibly amended the indictment. (Doc. # 34 at 85–90, ¶¶ 196–206.)  Relatedly, he asserts that his trial and appellate counsel were ineffective for failing to raise these issues.  (Doc. # 34 at 49, 62–63, ¶¶ 120, 152.)  Second, Carruth contends that the evidence at trial and the jury instructions constructively amended the indictment by broadening the basis for the convictions in Counts 1 through 4 of the capital murder indictment beyond what was charged.  (Doc. # 21-1 at 95; Doc. # 34 at 86–90, ¶¶ 198–201.)

On April 16, 2002, four indictments were returned against Carruth by the same grand jury.  The first contained four counts of capital murder, and the last three separately charged attempted murder, robbery, and burglary:

### Murder During Kidnapping—First Degree (Count 1)

The Grand Jury . . . charge that . . . Michael D. Carruth . . . did intentionally cause the death of William Brett Bowyer, by shooting the said William Brett Bowyer with a pistol, and Michael D. Carruth caused said death during the time that Michael D. Carruth was in the course of abducting William Brett Bowyer with the intent to inflict physical injury upon the said William Brett Bowyer, in violation of Section 13A-5-40(a)(1) of the Code of Alabama . . . .

### Murder During Burglary—First Degree (Count 2)

The Grand Jury . . . further charge that . . . Michael D. Carruth . . . did intentionally cause the death of William Brett Bowyer, by shooting the said William Brett Bowyer with a pistol, and Michael D. Carruth caused said death during the time that Michael D. Carruth was in the course of knowingly and unlawfully entering or remaining unlawfully in a dwelling with the intent to commit a crime therein and in effecting entry or while in the dwelling or in immediate flight therefrom Michael D. Carruth or another participant in the crime was armed with a deadly weapon, to-wit: a pistol, in violation of Section 13A-5-40(a)(4) of the Code of Alabama . . . .

### Murder During Robbery—First Degree (Count 3)

The Grand Jury . . . further charge that . . . Michael D. Carruth . . . did intentionally cause the death of William Brett Bowyer, by shooting the said William Brett Bowyer with a pistol, and Michael D. Carruth caused said death during the time that Michael D. Carruth was in the course of committing a theft of Currency of the United States of America, . . . the property of Forest L. Bowyer, by the use of force against the person of Forest L. Bowyer, with intent to overcome his physical resistance or physical power of resistance, while the said Michael D. Carruth was armed with a deadly weapon, to-wit: a knife

90

or other sharp instrument and or a pistol . . . , in violation of Section 13A-5-40(a)(2) of the Code of Alabama . . . .

Murder of a Victim Less Than Fourteen Years of Age (Count 4)

The Grand Jury . . . further charge that . . . Michael D. Carruth . . . did with the intent to cause the death of William Brett Bowyer, cause the death of William Brett Bowyer, by shooting the said William Brett Bowyer with a pistol or other firearm . . . , and at the time Michael D. Carruth caused said death, William Brett Bowyer was less that fourteen (14) years of age, in violation of Section 13A-5-40(a)(15) of the Code of Alabama . . . .

(Doc. # 21-1 at 94–95 ("capital murder indictment").)

Attempt to Commit Murder

The Grand Jury . . . charge that . . . Michael D. Carruth . . . did with the intent to commit the crime of murder . . . attempt to intentionally cause the death of another person, Forest F. Bowyer, by cutting or stabbing the said Forest F. Bowyer with a knife or other sharp instrument . . . , in violation of Section 13A-4-2 of the Code of Alabama . . . .

(Doc. # 21-5 at 43.)

Robbery—First Degree

The Grand Jury . . . charge that . . . Michael D. Carruth . . . did, in the course of committing a theft of Currency of the United States of America . . . , the property of Forest F. Bowyer, use force or threaten the imminent use of force against the person of Forest F. Bowyer, with the intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the property, which the said Michael D. Carruth was armed with a deadly weapon or dangerous instrument, to-wit a knife or other sharp instrument . . . , in violation of Section 13A-8-41 of the Code of Alabama . . . .

(Doc. # 21-8 at 14.)

Burglary—First Degree

> The Grand Jury ... charge that ... Michael D. Carruth ... did knowingly and unlawfully enter or remain unlawfully in a dwelling of Forest F. Bowyer, with intent to commit a crime therein to-wit: Robbery, and while effecting entry or while in the dwelling or in immediate flight therefrom, said defendant did cause physical injury to Forest F. Bowyer, in violation of Section 13A-7-5 of the Code of Alabama . . . .

(Doc. # 21-10 at 184.)

Most claims that Carruth now asserts were first found in his original Rule 32 petition.  (Doc. # 21-27 at 32, 45–47, 70–75, ¶¶ 50, 79, 126–34.)  The trial court dismissed the underlying claims regarding the indictment because they should have been brought in the original proceeding.  (Doc. # 21-31 at 190.)  The ineffective assistance claims were dismissed as insufficiently pleaded.  (Doc. # 21-31 at 188.)

In his Rule 32 appeal, Carruth did not raise either the underlying indictment claims or the ineffective assistance of trial counsel claim.  (Doc. # 21-35 at 11.)  However, he did raise the ineffective assistance of appellate counsel claim.  Carruth's one-sentence argument to the Court of Criminal Appeals opined that the claim was "sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven."  (Doc. # 21-35 at 62–63.)  The Court of Criminal Appeals affirmed the trial court, agreeing that this claim was insufficiently pleaded.  (Doc. # 21-36 at 102.)  *Carruth*, 165 So. 3d at 647.  In Carruth's petition for writ of certiorari in

the Alabama Supreme Court, he expressed general displeasure with how the Court of Criminal Appeals had handled his ineffective assistance of appellate counsel claims in his statement of the issues.  (Doc. # 21-36 at 127, 132.)  However, he did not provide any supporting argument in the argument section, nor did he mention the indictment claims in particular.  It is unclear whether this sufficed to exhaust the claim.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).

Nonetheless, Carruth is not entitled to relief on any of these claims because, for the reasons stated below, they have no merit.

### 1.     *Failure to Allege Essential Elements of the Offense*

Carruth's first complaint regarding his indictments is that one of the charges fails to include an essential element of the offense.  Specifically, Carruth argues that the second count of the capital murder indictment, which charged the offense of murder during a burglary, should have specified the crime that Carruth intended to commit within the dwelling place of Forrest Bowyer.  (Doc. # 34 at 85–86, ¶¶ 196–97.)

The Supreme Court has laid out relatively few concrete rules for the drafting of indictments, none of which specifies that a burglary indictment must identify the crime that the defendant intended to commit within the structure.  *See Lopez*, 574 U.S. at 6.  That being said, the Supreme Court's general rule is that an indictment

must "descend to the particulars," *Russell*, 369 U.S. at 765, and there is little debate that a burglary indictment fails to meet this rule without identifying the crime that the defendant intended to commit. *See, e.g.*, *United States v. Resendiz-Ponce*, 549 U.S. 102, 112 (2007) (Scalia, J., dissenting); *People v. Archuleta*, 503 P.2d 346, 348 (Colo. 1972) ("The specific crime, or perhaps crimes, must be clearly and specifically set forth, otherwise, we would have a situation only slightly less ambiguous than in an indictment which simply charged a man with the 'commission of a crime' without naming the crime."); *State v. Minnick*, 168 A.2d 93, 97 (Del. Super. Ct. 1960).

Even assuming that the lack of detail in Carruth's indictment was a constitutional error, Carruth's claim has no merit because the error was harmless. "[T]he general rule is that a constitutional error does not automatically require reversal of a conviction." *Greer v. United States*, 593 U.S. ___, ___, 141 S. Ct. 2090, 2099 (2021) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)) (quotation marks omitted); *Chapman v. California*, 386 U.S. 18, 22 (1967). A constitutional error only requires automatic reversal of a state conviction if the Supreme Court has clearly established that the error is a "structural error." *Glebe v. Frost*, 574 U.S. 21, 23 (2014). The Supreme Court has not clearly established that an error in an indictment is a structural error. *See United States v. Cotton*, 535 U.S. 625, 632 (2002) (declining to so hold); *Resendiz-Ponce*, 549 U.S. at 116

(Scalia, J., dissenting) (noting that the court has declined to so hold); *see also generally Neder v. United States*, 527 U.S. 1, 8 (1999) (listing the errors that the Court has held are structural); *Fulminante*, 499 U.S. at 306 (listing the errors that the Court has held are not structural).

For errors not subject to automatic reversal, the prosecution must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24. Here, this standard is easily met. Alongside Carruth's "murder in the course of a burglary" charge, he was also charged with murder in the course of a robbery, robbery itself, and a burglary charge that specified that the crime intended was robbery. It was obvious to the grand jury, petit jury, and Carruth himself that the intended crime in the "murder in the course of a burglary" charge was the robbery referred to in the three other counts. The underlying policy goals were met, *see Russell*, 369 U.S. at 763–64, and a review of the whole record shows that the omission was no more than a "minor and technical deficienc[y] which did not prejudice the accused." *Id.* at 763. There is no evidence of any prejudice stemming from the omission.

Because the underlying claim is meritless, Carruth's claims of ineffective assistance of counsel are also meritless.[23] Counsel's performance cannot be

---

[23] Trial counsel did raise this issue at trial. (Doc. # 21-24 at 85.) The trial court dismissed the argument, saying: "I think there's a universal presumption according to the law

95

deficient for failing to raise a meritless claim, and their performance could not have been prejudicial for the same reason

Thus, all of Carruth's claims associated with the lack of specificity in the charge of murder in the course of a burglary are due to be dismissed.

## 2.    *Constructive Amendment of the Capital Murder Indictment*

Carruth next complains that, although the four counts of the indictment for capital murder alleged that he intentionally caused the death of William Brett Bowyer, "by shooting the said William Brett Bowyer with a pistol," (Doc. # 21-1 at 95), the evidence adduced at trial showed that his co-conspirator, Brooks, shot Brett Bowyer.   (Doc. # 34 at 86–90, ¶¶ 198–201.)   Carruth argues that the discrepancy between the allegation in the indictment—that Carruth committed the murder of Brett Bowyer—and the proof at trial—that Brooks shot and killed Brett Bowyer—amounted to a constructive amendment of the indictment.   (Doc. # 34 at 87, ¶ 198.)

Carruth also complains that the trial court's jury instructions constructively amended the robbery-murder charge in Count 3 of the capital murder indictment because they permitted the jury to consider any deadly weapon or dangerous instrument, rather than just the knife, sharp instrument, or pistol charged in the

---

that if in the burglary . . . there is no defined crime, that theft would be the crime to be alleged to have been committed."  (Doc. # 21-24 at 130.)  Because Carruth's trial counsel did argue this claim, Carruth's claim of ineffective assistance of trial counsel fails for this reason as well.

indictment.  (Doc. # 34 at 88, ¶¶ 202–03; Doc. # 21-25 at 106.)  Similarly, he argues that the jury instructions went astray by permitting the jury to consider a use of force against Brett Bowyer, as well as against Forrest Bowyer, although Count 3 of the indictment only charged a use of force against Forrest Bowyer.[24]  (Doc. # 34 at 88–89, ¶¶ 203–04; Doc. # 21-25 at 105.)

Carruth's first claim is meritless for this simple reason:  Under Alabama law, an indictment charging an individual as a principal includes a charge that the individual was merely an accomplice.  In fact, Alabama law *requires* those who aid and abet a crime to be indicted as a principal.  *Watkins v. State*, 357 So. 2d 156, 159 (Ala. Crim. App. 1977); *see* Ala. Code § 13A-2-23.   The United States Supreme Court generally permits indictments to state elements in the alternative, *see Lopez*, 574 U.S. at 5; *United States v. Miller*, 471 U.S. 130, 136 (1985), and has specifically accepted as constitutional a charge against an accomplice worded as against a principal.  *See Lopez*, 574 U.S. at 4.  Though it may seem strange for an indictment to speak of an accomplice as if he were a principal, it is a

---

[24] The trial court's charge instructed the jury that, to convict Carruth, it must find

[t]hat in the course of committing or attempting to commit the theft, or in immediate flight after the attempt or commission, the Defendant either used force or threatened the imminent use of force against the person of Forest F. Bowyer or William Brett Boyer with the intent to overcome his physical resistance . . . ; that the Defendant was armed with a deadly weapon or a dangerous instrument.

(Doc. # 21-25, at 105–06.)

constitutionally accepted practice. A defendant may be entitled to a bill of particulars or some other form of notice regarding the theory the prosecution intends to pursue, but Carruth makes no argument that such notice was lacking in his case.

Next, Carruth's contention that the trial evidence and jury instructions in support of Count 3 in the capital murder indictment constructively amended the indictment is similarly unmeritorious. (Doc. # 34 at 87, ¶¶ 203–05.) "A constructive amendment to the indictment occurs where the jury instructions" or some other variable, such as the trial evidence, "so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the indictment." *United States v. Simpson*, 228 F.3d 1294, 1299 (11th Cir. 2000) (citation and internal quotation marks omitted). Carruth is correct that a constructive amendment to an indictment can rise to the level of a constitutional violation.[25] But his reliance on the Fifth Amendment for the alleged violation is misplaced. (*See* Doc. # 34 at 88–89, ¶¶ 204–05 (citing *United States v. Miller*, 471 U.S. 130, 138 (1985) (Under the Fifth Amendment, "[t]he right to have the grand

---

[25] Carruth's arguments use "fatal variance," "material variance," and "constructive amendment" interchangeably. There is support for this usage. *See Thomas v. Harrelson*, 942 F.2d 1530, 1531 (11th Cir. 1991) ("Federal cases frequently refer to 'constructive amendment.' State cases . . . often discuss the issue in terms of 'fatal variance.'"); *see also United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (observing that a constructive amendment is "sometimes referred to as a fatal variance") (citations omitted); *Lucas v. O'Dea*, 179 F.3d 412, 417 (6th Cir. 1999) ("A change from the indictment material enough to result in a constructive amendment is also called a 'fatal variance.'").

jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment." (citation and quotation marks omitted)), and *Stirone v. United States*, 361 U.S. 212, 215–16 (1960) (Under the Fifth Amendment, "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.").)   The Fifth Amendment offers Carruth no relief:   The Supreme Court has "never held that federal concepts of a 'grand jury,' binding on the federal courts under the Fifth Amendment, are obligatory for the States." *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972); *see also Campbell v. Louisiana*, 523 U.S. 392, 398–99 (1998) ("[The] Fifth Amendment's grand jury requirement is not binding on the States." (citing *Hurtado v. California*, 110 U.S. 516 (1884)); *Grim v. Sec'y, Fla. Dep't of Corr.*, 705 F.3d 1284, 1287 (11th Cir. 2013) ("[T]he 'Fifth Amendment's grand jury indictment requirement' is not applicable to the States." (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 765 n.13 (2010)).   Hence, a constructive amendment of an indictment in a state criminal case does not violate the Fifth Amendment.

Rather, in state criminal cases, the prohibition against constructive amendments to charging documents finds it origin in the Sixth Amendment's notice clause and in the Fourteenth Amendment's due process clause. *See Cole*, 333 U.S. at 201; *In re Oliver*, 333 U.S. at 273.  The constitutional requirement of notice has two concrete effects on charging documents.  First, a charging document

must set forth the elements of the offense charged sufficient to notify the defendant of the charges against which he must defend. *See Hamling v. United States*, 418 U.S. 87, 117 (1974); *Russell v. United States*, 369 U.S. 749, 763 (1962); *see also Belt v. United States*, 868 F.2d 1208, 1211 (11th Cir. 1989) ("The requirement that an indictment set forth the essential elements of an offense functions . . . to give the defendant notice as guaranteed by the sixth amendment . . . ."). Second, the indictment must be specific enough to determine whether the facts alleged have been or will be subject to other prosecution, as could possibly violate the Double Jeopardy Clause of the Fifth Amendment. *Hamling*, 418 U.S. at 117; U.S. Const. amend. V, cl. 2. "These factors ensure the provision of constitutional notice and due process." *United States v. McGarity*, 669 F.3d 1218, 1235 (11th Cir. 2012), *abrogated on other grounds as recognized by United States v. Rothenberg*, 923 F.3d 1309, 1336 (11th Cir. 2019). However, "even an inadequate indictment satisfies due process if the defendant has actual notice [of the charges against him], such that [he] suffers no prejudice." *United States v. Odom,* 252 F.3d 1289, 1298 (11th Cir. 2001); *see also United States v. Stuckey*, 220 F.3d 976, 981 n.5 (8th Cir. 2000) (observing that a "prejudice analysis" must "be performed to determine whether a defendant's Fourteenth Amendment due process or notice rights were materially affected." (citation omitted)).

As protectors of these constitutional notice requirements, "federal courts have not hesitated to grant habeas relief to a state criminal defendant convicted of an offense other than that for which he was charged." *Tarpley v. Estelle*, 703 F.2d 157, 160–61 (5th Cir. 1983) (collecting cases). However, as the foregoing cases reveal, differences between the evidence and the charges have constitutional implications only where the charging document deprives the defendant of notice and double jeopardy concerns such that prejudice ensues.

Against this legal backdrop, the discrepancy between the proof or jury instructions and the indictment could not have been a constructive amendment of Count 3. This is because the identity of the weapon used by Carruth was not an essential element of the offense. *See Thompson v. State*, 542 So. 2d 1286, 1292 (Ala. Crim. App. 1988), *aff'd sub nom. Ex parte Thompson*, 542 So. 2d 1300 (Ala. 1989). Even if the broad language used in the court's jury instructions amounted to a variance, *see supra* note 24, it was not prejudicial. The proof at trial supported solely the allegations in Count 3 of the indictment, (Doc # 21-1, at 95)—that the weapon was a knife, sharp instrument, or pistol. The record does not disclose any other weapon upon which the jury might have based its verdict.

The identity of the victim *was* an essential element of the offense.[26]  *See Ex parte Verzone*, 868 So. 2d 399, 402 (Ala. 2003).  However, the misstatement in the jury instructions was not an amendment of the indictment because the whole context of the trial demonstrates that any new ground introduced by the jury instructions could not have been used by the jury.  The facts adduced at trial supported only the facts alleged in the indictment—that Carruth used force against Forrest Bowyer by slashing his throat.  There was no evidence supporting the alternative theory of liability—that Carruth used force against Brett Bowyer.  The misstatement by the trial court did not invite a conviction on the alternative grounds, and it therefore cannot be categorized as a constructive amendment to the indictment.

---

[26] In a charge conference before this misstatement was made, the following colloquy occurred:

> THE COURT [stating the proposed charge]:  . . . the defendant either used force or threatened to use force against a person—and this would be Forrest Butch Bowyer and Brett Bowyer—with the intent to overcome their physical resistance or physical power to resist—since they were both involved there.

> DEFENSE COUNSEL:  Judge, in the indictment they only allege in terms of physical resistance or physical power to resist against Forrest L. Bowyer.  They did not indicate William Brett Bowyer.

> . . .

> THE COURT:  All right.  Then we use just Forrest.

(Doc. # 21-24 at 125–26.)  It is unclear why or how the court reverted to the unrevised charge when time came to charge the jury.

Because the underlying claims are meritless, Carruth's claims of ineffective assistance of trial counsel and appellate counsel are also meritless. Counsel's performance cannot be deficient for failing to raise a meritless claim, and their performance could not have been prejudicial for the same reason. Further, appellate counsel could not have raised this claim because it was not raised at trial. *See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301. The claim of ineffective assistance of appellate counsel is therefore meritless for that reason too.

Thus, all of Carruth's claims associated with alleged constructive amendments to the indictment are due to be dismissed.

## D.   **Motion for Recusal**

Carruth alleges that Judge Albert Johnson's failure to recuse himself violated Carruth's "rights to due process, a fair trial, and an impartial adjudicator protected by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." (Doc. # 34 at 90–94, ¶¶ 207–19.) Carruth also brings an adjacent claim, alleging that his counsel on direct appeal was ineffective for failing to raise the issue of recusal. (Doc. # 34 at 62–63, ¶ 152.)

On November 26, 2002, after successfully arguing for the recusal of Judge George Green in the Alabama Court of Criminal Appeals, Carruth filed a motion in the trial court to recuse the newly assigned Judge Johnson. (Doc. # 21-11 at 6.) On December 4, 2002, a hearing was held on the motion. (Doc. # 21-15 at 7–90.)

At the hearing, Carruth took the stand and testified that he was employed as a bail bondsman by Tri-County Bonding LLC prior to his arrest.  Tri-County Bonding was owned by his ex-wife Catherine O'Neal.  (Doc. # 21-15 at 18–19.)  Carruth testified that he had appeared before Judge Johnson as a representative of Tri-County Bonding in "maybe fifteen or twenty" bail forfeiture proceedings.  (Doc. # 21-15 at 20.)   During this period, Carruth's brother and ex-wife had also represented Tri-County Bonding before Judge Johnson.  (Doc. # 21-15 at 21.)

At the recusal hearing, Carruth recounted three prior encounters with Judge Johnson that he believed evidenced Judge Johnson's bias toward Carruth.  In the first incident, an individual bonded by Tri-County Bonding had been arrested in Georgia.   When Judge Johnson asked Tri-County Bonding why the bonded individual failed to appear in Alabama court, Carruth filed a letter from the Russell County Sheriff's Department generally indicating that the bonded individual was detained in Georgia.  (Doc. # 21-15 at 26–27.)  Two months later, Judge Johnson ordered a hearing on the bond forfeiture.   (Doc. # 21-15 at 28.)   Carruth represented Tri-County Bonding at the hearing.  (Doc. # 21-15 at 30.)  At the hearing, Judge Johnson indicated that the letter provided by Tri-County Bonding was insufficient and said that Tri-County Bonding must provide five thousand dollars to the court by nine o'clock the day after the hearing "or you're not going to be operating at 9:01."  (Doc. # 21-15 at 30–31, 66; Doc. # 21-14 at 52–53.)

104

Carruth testified that Judge Johnson's behavior was uncordial.  Carruth remarked: "If I spoke to him like he spoke to me, I'd be in contempt of court." (Doc. # 21-15 at 31.)  Judge Johnson entered a written order of forfeiture on the same day as the hearing. (Doc. # 21-15 at 34.)  Tri-County Bonding paid the forfeiture amount but later asked that the forfeiture be set aside. (Doc. # 21-15 at 35–41.)  Although Tri-County Bonding did not produce the certified affidavit of incarceration requested by Judge Johnson, the evidence presented at a second hearing convinced Judge Johnson to set aside the forfeiture regardless. (Doc. # 21-15 at 41–43.)

In the second incident, a different bonded individual failed to appear in court.  Tri-County Bonding told Judge Johnson that it was attempting to locate the bonded individual, and Judge Johnson set the matter for a hearing.  The hearing occurred on the same date as the hearing mentioned above, but at a different time that day. (Doc. # 21-15 at 43–48, 50.)  At the hearing, Judge Johnson told Carruth: "I want $7,500 by noon today or I'll issue an order to stop you from operating." (Doc. # 21-15 at 49–50; Doc. # 21-14 at 63.)   Carruth testified that Judge Johnson's demeanor was "angry." (Doc. # 21-15 at 50.)  Tri-County Bonding paid the forfeiture amount and, although the bonded individual was later apprehended, never sought to set aside the order of forfeiture. (Doc. # 21-15 at 52.)  Carruth testified that Judge Johnson's demeanor during these two incidents was not consistent with his demeanor toward other bail bondsmen who appeared before

him that day.  (Doc. # 21-15 at 53–55, 57.)  However, Carruth testified that Judge Johnson entered orders of final forfeiture against all bonding companies "equally." (Doc. # 21-15 at 69.)

In the third incident, Tri-County Bonding had applied for recertification as a bonding agency and was required to appear before Judge Johnson to complete the application.  (Doc. # 21-15 at 55.)  During this proceeding, Judge Johnson, who had recently altered his case assignments to accept more bail bond proceedings, remarked to Carruth that the change in case assignments was "the best news that you're going to have this year."  Judge Johnson explained:  "I may be a son-of-a-bitch, but I'm an equal opportunity son-of-a-bitch."  (Doc. # 21-15 at 56.)[27] Carruth testified that Judge Johnson had made these remarks in a "polite" manner and that Judge Johnson appeared to be "in a good mood" at the time.  (Doc. # 21-15 at 55.)  Nevertheless, Carruth testified that these remarks made him feel "scared."  (Doc. # 21-15 at 56.)

At the recusal hearing, Judge Johnson offered into evidence the transcript of another proceeding where he had placed a short deadline on a different bail bonding agency.  (Doc. # 21-15 at 75–77; Doc. # 21-14 at 79–80.)  At the end of

---

[27] Judge Johnson remarked at the recusal hearing that he has used similar language in the past.  He commented that he probably would have used the acronym "S.O.B." instead of saying "son of a bitch," but did not recall the specific incident mentioned by Carruth.  (Doc. # 21-15 at 83.)

the hearing, Judge Johnson held that Carruth had not presented evidence supporting a reasonable perception of bias.  Judge Johnson therefore orally denied the motion to recuse.  (Doc. # 21-15 at 87.)  A written order to the same effect was entered later that day.  (Doc. # 21-11 at 49.)

Carruth's subsequent attempt to recuse Judge Johnson via writ of mandamus was rebuffed by the Court of Criminal Appeals without opinion.  (Doc. # 21-11 at 51.)  *See Carruth*, 927 So. 2d at 873 n.3.  Carruth did not seek review of his mandamus petition in the Alabama Supreme Court.

After he was sentenced to death, Carruth raised this issue on direct appeal.  (Doc. # 21-26 at 60, 138, 140–51, 174.)  The Court of Criminal Appeals again dismissed the argument, saying:

> In this case, the only bias on the part of Judge Johnson Carruth alleged is judicial in nature—stemming from Judge Johnson's presiding over two bond-forfeiture cases involving Carruth's employer and Judge Johnson's off-the-record comments when Carruth applied for recertification on behalf of his employer.  Carruth has failed to show, or even to allege, any personal bias on the part of Judge Johnson stemming from an extrajudicial source.  Moreover, there is no reasonable question as to Judge Johnson's impartiality or any appearance of impropriety.  Merely because Judge Johnson ruled against Tri-County in the bond-forfeiture hearings at which Carruth was Tri-County's representative does not create an appearance of impropriety and, as Carruth admitted during cross-examination, Judge Johnson entered final forfeitures against all bonding companies "equally."  Although Carruth found Judge Johnson's demeanor at the forfeiture hearings to be less than cordial, a judge's demeanor during a judicial proceeding is not sufficient to warrant recusal.  "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—

remain immune." Finally, as Judge Johnson noted during the recusal hearing, any comments he made to Carruth when Carruth applied for recertification on behalf of Tri-County were "not . . . reference[s] to anyone else but to [him]self," and, thus, do not create an appearance of impropriety.

There was no basis for Judge Johnson to recuse himself in this case; therefore, he properly denied Carruth's motion to recuse.

*Carruth*, 927 So. 2d at 874–75 (citations omitted). Carruth, as discussed above, did not file a petition for writ of certiorari in the Alabama Supreme Court in his direct appeal.

Carruth raised the issue for a third time in his Rule 32 petition. (Doc. # 21-27 at 87–88, ¶¶ 157–59.) Carruth's Rule 32 petition also identified the new claim that his appellate counsel was ineffective for failing to raise the recusal issue. (Doc. # 21-27 at 45–46, ¶ 79.) The trial court dismissed the ineffective assistance claim as insufficiently pleaded, and it dismissed the underlying recusal claim as procedurally barred because it was addressed at trial and in a previous appeal. (Doc. # 21-31 at 188, 192.)

In his Rule 32 appeal, Carruth did not raise the underlying recusal claim. (Doc. # 21-35 at 11.) However, he did raise the ineffective assistance claim. Carruth's one-sentence argument to the Court of Criminal Appeals opined that the claim was "sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. # 21-35 at 62–63.) The Court of Criminal Appeals dismissed this

108

argument, noting that Carruth's claim was "refuted by the record" since the recusal issue was in fact "raised by appellate counsel in Carruth's direct appeal." (Doc. # 21-36 at 102.)   *Carruth*, 165 So. 3d at 647.   In Carruth's petition for writ of certiorari in the Alabama Supreme Court, he expressed general displeasure with how the Court of Criminal Appeals had handled his ineffective assistance of appellate counsel claims in his statement of the issues. (Doc. # 21-36 at 127, 132.) However, he did not provide any supporting argument in the argument section, nor did he mention the recusal claim in particular.   It is unclear whether Carruth's brief mention of the ineffective assistance claim sufficed for exhaustion purposes.   *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).

The underlying claim that Judge Johnson ought to have recused himself, however, is certainly unexhausted.   Carruth never marshalled the claim through a full round of the state's appellate process.   He did not seek review in the Alabama Supreme Court from the writ of mandamus, and he did not seek review on direct appeal.   In the Rule 32 proceeding, Carruth did not raise the main recusal claim in either the Court of Criminal Appeals or the Alabama Supreme Court.   The claim is therefore unexhausted, procedurally defaulted, and—because Carruth has presented no sufficient grounds to excuse the default—barred by 28 U.S.C. § 2254(b)(1).   Even if it were exhausted, the claim is meritless.

Carruth's motion for recusal relied on both Alabama and federal law.  This court must look only to the federal law.  *Estelle*, 502 U.S. at 67.  Specifically, this court must determine whether the failure to recuse violated clearly established federal standards for the recusal of state judges.

"[M]ost matters relating to judicial disqualification d[o] not rise to a constitutional level."  *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702 (1948).  While the Supreme Court has generally urged recusal if "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), and has said that "justice must satisfy the appearance of justice," *In re Murchison*, 349 U.S. 133, 136 (1955) (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)), these vague urges have been countered by "a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47.

At the time the Alabama state courts adjudicated Carruth's recusal claim on the merits, federal law had only clearly established two situations where recusal was required.  *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 890 (2009) (Roberts, C.J., dissenting); *Withrow*, 421 U.S. at 47.  The first is where the judge holds a direct or indirect pecuniary interest in the outcome of the case.  *See Tumey v. Ohio*, 273 U.S. 510, 535 (1927).  The second is where the judge "has been the target of personal abuse or criticism from the party before him" and is asked to

preside over contempt proceedings arising out of that conduct.  *Withrow*, 421 U.S. at 47; *see Murchison*, 349 U.S. at 138–39.[28]  The Supreme Court has consistently held that "[p]ersonal bias or prejudice 'alone would not be sufficient basis for imposing a constitutional requirement [of recusal] under the Due Process Clause.'" *Caperton*, 556 U.S. at 877 (main opinion) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986)).

Contrary to Carruth's assertions, recusal has never been constitutionally required "whenever impartiality might reasonably be questioned."  (Doc. # 34 at 93.)  However, if state courts apply this higher standard, their inquiry is sufficient to encompass the constitutional inquiry.  After all, constitutional questions of recusal "are, in most cases, answered by common law, statute, or the professional standards of the bench and bar."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Lavoie*, 475 U.S. at 828.

Carruth takes issue with the factual finding that Judge Johnson's impartiality could not reasonably be questioned.  (Doc. # 34 at 93, ¶ 217.)  By making this

---

[28] Since 2009, the Supreme Court has also required recusal where a litigant had provided substantial campaign contributions to a judge.  *Caperton*, 556 U.S. at 884 (main opinion).  And since 2016, the Court has required recusal where "a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case."  *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).  However, these cases are inapplicable here because a state court is only required to comply with the Supreme Court precedent that existed at the time of the state court's decision.  *Williams*, 529 U.S. at 365; *Lockyer*, 538 U.S. at 71–72.  The last state court decision to address Carruth's recusal claim on the merits was issued in 2005.  (Doc. # 21-26 at 273–85.)  *Carruth*, 927 So. 2d 866.

factual finding, the trial court made a far deeper inquiry than that required by the Constitution.  To the extent that this finding exceeded the requirements of the Constitution, Carruth's disagreement with the finding cannot find relief in this habeas corpus action.  But hair-splitting is unnecessary here:  The whole of Judge Johnson's factual finding was reasonable in light of the evidence presented in the state court hearing because the prior interactions between Carruth and Judge Johnson were limited, consistent with Judge Johnson's usual treatment of bail bondsmen, and could not have generated any reasonable questioning of Judge Johnson's impartiality.

In sum, no clearly established federal law required Judge Johnson to recuse himself.  Judge Johnson had no direct or indirect pecuniary interest in the outcome of Carruth's case, and the case was not a contempt proceeding.  The relatively harsh manner in which Judge Johnson had treated Carruth and Tri-County Bonding in the past provided no basis for requiring recusal.  Judge Johnson's decision not to recuse—and its affirmance by the Court of Criminal Appeals—was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The underlying claim is meritless.  Because the underlying claim is meritless and because Carruth's appellate counsel did raise this issue on appeal,[29] the claim of ineffective assistance of appellate counsel is meritless.

Both claims are due to be dismissed.

## E.  Motion for Change of Venue

Carruth alleges that the denial of his motion to change venue violated his "rights to due process, a fair trial, an impartial jury, and a reliable sentencing protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."  (Doc. # 34 at 34–37, ¶¶ 87–93.)  Carruth also brings an adjacent claim, alleging that his counsel on direct appeal was ineffective for failing to raise the change of venue claim.  (Doc. # 34 at 62–63, ¶ 152.)

Pretrial publicity was a constant concern in Carruth's case.  Though news media was never excluded from the proceedings, an order was entered at a preliminary hearing on April 1, 2002, prohibiting lawyers and witnesses from making out-of-court statements about the case.  (Doc. # 21-14 at 110.)  This order was continued through trial.  (Doc. # 21-12 at 65; Doc. # 21-13 at 17; Doc. # 21-16

---

[29] Carruth's petition for writ of habeas corpus only alleges that his "appellate counsel failed to raise on appeal the following issue[]: . . . trial court error in denying the recusal motion."  (Doc. # 34 at 62–63, ¶ 152.)  This allegation is false.  Recusal was one of two issues extensively argued before the Court of Criminal Appeals in Carruth's direct appeal.  (Doc. # 21-26 at 60, 138, 140–51, 174.)  If Carruth is instead complaining about the *way* this issue was argued, he fails to raise any facts showing that his appellate counsel was deficient—much less facts sufficient to show that such deficiency was prejudicial.

at 52–53.)  Carruth filed a pretrial motion for discovery from news organizations, alleging that "the case has been given such extensive publicity . . . in Russell County and neighboring counties, and in a manner so prejudicial to the Defendant, that a fair trial by an impartial and unbiased jury cannot be had in Russell County, or any neighboring counties."  (Doc. # 21-11 at 139–44.)[30]  That motion was soon followed by the motion at issue here—a motion to change venue.  (Doc. # 21-12 at 108–13.)

The motion to change venue cited several news articles discussing the crime and/or the ensuing legal proceedings.  Much of the news coverage occurred shortly after the crime, (Doc. # 21-12 at 114–38), though later articles discussed the grand jury's indictment, (Doc. # 21-12 at 139), a motion to close the proceedings to the public, (Doc. # 21-12 at 141–42), the Court of Criminal Appeals' order permitting Judge Johnson to try the case, (Doc. # 21-12 at 143), and several articles discussed the one-year anniversary of the crime.  (Doc. # 21-12 at 145–54.)[31]

---

[30] Carruth's motion for discovery from news organizations was resolved at oral argument when Carruth conceded that the discovery should be handled through subpoenas on an organization-by-organization basis.  (Doc. # 21-16 at 26–28.)

[31] At trial, Carruth orally supplemented his motion for change of venue, (Doc. # 21-16 at 93), to include one article from September 28, 2003, discussing the trial court's decision to defer ruling on the motion to change venue.  The article provided a summary of the facts of the case, but not any inadmissible and prejudicial information.  (Doc. # 21-14 at 67.)

Nearly all the articles provided a summary of the public facts of the case. With only few exceptions,[32] the facts aligned with the evidence presented at trial. However, some articles also contained facts that, regardless of their truth, were inadmissible at trial and prejudicial to Carruth.  First, most of the articles claimed or suggested a connection between the Bowyer crime and another notable crime against the Ratliff family.[33]  (Doc. # 21-12 at 115–19, 123–27, 129, 142, 149.) Second, many of the articles provided details about the personal lives of the victims.  (Doc. # 21-12 at 116, 127, 129, 132, 135, 147, 149.)  Third, one article indicated that a "statement" was "taken . . . from Brooks," (Doc. # 21-12 at 124), although the article did not contain any further details regarding this statement.[34]

Lastly, several articles included possibly prejudicial opinions on the crime or the potential punishment.  One commentator described the crime as a "heinous act," (Doc. # 21-12 at 116), another commentator said that it was "a horrible crime" and proof that "man can be evil and wicked," (Doc. # 21-12 at 127), a third

---

[32] One such exception was the headline: "Boy Killed with Dad's Gun."  (Doc. # 21-12 at 122.)  When it became public that Forrest Bowyer's gun was not used to kill Brett Bowyer, this headline was retracted.  (Doc. # 21-12 at 125.)

[33] The Ratliff crime is discussed in greater detail in Section IV.I.1. of this opinion.

[34] Though unlikely to have prejudiced Carruth, one feature of the pretrial publicity was discussion of Forrest Bowyer's March 3, 1994 conviction in federal court on drug charges.  On February 24, 2002, one newspaper published a story on this conviction alongside a story on the funeral of Brett Bowyer.  (Doc. # 21-12 at 128–29.)  On February 28, 2002, several letters to the editor were published criticizing publicizing the conviction.  (Doc. # 21-12 at 132, 135.)

commentator said that it was an "unthinkable crime." (Doc. # 21-12 at 132.)  A letter published in one newspaper addressed Forrest Bowyer:  "May God be with Brett and punish all of those who have victimized you and your family." (Doc. # 21-12 at 132.)

One local newspaper published a letter from a Georgia resident in its opinion section, entitled "Let the Murderers Suffer."  The letter advocated for the continued use of the electric chair in Alabama, instead of the then-novel lethal injection.  The author remarked:  "Killers need to know some pain and agony before they exit this world."  The letter used the killing of Brett Bowyer as an example, detailing the author's personal connection with the boy.  The author bemoaned the inevitable process that would be accorded to the defendants:  "For the next 10 years we'll have to listen to these liberal bleeding hearts about the defendants' rights.  When the killer or killers pulled the trigger they forfeited all their rights, even to breathe any more life." (Doc. # 21-12 at 135.)  A letter from another Georgia resident expressed similar concerns with the criminal justice system:  "If we ever hear of someone being executed for a crime it is 15 to 20 years afterward when the crime itself is almost forgotten.  Obviously some changes need to be made.  I only hope that the system works better in Alabama, and that the Bowyer killers get their punishment soon." (Doc. # 21-12 at 138.)

That letter was published on March 7, 2002.

At oral argument on the motion to change venue, the trial court indicated that the best way to assess prejudice was through voir dire.  (Doc. # 21-15 at 105–06.)  Accordingly, the trial court entered an oral order reserving ruling on the motion.  (Doc. # 21-16 at 55–56.)  The trial court also entered an oral order to sequester the jury, (Doc. # 21-16 at 7–8), with both sides agreeing that this would resolve any in-trial issues regarding news media.  (Doc. # 21-16 at 54.)

More than one hundred prospective jurors were called for jury service.  (Doc. # 21-16 at 141; Doc. # 21-21 at 72.)  Seventy-three were asked about pretrial exposure to the facts of the case—fifty-six of whom reported that they had some level of exposure to the facts through media or general conversations, twenty-one of whom reported that they had formed an opinion as to Carruth's guilt or suspected that the media exposure could affect their verdict, and six of whom indicated that they would be unable to put aside that opinion and base their verdict solely on the facts presented at trial.  (Doc. # 21-16 at 153–Doc. # 21-21 at 71.)

Thirty-two of the seventy-three were then dismissed or excused for various reasons before the jury was selected.  Of the forty-one remaining, thirty-two had indicated some level of exposure to the facts, and eight had reported that they had formed an opinion as to Carruth's guilt or suspected that the media exposure could

affect their verdict.[35]   None had indicated that they would be unable to set aside that opinion and base the verdict solely on the facts presented at trial.  During voir dire, Carruth only challenged for cause two of the thirty-two who had media exposure, but neither challenge was based on pretrial exposure to the facts.[36]

Before selecting the jury, the trial court heard oral argument on the motion to change venue.  (Doc. # 21-21 at 71.)  The trial court then noted that none of the remaining prospective jurors was challenged for cause based on pretrial exposure to the facts, and orally denied the motion to change venue without further elaboration.  (Doc. # 21-21 at 79–80.)  The jury was then selected.

Of the twelve jurors selected, (Doc. # 21-26 at 5–6), ten had been exposed to some pretrial publicity of the case, but none had formed any opinion about the case.  Both alternates were exposed to pretrial publicity, and one had formed an opinion about the case, but neither participated in deliberations.  (Doc. # 21-25 at

---

[35] At oral argument on the motion to change venue, defense counsel represented a different count, saying that only twenty-six had been exposed to the facts and only six had expressed an opinion as to guilt or predicted difficulty in ignoring the exposure.  (Doc. # 21-21 at 74.)

[36] Prospective juror Cardwell indicated that her media exposure was "some but not very in depth."  (Doc. # 21-17 at 80.)  Prospective juror F. Hill indicated that she had read about the case, and when asked if she had formed an opinion, answered: "Sort of yes and no."  (Doc. # 21-18 at 56.)  She then clarified that she had not formed "definite opinions," but agreed that she had formed "leanings" toward guilt.  (Doc. # 21-18 at 64.)  Both indicated that they could set aside their media exposure, and both were challenged for cause solely for unrelated reasons.  (Doc. # 21-17 at 107; Doc. # 21-18 at 73–74.)  At oral argument on the motion to change venue, defense counsel only identified Cardwell as fitting this category.  (Doc. # 21-21 at 79–80.)

118

138–40.)  All of the jurors said that they could set aside any pretrial information or opinions.

After he was sentenced to death, Carruth raised this issue on direct appeal. (Doc. # 21-26 at 60, 138, 152–75.)  The Court of Criminal Appeals disagreed with Carruth's argument, saying:

> In support of his motion for a change of venue, Carruth submitted several newspaper articles that had been published about the case; most of those articles were printed within two months of the murder, and all but one of the remaining articles were printed approximately a year later, in February 2003, over seven months before Carruth's trial began in September 2003.  One article appeared in a local newspaper the weekend before jury selection began.  We have examined the articles presented to the trial court, and we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational.  . . .
>
> We do not find that the pretrial publicity in this case so "pervasively saturated" the community as to render the court proceedings nothing more than a "hollow formality."  Nor do we find that the publicity was so inherently prejudicial as to create a presumption of prejudice. Carruth has failed to prove that the media reports so inflamed or saturated the community as to create an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice.
>
> In addition, we have thoroughly reviewed the record and we find no evidence of actual prejudice on the part of any juror who sat on Carruth's jury.  The jury venire . . . was questioned extensively and thoroughly in an individual, sequestered setting.  While the majority of the prospective jurors had read or heard media reports about the case and many had formed opinions about the case based on those reports, only six stated that they had such fixed opinions of Carruth's guilt based on the media coverage that they would be unable to set aside those opinions and render a decision based solely on the

evidence, and those jurors were removed for cause.  In addition, although 10 of the 12 jurors who ultimately decided the case indicated during voir dire that they had read or heard media reports, those 10 jurors also indicated that they could set aside what they had read or heard and base their decision solely on the evidence presented during the trial.

. . .

Carruth has failed to show either that the community was saturated with such prejudicial pretrial publicity as to create a presumption of prejudice or that actual prejudice existed among the jurors at his trial. The media coverage was not so sensational and inflammatory as to create a presumption of prejudice, and the record contains no indication that any juror who sat on Carruth's jury had such a fixed opinion of Carruth's guilt that he or she could not render an impartial verdict based on the evidence presented at trial.  Therefore, the trial court did not abuse its discretion in denying Carruth's motion for a change of venue.

*Carruth*, 927 So. 2d at 876–78 (citations omitted) (footnote omitted).  Carruth, as discussed above, did not file a petition for writ of certiorari in the Alabama Supreme Court on his direct appeal.

Carruth raised the issue for a third time in his Rule 32 petition.  (Doc. # 21-27 at 53–56, ¶¶ 90–95.)  Carruth's Rule 32 petition also identified the new claim that his appellate counsel was ineffective for failing to raise the venue issue.  (Doc. # 21-27 at 45–46, ¶ 79.)  The trial court dismissed the ineffective assistance claim as insufficiently pleaded, and it dismissed the underlying change of venue claim as procedurally barred because it was addressed at trial and in a previous appeal.  (Doc. # 21-31 at 188–89.)

120

In his Rule 32 appeal, Carruth did not raise the underlying change of venue claim.  (Doc. # 21-35 at 11.)  However, he did raise the ineffective assistance claim.  Carruth's one-sentence argument to the Court of Criminal Appeals opined that the claim was "sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven."  (Doc. # 21-35 at 62–63.)  The Court of Criminal Appeals dismissed this argument, noting that Carruth's claim was "refuted by the record" since the venue issue was in fact "raised by appellate counsel in Carruth's direct appeal." (Doc. # 21-36 at 102.)  *Carruth*, 165 So. 3d at 647.  In Carruth's petition for writ of certiorari in the Alabama Supreme Court, he expressed general displeasure with how the Court of Criminal Appeals had handled his ineffective assistance of appellate counsel claims in his statement of the issues.  (Doc. # 21-36 at 127, 132.) However, he did not provide any supporting argument in the argument section, nor did he mention the change of venue claim in particular.  It is unclear whether Carruth's brief mention of the ineffective assistance claim sufficed for exhaustion purposes.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).

The underlying change of venue claim, however, is certainly unexhausted. Carruth never marshalled the claim through a full round of the state's appellate process.  He did not seek review in the Alabama Supreme Court on direct appeal,

and he did not seek review in either the Court of Criminal Appeals or the Alabama Supreme Court in the Rule 32 proceeding. The claim is therefore unexhausted, procedurally defaulted, and—because Carruth has presented no sufficient grounds to excuse the default—barred by 28 U.S.C. § 2254(b)(1). Even if it were exhausted, the claim is meritless.

The Sixth Amendment guarantees the right to trial by an "impartial jury." U.S. Const. amend. VI. This right has been accorded to state defendants by operation of the Fourteenth Amendment's Due Process Clause. *See Cummings v. Dugger*, 862 F.2d 1504, 1509 (11th Cir. 1989). It should first be noted that "[t]he law . . . favors publicity in legal proceedings, so far as that object can be attained without injustice to the persons immediately concerned." *Estes v. Texas*, 381 U.S. 532, 542 (1965) (plurality opinion).[37] It is generally presumed that jurors are impartial, *see Irvin v. Dowd*, 366 U.S. 717 (1961), and the defendant has the burden to prove otherwise. *Murphy v. Florida*, 421 U.S. 794, 803 (1975); *Cummings*, 862 F.2d at 1509.

"It is not required . . . that the jurors be totally ignorant of the facts and issues involved." *Irvin*, 366 U.S. at 722. However, there are two situations where the effect or potential effect of pretrial media is so great that a change of venue

---

[37] The plurality and concurrence in *Estes* disagreed on the proper test for permitting or excluding video broadcasting in criminal trials. *See id.* at 587 (Harlan, J., concurring).

must be granted.   The first is where the criminal defendant proves that the publications have resulted in "actual prejudice" to his case because members of the jury already have formed an opinion as to guilt.  *Murphy*, 421 U.S. at 798; *Irvin*, 366 U.S. at 722.   The second is where the criminal defendant proves that "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings" such that prejudice ought to be presumed. *Murphy*, 421 U.S. at 799; *see also Estes*, 381 U.S. at 542–43; *Sheppard v. Maxwell*, 384 U.S. 333, 357 (1966).

Carruth has not demonstrated that any of the twelve jurors who convicted him had any preconceived opinion as to his guilt.   Therefore, Carruth has not sufficiently proven actual prejudice.   Even if a juror's mere pretrial exposure to inadmissible information was a basis for a finding of actual prejudice,[38] most of the ten jurors who were exposed to pretrial publicity only vaguely recalled hearing about the case or briefly seeing a headline on the case.   There is no basis in the record for concluding that any of the ten encountered any inadmissible information.

---

[38] Carruth argues that any juror exposure to inadmissible and prejudicial information should be treated as actual prejudice.  (Doc. # 34 at 34–35, ¶ 87.)  For this proposition, he cites *Marshall v. United States*, 360 U.S. 310, 312 (1959).   However, *Marshall* was not a constitutional decision and does not apply to state prosecutions.  *See Murphy*, 421 U.S. at 798. The Supreme Court has not clearly established this rule for state prosecutions.

The bar for presumed prejudice is high, and the Supreme Court has only presumed prejudice when the media caused the proceedings to be "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy*, 421 U.S. at 799.  A juror's mere exposure to inadmissible information will not give rise to presumed prejudice.  *Id.*  Pretrial media must have "so pervasively exposed" the community to highly prejudicial and inadmissible material that "[a]ny subsequent court proceedings in [that] community . . . could be but a hollow formality." *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963).  A change of venue has been mandated where a "pattern of deep and bitter prejudice [against the defendant is] shown to be present throughout the community," *Irvin*, 366 U.S. at 727 (quotation marks omitted), and where the community is shown to be "deeply hostile to the accused." *Murphy*, 421 U.S. at 803.

The Supreme Court has not drawn a definite line on the percentage of jurors or prospective jurors that must express hostility to the defendant before a change of venue is mandated under the Constitution.  Assessing the potential prejudicial effect of media is generally left to the trial court.  *See Irvin*, 366 U.S. at 724–25. However, some guideposts can be found in the Supreme Court's jurisprudence. First, in *Irvin*, the Court noted that ninety percent of the prospective jurors in that case had a pretrial opinion on the defendant's guilt, including eight out of twelve

who were selected to serve on the jury. This figure was used by the Court to conclude that prejudice must be presumed. 366 U.S. at 727. Conversely, in *Murphy*, the Court noted that only twenty out of seventy-eight prospective jurors in that case—around twenty-six percent—had formed an opinion on the defendant's guilt. The Court remarked that: "This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." 421 U.S. at 803.

Twenty-nine percent of the prospective jurors called in Carruth's case harbored a pretrial opinion as to his guilt. The media exposure was, for the most part, several months removed from the trial. And while the publication of inadmissible and prejudicial content—a claimed connection to the Ratliff murders, details of the personal lives of the victims, mention of a co-conspirator's confession, and the opinions of members of the public on the appropriateness of the death penalty in this case—was not helpful to the proper insulation of jurors from this information, it did not sufficiently pervade the community so as to necessitate a finding of presumed prejudice. While the crime certainly was of interest to the community, it cannot be said that a "pattern of deep and bitter prejudice" developed against Carruth, *Irvin*, 366 U.S. at 727, or that the community was "deeply hostile to the accused." *Murphy*, 421 U.S. at 803. The

Alabama courts' conclusion did not contradict or unreasonably apply the broad standard set forth by the Supreme Court, and their decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The underlying claim is meritless.  Because the underlying claim is meritless and because Carruth's appellate counsel did raise this issue on appeal,[39] the claim of ineffective assistance of appellate counsel is meritless.

Both claims are due to be dismissed.

## F.   **Alleged Errors in Jury Selection**

### 1.   *Racial Bias in Jury Selection*

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that an inquiry into the motivations behind a peremptory challenge may be required to ensure that the challenge was not made for purposeful discrimination on the basis of race.  "[T]he burden is, of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination."  *Id.* at

---

[39] Carruth's petition for writ of habeas corpus only alleges that his "appellate counsel failed to raise on appeal the following issue[]: . . . the trial court's improper denial of Carruth's motion for a change of venue."  (Doc. # 34 at 62–63, ¶ 152.)  This allegation is clearly false. Change of venue was one of two issues extensively argued before the Court of Criminal Appeals in Carruth's direct appeal.  (Doc. # 21-26 at 60, 138, 152–75.)  If Carruth is instead complaining about the *way* this issue was argued, he fails to raise any facts showing that his appellate counsel was deficient—much less facts sufficient to show that such deficiency was prejudicial.

93 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)) (quotation marks omitted).

> In deciding if the defendant has carried his burden of persuasion, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Circumstantial evidence of invidious intent may include proof of disproportionate impact. . . .
>
> . . . Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion.  The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties.  Rather, the State must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result."

*Id.* at 93–94 (citations omitted).

Carruth is white; Brooks is white; Forrest Bowyer is white; and Brett Bowyer was white.  While Carruth's race does not preclude him from challenging the state's treatment of jurors of other races, it is relevant to this analysis.  *Powers v. Ohio*, 499 U.S. 400, 416 (1991).

Carruth alleges that *Batson* was violated in the selection of his jury.  (Doc. # 34 at 38–42, ¶¶ 94–102.)  As evidence that a racial bias was present, Carruth alleges that "the district attorney used 66% of his challenges to strike 63% of the black jurors from the jury."  (Doc. # 34 at 38, ¶ 95.)  Carruth alleges that a comparison of the characteristics of the struck and non-struck jurors shows that race must have been a motivating factor.  (Doc. # 34 at 39–40, ¶ 98.)  In addition to

the numerical disparity in the state's use of peremptory strikes, Carruth points to specific instances in the record where he believes that racial bias played a role in a peremptory strike—specifically, the state's treatment of prospective jurors Willis and Word.  (Doc. # 34 at 40–41, ¶ 99.)  Lastly, Carruth alleges that "[t]he Russell County district attorney's office has a history of practicing racial discrimination in jury selection." (Doc. # 34 at 41, ¶ 100.)

As support for his numerical data, Carruth cites a single sheet in the record. However, that sheet lists only the names, juror numbers, and strike order of the forty-one prospective jurors remaining at the time the jury was struck.  It does not provide any demographic data on the individuals.  (Doc. # 21-4 at 94.)  Other than a partial list summarizing some of the juror questionnaires, (Doc. # 21-4 at 59), and a few responses given during voir dire, there is no evidence in the record indicating the racial makeup of either the venire or the jury that was ultimately selected.  The numbers provided by Carruth do not have any basis in the record.

No *Batson* challenge was made during the jury selection, and juror questionnaires were not placed in the record.  Therefore, the record does not contain the state's justifications for each strike or even all the information that might have been contemplated by the state in making its strikes.

To be clear, Carruth's trial counsel were not unaware of *Batson* or the legal implications of race in jury selection.  Trial counsel challenged the racial

composition of the jury pool, (Doc. # 21-11 at 120–24), and the racial composition of the grand jury.  (Doc. # 21-11 at 128–32.)  He sought demographic data on the grand jury, (Doc. # 21-11 at 163–67), and advocated for equal representation on the petit jury.  (Doc. # 21-16 at 40–50.)  Trial counsel filed a motion *in limine* to preempt any *Batson* issues, (Doc. # 21-11 at 78), which was granted by the trial court.   (Doc. # 21-16 at 37.)   At the end of jury selection, trial counsel affirmatively stated to the trial court that there were no *Batson* challenges.  (Doc. # 21-21 at 84–85.)   Thus, the record clearly demonstrates that Carruth's trial counsel were attentive to *Batson* issues.

Carruth tacitly acknowledges the lack of evidence for this claim by accusing his trial counsel of "failing to create a record of the racial composition of the jury venire," and his appellate counsel of failing to "preserve in the trial or appellate record facts necessary to support this claim."  (Doc. # 34 at 44–45, ¶ 109.)  These allegations are brought alongside other allegations that Carruth's trial counsel, (Doc. # 34 at 43–45, ¶¶ 105–109), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were deficient in their challenges to the state's racial bias in jury selection.

Each of these claims made its first appearance in Carruth's Rule 32 petition.  (Doc. # 21-27 at 25–27, 45–53, ¶¶ 35–38, 79, 82–89.)  The trial court dismissed the underlying *Batson* claim because it should have been raised in the original trial-level proceedings, and it dismissed the ineffective assistance claims as

insufficiently pleaded.  (Doc. # 21-31 at 188–89.)  On appeal, Carruth argued that

dismissal of his ineffective assistance claims was improper, (Doc. # 21-35 at 4, 34–

48, 62–63), but he did not mention the underlying *Batson* claim.   The Court of

Criminal Appeals agreed with the trial court:

> According to Carruth, the State used 10 of its 15 peremptory strikes,
> or 66 percent, to remove prospective black jurors.  Carruth also
> alleged that all but one of the State's first nine strikes were used to
> remove blacks from the venire.  Carruth contended that this pattern of
> strikes gave rise to an inference of discrimination.   However,
> Carruth's petition did not indicate the ultimate composition of the jury
> nor did it indicate whether the other six black veniremen served on the
> jury or whether they were struck by the defense.  To be sufficiently
> specific, a petition, at a minimum, should indicate the ultimate
> composition of the petit jury.
>
> Although Carruth did allege a number of facts in his petition, he still
> fell short of the specificity requirement by failing to disclose the racial
> composition of the jury that was ultimately selected.   Additionally,
> Carruth failed to provide thorough and specific details to support his
> other general allegations.  We note that Carruth did not disclose the
> identities of all the black veniremen that he claimed were struck in a
> racially discriminatory manner.   In his petition, Carruth only
> specifically identified five of the 10 veniremen that he claimed were
> struck solely on the basis of their race.
>
> Carruth also failed to allege that trial counsels' decision not to raise
> any Batson challenges was not sound trial strategy.  A review of the
> record reveals that, at the conclusion of jury selection, Carruth's trial
> counsel stated:  "The defense does not have any *Batson* or *J.E.B.*
> challenges at all, Your Honor."  Thus, counsel did not simply forget
> or overlook the possibility of raising *Batson* challenges but
> affirmatively stated that they did not have any such challenges.
> Counsel could have been completely satisfied with the jury that was
> selected and not wished to potentially disturb its composition by
> making a *Batson* challenge.  Because Carruth failed to even allege that

counsels' decision was not the result of sound trial strategy, his petition failed to meet the specificity requirement.

(Doc. # 21-36 at 94–95.)  *Carruth*, 165 So. 3d at 639 (citations omitted).

Carruth raised both ineffective assistance claims in his petition for writ of certiorari.  (Doc. # 21-36 at 119, 127–28, 158–60.)  Thus, the underlying *Batson* claim is not exhausted, but both ineffective assistance claims are exhausted. Regardless, none of the claims has merit.

The underlying claim is meritless because there is no evidence in the record to support it.  It is impossible to conduct a complete assessment of the state's peremptory strikes without full demographic data for the venire and the state's explanation for its strikes.

Carruth's specific examples do not prove any purposeful discrimination: Carruth says that "the prosecutor struck juror James Willis, a black juror, after receiving only affirmative responses to questions regarding his ability to be fair and impose the death penalty."  (Doc. # 34 at 40, ¶ 99.)  However, under Alabama law, the parties must continue striking jurors until only twelve remain, with the last two struck individuals being seated as alternates.  *See* Ala. R. Crim. P. 18.  Willis was the last strike used by the state and was seated on the jury as an alternate. (Doc. # 21-25 at 138–40.)  Even if the state was satisfied with Willis, someone had to be struck.  Willis was alphabetically last on the list of remaining jurors.  This or any number of other non-racial reasons could have led the prosecutor to strike

Willis.  Carruth's claim, besides lacking evidence of Willis's race, is simply too speculative to conclude that race was the motivating factor behind the strike.

Carruth says that "the prosecutor struck Willie Word, a black juror, after asking only three questions."  (Doc. # 34 at 40, ¶ 99.)  This claim might be true, but the record is missing a page of Word's voir dire.  (Doc. # 21-21 at 47–48 (page 47 of the PDF is marked as page 1365 of the transcript; page 48 is marked as page 1367).)  The material on this missing page or the material on Word's juror questionnaire may have given reason for the prosecutor to strike Word.

Lastly, a prosecutor's history of racial discrimination in jury selection cannot alone meet the defendant's burden under *Batson* to show that purposeful discrimination has occurred in *his* jury selection.  *Cf. McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) (mentioning, but not relying on, a prosecutor's history of racial discrimination in jury selection).

Carruth's underlying *Batson* claim has no merit.

Similarly, without a record of the demographic composition of the venire, it is impossible to determine whether trial counsel or appellate counsel was ineffective for failing to make a *Batson* challenge.  Even if a colorable *Batson* challenge could have been made, it also could have been sound strategy to refrain from making any such challenge.  Further, appellate counsel could not have raised

a *Batson* claim that was not raised at trial.   *See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301.

Because Carruth has the burden in this habeas proceeding, the lack of information dooms his claims.

The adjacent issue, of course, is whether Carruth's trial counsel were ineffective for failing to make a record of the racial composition of the venire.  But this claim suffers from a similar problem.  Even assuming that the performance of counsel was deficient, Carruth cannot show that the performance was prejudicial unless he can show that the *Batson* claim has merit.  Again, while the Constitution certainly prefers a complete record, *see Dobbs*, 506 U.S. at 359; *Gardner*, 430 U.S. at 361, there is no universal rule demanding that a record be made of the racial demographics of every venire.  Carruth must allege a specific reason why his counsel ought to have done so in his case.  Mysterious statistics from an unknown source, citations to irrelevant documents in the record, and incomplete summaries of the treatment of two prospective jurors cannot suffice to carry this burden.

Carruth's allegations and the information contained in the record do not establish that his trial or appellate counsel's performance was prejudicial, and the allegations do not establish that his appellate counsel's performance was deficient.

All claims in this section are due to be dismissed.

## 2.     *Erroneous Refusal to Excuse Unfit Juror*

Carruth next alleges that the Constitution was violated when the trial court refused to excuse prospective juror Cardwell for cause.   Carruth alleges that Cardwell should have been excused for cause because her voir dire testimony indicated that she could not be fair, her pre-trial exposure to media would influence her verdict, and she would be inclined to automatically impose the death penalty unless Carruth testified and showed remorse.   (Doc. # 34 at 77–79, ¶¶ 178–82.) Carruth also claims that his appellate counsel was ineffective for failing to raise these issues.   (Doc. # 34 at 62–63, ¶ 152.)   The following are the relevant portions of Cardwell's voir dire:

> COUNSEL FOR THE STATE:  Ms. Cardwell, if I asked you . . . how you felt about the death penalty.  What would you be likely to say? Believe in it, don't believe in it?
>
> CARDWELL:  Yeah, I do believe in it somewhat.
>
> THE STATE:  Somewhat.
>
> CARDWELL:  Somewhat, according to the circumstances.
>
> THE STATE:  You think that there would be cases in which it would be appropriate?
>
> CARDWELL:  Uh-huh.
>
> THE STATE:  [If you convict Mr. Carruth of capital murder,] there are two penalties, life in prison without parole and death.  Could you consider both those?
>
> CARDWELL:  Uh-huh.

THE STATE:  You wouldn't just say, well, I don't believe in the death penalty, so it's going to have to be life without parole?

CARDWELL:  Well, I think it will be according to the circumstances. You know, what I hear—

THE STATE:  Okay. That's fair enough. That's the way it's supposed to be.  Have you heard anything about this case in the media?

CARDWELL:  Somewhat.  I haven't seen much on it, T.V., because I get home afterwards, and I don't get the paper, so I have some but not very in depth.

THE STATE:  You haven't formed any opinion about whether the defendant here is guilty or—you haven't decided he's guilty based on what you read in the newspaper?

CARDWELL:  No.  No.

THE STATE:  And you understand that he is, in fact, presumed to be innocent right now?

CARDWELL:  Yeah, as of right now.

THE STATE:  That's a constitutional guarantee that we get.  And you don't have any problem with that?

CARDWELL:  No.

. . .

COUNSEL FOR THE DEFENSE:  Now, Ms. Cardwell, your jury questionnaire that you filled out for this case indicates that you occasionally read the Columbus Ledger Enquirer; correct?

CARDWELL:  Uh-huh.

THE DEFENSE:  And watch local news.  What local news channels do you watch?

CARDWELL:  Channel 9, whatever that is.  I don't even know, but like I say, I get home late, so usually it's just the seven o'clock news that I get to watch, the national news.

THE DEFENSE:  And you've indicated to the district attorney that you have read some about this case in the newspaper; correct?

CARDWELL:  Some.

THE DEFENSE:  Have you seen some about this case on the local news?

CARDWELL:  Not a lot.  Not a whole lot as far as deep details that other people might know.

THE DEFENSE:  Did you see the paper yesterday?

CARDWELL:  No, I don't get the paper.

THE DEFENSE:  All right.  Now with that exposure that you've had to media attention about this case, has that swayed you in any way in terms as to the guilt or innocence of Michael David Carruth?  . . .  Has it swayed you in any way?

CARDWELL:  No, it just bothers me that there was a child involved.

THE DEFENSE:  Do you think you would have trouble sitting on this case with this being a murder of a 12-year-old little boy?

CARDWELL:  Knowing me, yeah.

THE DEFENSE:  You'd rather not sit on this case?

CARDWELL:  Well—

THE DEFENSE:  If you had it your way, would you rather not sit on this case?

CARDWELL:  Well, I'd rather not on any case really.  I mean, you know—

THE DEFENSE:  Particularly this case.

136

CARDWELL:  I would get emotional, I'm afraid, because of the child.

THE DEFENSE:  . . . [I]f you were selected as a juror in this case, could you decide this case based solely on the evidence presented in court or would you also decide it on the evidence and what you've read or heard in the news?

CARDWELL:  No.  I would listen to what was said because I'm sure there's plenty I don't know.

THE DEFENSE:  If you were sitting as a juror in this case and you go back to that deliberation room to determine whether to convict Michael David Carruth of capital murder and any other charges that he's been indicted for, do you think what you've read or heard in the media would play a role in that?  And just being honest, do you think—

CARDWELL:  Possibly.

THE DEFENSE:  Possibly?

CARDWELL:  Possibly.

THE DEFENSE:  So if the judge instructed you, anything you've heard or read in the media, you can't consider that in the deliberation room, you're telling me it would still come in your mind and come into play?  Is that what you're saying?

CARDWELL:  It would be hard not to think about that, but I would try to look at the evidence.

. . .

THE DEFENSE:  When you go back to that deliberation room, do you think because you have that opinion, criminals just have more rights [than victims], that you would be more inclined to be harsher and automatically impose the death penalty?

CARDWELL:  Probably the impression I would get from him, it might would.

THE DEFENSE:  Okay.  What do you mean probably the impression you get from him?  Are you talking about Michael David Carruth?

CARDWELL:  Uh-huh.

THE DEFENSE:  What impression to you get from him?

CARDWELL:  Well, just what I feel he would—what I would perceive how he feels about what happened and what he says.

THE DEFENSE:  Okay.

CARDWELL:  Like I say, I'm very—with the child.  If I would hear remorse of what happened or something.

THE DEFENSE:  So before you could consider life without parole, if you were on the jury and you convicted Michael David Carruth of capital murder, before you would consider life without parole, you're telling me you would want him to take this witness stand and hear from him; is that correct?

CARDWELL:  Yeah.  I'd like to hear what he has to say.

THE DEFENSE:  And if he didn't take that witness stand, he didn't tell you what he felt or whether there was any remorse, you'd be more likely to vote for the death penalty when you go back to deliberate his punishment?

CARDWELL:  I don't really know if I would or not.  I can't really answer that truthfully until I'm in the situation.

THE DEFENSE:  All right.  But there's no doubt you'd want to hear from him?

CARDWELL:  Uh-huh.

. . .

COUNSEL FOR THE STATE:  The judge, at some point in this case, will tell you what the law is and what your obligation is.  Would you follow his instruction?  If the judge says, "Ms. Cardwell, you cannot

consider anything you heard outside this courtroom; you can only consider the evidence as it comes from the witness stand and taking into account the defendant's presumption of innocence," could you follow that direction?

CARDWELL:  Yes, sir, I would have to.

THE STATE:  It is understandable from the human perspective that the murder of a child would have an impact on anyone, but when we decide the issues of guilt in a criminal case, you can't let passion or prejudice interfere in reaching your decision about the facts.  Do you understand that?

CARDWELL:  Yes, sir.

THE STATE:  Can you set aside any passion or prejudice or sympathy that you would have for the family of little Brett Bowyer and just decide this case based on the facts, based on what comes from the witness stand?

CARDWELL:  Yes, sir.

. . .

COUNSEL FOR THE DEFENSE:  It's clear by what you indicated to me a while ago that it would have some influence as to whether you will convict Mr. Carruth and/or whether you would impose the death penalty depending on whether he took that stand; is that correct?  I mean, you would want him to take the stand before you, at least, before you would consider life without parole for him; is that correct?

CARDWELL:  Yes, sir.

(Doc. # 21-17 at 79–93.)

After Cardwell was excused from the room, Carruth challenged her for

cause, solely citing her desire to hear from the defendant:

COUNSEL FOR THE DEFENSE:  We challenge for cause Ms. Cardwell.  You heard from her, specifically, and I'm quoting her

139

because I wrote this down, she would require the defendant to take the stand and give remorse before considering life without parole.  Now, of course, the defendant has the right not to take the stand, and the DA's office didn't follow that up with any rehabilitation . . . .  [S]ince she would require the defendant to take the stand before she would— and hear remorse from him before she would even consider life without parole, and he doesn't have to take the stand, and I think that is proper grounds for a challenge for cause in this case.

. . .

THE COURT:  She did say she would follow the law.  The question was not asked to her:  "No matter what the judge tells you, are you still going to require him to take the stand?"  If that question had been asked, I would be more likely to grant your challenge, but what I've got is really a conflicting testimony situation here.  And, in all candor, trying to rectify—I'm going to rectify this one.  I believe this lady can do what we ask her to do.

(Doc. # 21-17 at 106–08.)  Later in jury selection, the court reiterated its reasoning:

The challenge for [Cardwell] basically had to do with wanting to hear from the defendant at the sentencing stage.  The juror specifically responded in no unequivocal terms that the juror could listen and abide by the instructions of the court.  Then subsequent to that, the question was asked notwithstanding that, basically would she want to hear [from the defendant] at the sentencing stage.  [If] the question had been, would the juror require the defendant to testify, I think then, as a matter of law, your challenge should have been granted, but there's a whole lot of difference between required and want.

(Doc. # 21-21 at 70–71.)

Carruth used a peremptory strike to remove Cardwell.  (Doc. # 21-4 at 94.)

Under Alabama law, as noted above, both sides had to continue striking jurors until only twelve remained, regardless of whether they were satisfied with the remaining jurors.

Carruth did not raise any issue regarding jury selection on direct appeal. (Doc. # 21-26 at 60.)  In his Rule 32 proceeding, Carruth argued, as he does here, that Cardwell should have been struck for cause because she could not be fair, her pre-trial exposure to media would influence her verdict, and she would be inclined to automatically impose the death penalty unless Carruth testified and showed remorse.  (Doc. # 21-27 at 59–61, ¶¶ 101–05.)  Carruth also argued that his appellate counsel was ineffective for failing to raise these issues on appeal.  (Doc. # 21-27 at 45–46, ¶ 79.)  Notably, however, Carruth did not argue that his trial counsel were ineffective in his handling of Cardwell.  (Doc. # 21-27 at 25–27, ¶¶ 35–39.)

The trial court dismissed the underlying claim either because it was raised at trial or could have been raised at trial.  (Doc. # 21-31 at 189–90.)  The ineffective assistance of appellate counsel claim was dismissed as insufficiently pleaded. (Doc. # 21-31 at 188.)  On appeal, Carruth only raised the ineffective assistance of appellate counsel claim, repeating his one-sentence argument that the claim was "sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. # 21-35 at 62–63.)  The Court of Criminal Appeals found that counsel was not deficient because the underlying claim was not meritorious:

> Carruth claimed that the trial court erred by refusing to grant his for-cause challenge regarding juror S.C.   Carruth quoted isolated

141

statements that S.C. made in voir dire regarding her ability to be fair. However, in none of those statements did S.C. unequivocally indicate that she could not be fair or that she had a fixed opinion about Carruth's guilt or innocence. *See* § 12–16–150(7), Ala.Code 1975 ("it is good ground for challenge of a juror by either party . . . [t]hat he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict"). Accordingly, this claim was meritless.

(Doc. # 21-36 at 103.)  *Carruth*, 165 So. 3d at 648.

Carruth raised only the ineffective assistance of appellate counsel claim in his petition for writ of certiorari.  (Doc. # 21-36 at 130.)  Thus, only the ineffective assistance of appellate counsel claim has been exhausted.  Regardless, neither claim has merit.

At trial, Carruth only challenged Cardwell on the basis that Cardwell would prefer to hear from Carruth before imposing a sentence of life without parole. (Doc. # 21-17 at 106–08.)   The other claims that he now raises—regarding Cardwell's pretrial media exposure and letting emotions rule her verdict—were never presented to the trial court.  Thus, these claims were abandoned.  Throughout his Rule 32 proceedings and his present petition for writ of habeas corpus, Carruth never has alleged that his trial counsel were ineffective for abandoning these claims.  (Doc. # 21-27 at 25–27, ¶¶ 35–39; Doc. # 34 at 43–45, ¶¶ 105–110.)[40]

---

[40] Carruth's abandonment of these hypothetical claims in his Rule 32 proceedings could possibly be overcome through *Martinez*, 566 U.S. at 14, but that avenue was closed when he failed to bring the claims in his petition for writ of habeas corpus.  In any event, the hypothetical claims would have failed for the reasons explained above the line.

Carruth's appellate counsel could not have raised these claims because they were not raised at trial.  *See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301.

The Supreme Court has held that a juror is not disqualified merely because they hold a pretrial opinion on a relevant issue:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723.  If a juror states that he or she can set aside a pretrial opinion, the trial court must "determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality."  *Reynolds v. United States*, 98 U.S. 145 (1878).  "Impartiality is not a technical conception.  It is a state of mind.  For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."  *United States v. Wood*, 299 U.S. 123, 145–46 (1936).

The trial court's refusal to dismiss Cardwell for cause was neither an unreasonable application of Supreme Court precedent nor did it involve an unreasonable determination of the facts.  Cardwell was upset about the murder of a child.  She asked herself the natural question—*How could someone do such a thing?*—and realized that the only person who knew the answer was the

perpetrator. Cardwell's answers were emotional, but sensible—and nothing about them evidenced a lack of impartiality or an inability to follow the directions of the court. Every time that Cardwell was asked whether she could follow the judge's directions, she answered in the affirmative. When she was specifically asked whether she could disregard her preference for testimony from Carruth, she unequivocally answered in the affirmative. The trial judge who was present at voir dire was in the best position to judge her answers. *See Irvin*, 366 U.S. at 723. The judge saw in Cardwell an ability to follow directions and to set aside any pretrial opinion. That was not an unreasonable finding based on the evidence presented. The ruling refusing to dismiss Cardwell for cause was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

All of Carruth's arguments are meritless. His appellate counsel's failure to raise the claim was therefore neither deficient nor prejudicial. His claim of ineffective assistance of appellate counsel is thus meritless as well.

These claims are due to be dismissed.

### 3.   *Improper Grant of a Challenge for Cause*

Carruth next alleges that the dismissal of prospective juror Richerson was unconstitutionally erroneous. Specifically, Carruth argues that "Richerson indicated that she could follow the law even though she had an opinion about the death penalty," and thus she should not have been dismissed for cause. (Doc. # 34

at 79, ¶¶ 183–84.)   Carruth also argues that his trial counsel, (Doc. # 34 at 45,

¶ 110), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective for

failing to argue this point.   The following are the relevant portions of Richerson's

voir dire:

> COUNSEL FOR THE STATE:   Ms. Richerson, you recall some
> months ago that you filled out this questionnaire?
>
> RICHERSON:  Uh-huh.
>
> THE STATE:  . . .  One question . . . asked you to give your opinion
> . . . about the death penalty if you have one.   You didn't mark
> anything, but you did down below that where it says: "Should the
> State of Alabama be allowed to impose the death penalty as
> punishment for capital murder?"  You checked that you were not sure.
> Is that sort of your feeling about it?
>
> RICHERSON:  Well, actually, my religion does—  I don't feel that
> it's my right to say so whether they should get death.
>
> THE STATE:  And that's based on your religion?
>
> RICHERSON:  Uh-huh.
>
> THE STATE:  So I would take it that being a religious conviction
> deeply held by you, and you believe that it would be a sin or immoral
> in your religion to impose the death penalty?
>
> RICHERSON:  Yes.
>
> THE STATE:  . . .  [I]f you were in this jury panel and you got to the
> point where you were considering the only two possible . . . sentences,
> . . . you would never consider the death penalty as an option, no
> matter what the facts of the case were or how heinous the crime was?
>
> RICHERSON:  Right.
>
> . . .

145

COUNSEL FOR THE DEFENSE:  Under no circumstances at all, no matter what case it is, you can never consider the death penalty in a case; is that correct?

RICHERSON:  The death penalty—  Maybe I misunderstood what he was saying, maybe he misunderstood what I was saying:  That I, myself, wouldn't feel right to say what a person should get.  Death penalty or—

THE DEFENSE:  Or life without parole.

RICHERSON:  —or life without parole.

THE DEFENSE:  So I can be clear, is you just feel that—  Do you feel that you can sit in judgment of others?

RICHERSON:  I wouldn't say whether they should either.

THE DEFENSE:  Well, let's follow up with that a little bit.  If you were selected for this jury, and you go back to that deliberation room with your fellow jurors, could you participate in the deliberation process to determine whether Mr. Carruth was guilty or not guilty?

RICHERSON:  I couldn't.

THE DEFENSE:  You could not?

RICHERSON:  *shakes head in the negative*

THE DEFENSE:  So I can be clear again, you just could not sit in judgment of someone to decide whether they're guilty or not; is that correct?

RICHERSON:  *shakes head in the negative*

THE DEFENSE:  . . .  In your questionnaire, it asked would you be more likely to believe the testimony of a law enforcement officer than that of a private citizen merely because the witness is a law enforcement officer, and you answered yes; is that correct?

RICHERSON:  Yes.

THE DEFENSE:  So if any law enforcement officer got on the stand . . . you'd be more likely to believe what that person says over anyone else?

RICHERSON:  Unless there's some change because—  Yes.

THE DEFENSE:  So you'd be more likely to believe the testimony of a police officer; is that correct?

RICHERSON:  It all depends.

THE DEFENSE:  All depends.  All depends on the evidence that's presented—

RICHERSON:  Yes.

THE DEFENSE:  —in this case?

RICHERSON:  Uh-huh.

THE DEFENSE:  And I notice from your questionnaire you've got a 12-year-old little girl?

RICHERSON:  Yes.

THE DEFENSE:  And being that Michael David Carruth is charged with allegedly murdering 12-year-old Brett Bowyer, do you think having a child that is the same age as Brett Bowyer would cause you any problems in sitting on this jury?

RICHERSON:  Uh-huh.

THE DEFENSE:  Is that a yes?

RICHERSON:  That's correct, yes.

THE DEFENSE:  Because of that, do you think that would prevent you from being fair and impartial in this case?

RICHERSON:  I don't want to be a part of this case because I have a 12-year-old, and, you know, it would break me, my heart, to know, you know, something like tragic like that would have happened.

147

THE DEFENSE:  So you couldn't be fair in the case because of that; is that correct?

RICHERSON:  I would be fair, but I, you know, I just wouldn't want to have no part of it.

THE DEFENSE:  But again, so we can be clear for the record, you can't sit in judgment of your fellow man to determine whether to convict him or not; is that correct?

RICHERSON:  I mean, I could.

THE DEFENSE:  So, because I— It seems like I'm getting a little bit of inconsistency here, so I want to be clear.  Now, you could sit on this jury and go in that deliberation room and decide whether to vote guilty or not guilty for Mr. Carruth?

RICHERSON:  I could.

THE DEFENSE:  You can.  Okay.  And you can participate with your fellow jurors to decide whether to find him guilty or not guilty; is that correct?

RICHERSON:  Yes.

THE DEFENSE:  Now, if you were on this jury, and you have already determined with your fellow jurors that Michael David Carruth is guilty for murdering 12-year-old Brett Bowyer, we're going to go another part of the trial where you have to decide whether to give him death or life without parole.  . . .  Do you think you can consider both of those punishments?

RICHERSON:  If the group is.

THE DEFENSE:  And you can participate in the jury deliberation?

RICHERSON:  Yes.

. . .

THE DEFENSE:  Now, in your questionnaire, you indicated that you read the [Columbus] Ledger Enquirer on a regular basis; is that correct?

RICHERSON:  Yes.

THE DEFENSE:  Do you read it on a daily basis?

RICHERSON:  Yes.

THE DEFENSE:  Have you read anything in the Ledger Enquirer about this case?

RICHERSON:  Yes.  But I was told not to read the papers.

THE DEFENSE:  . . .  Have you formulated by what you've read in the paper any fixed opinion as to the guilt or innocence of Mr. Carruth?

RICHERSON:  I have not.

THE DEFENSE:  You have not?

RICHERSON:  No, sir.

THE DEFENSE:  And whatever you've read in the papers or whatever you've seen on television about this case, you can set that aside and not let that enter into your deliberation process?

RICHERSON:  I couldn't.

THE DEFENSE:  You could not?

RICHERSON:  No.

THE DEFENSE:  . . .  [I]f the judge instructs you:  "You're not to consider any outside sources in terms of what you've read in the media, what people told you, what you've seen on television, and all you are to consider is what's presented in court"—can you do that?

RICHERSON:  Yes.

THE DEFENSE:  You can?

RICHERSON:  Uh-huh.

THE DEFENSE:  What you've read in the media or seen on television, that will not affect you in your deliberation process at all? Is that what I'm hearing?

RICHERSON:  Yes, that's what you're hearing.

. . .

COUNSEL FOR THE STATE:  I understood you to say when I talked to you, and, in fact, when you filled out your questionnaire, that you had a religious conviction that would prevent you from considering imposing the death penalty on anybody.  Is that true or not?

RICHERSON:  That's true.

THE STATE:  . . .  The death penalty is not an option that you could consider because of your religious convictions; is that correct?

RICHERSON:  I'm nervous right now.

THE STATE:  I understand.

RICHERSON:  I couldn't do it.

THE STATE:  You couldn't do it?

RICHERSON:  I couldn't.

(Doc. # 21-20 at 39–51.)

At the end of Richerson's voir dire, the prosecution challenged her for cause because she had "expressed her view that she could never, under any circumstances, consider the death penalty as an option."  (Doc. # 21-20 at 81–82.)

Defense counsel stated that there was no objection, (Doc. # 21-20 at 82), and the challenge for cause was granted.  (Doc. # 21-21 at 61.)

Carruth's complaints with Richerson's dismissal first made their appearance in Carruth's Rule 32 petition, alongside claims that Carruth's trial and appellate counsel were ineffective in their handling of this issue.  (Doc. # 21-27 at 27, 45–47, 61–62, ¶¶ 39, 79, 106–07.)  The Rule 32 court dismissed the underlying claim because it should have been raised in the original trial-level proceedings, and dismissed the ineffective assistance claims as insufficiently pleaded.  (Doc. # 21-31 at 188–90.)  Carruth did not raise the underlying claim on appeal, but he did raise both claims of ineffective assistance.  (Doc. # 21-35 at 11, 34–47, 62–63.)  The Court of Criminal Appeals affirmed dismissal, saying:

> Carruth alleged that trial counsel were ineffective for failing to object to the trial court's decision to grant the State's challenge for cause against prospective juror D.R.  According to Carruth, "counsel should have marshaled evidence and argued that the record did not adequately reflect that [D.R.] had views which would 'prevent or substantially impair' the performance of her duties as a juror in accordance with instructions and her oath."  The [trial] court summarily dismissed this claim as insufficiently pleaded.  We agree.

> Carruth failed to specifically state what evidence trial counsel could have "marshaled" that would have changed the trial court's ruling nor did he plead any other facts that would have called the ruling into question.  "A trial judge's finding on whether or not a particular juror is biased is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province."  Therefore, we are unable to determine, from the petition, whether trial counsel were deficient for failing to object to D.R.'s exclusion.

Additionally, Carruth failed to demonstrate how he was prejudiced by D.R. being excused for cause.  Although he generally stated that her exclusion violated his right to a fair trial, his petition did not disclose any facts that, if true, would demonstrate that he was prejudiced.  In order to meet the requirements of *Strickland*, a petitioner must establish both deficient performance and prejudice.  Carruth did neither.

Additionally, Carruth failed to allege that trial counsels' decision not to object to the State's for-cause challenge against D.R. was not the product of trial strategy.  D.R. may have been an unfavorable juror for the defense as well.  Thus, counsels' decision not to object to D.R.'s removal may have been sound trial strategy.  Nevertheless, we are unable to determine this issue from Carruth's petition.  Accordingly, the [trial] court was correct to summarily dismiss . . . .

(Doc. # 21-36 at 95–96.)   *Carruth*, 165 So. 3d at 640 (citations omitted).

Dismissal of the ineffective assistance of appellate counsel claim was affirmed for the same reasons.  (Doc. # 21-36 at 103.)  *Carruth*, 165 So. 3d at 648.

In Carruth's petition for writ of certiorari, he raised both claims in his statement of the issues, (Doc. # 21-36 at 118–19, 127, 130–31), but he only provided supporting argument for the ineffective assistance of trial counsel claim in his argument section.  (Doc. # 21-36 at 160.)

Thus, the underlying claim is not exhausted; the ineffective assistance of trial counsel claim is exhausted; and it is questionable whether the ineffective assistance of appellate counsel claim is exhausted.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).  Regardless, all are due to be dismissed as lacking merit.

152

In order to death-qualify a jury, a process discussed in greater detail below, a trial court is permitted to dismiss a juror for cause if the juror's philosophical beliefs about the death penalty "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  Although Richerson stated once that she could consider the death penalty "if the group is," she stated repeatedly and in far more direct fashion that her religious convictions would prevent her from considering the death penalty.  To the extent that Richerson's testimony conflicted, the trial judge who was present at voir dire was in the best position to sift out the truth.  *See Irvin*, 366 U.S. at 723; *Wainwright*, 469 U.S. at 425–26 ("[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.").

It was not an unreasonable determination of the facts to conclude that Richerson's beliefs would have prevented or substantially impaired her ability to impose the death penalty.  Consequently, Carruth's underlying claim has no merit, and his counsel's failure to raise the claim could not have been either deficient or prejudicial.

Carruth's claims of ineffective assistance of counsel fail for an additional reason:  Even if the Constitution did not demand that Richerson be removed for cause, Carruth must show that his counsel were deficient for failing to press that point and that Carruth was prejudiced by Richerson's absence on the jury. Richerson had testified that she would tend to believe law enforcement witnesses over other witnesses, that she had a daughter the same age as the victim and would get emotional over the case, and that she had extensive media exposure to the facts of the case that would be difficult to set aside.  Even if Richerson was unlikely to vote for the death penalty, there were obvious reasons why a reasonable defense attorney would not want Richerson on the jury, and Carruth makes no allegations tending to show that he was prejudiced by Richerson's absence from the jury.[41]

The assessment of this claim made by the Court of Criminal Appeals was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

All claims in this section are due to be dismissed.

---

[41] Under Alabama law, a verdict recommending death can be based on a vote of as few as ten of the twelve jurors.  *See* Ala. Code § 13A-5-46(f).

4.      *Death-Qualifying the Jury*

Carruth next argues that it was constitutional error to exclude jurors who could not impose the death penalty.  (Doc. # 34 at 80–81, ¶¶ 185–87.)  Carruth also raises a claim of ineffective assistance of appellate counsel regarding this claim.  (Doc. # 34 at 62–63, ¶ 152.)  However, he does not raise a claim of ineffective assistance of trial counsel regarding this claim.

An extended analysis of this history of this claim is unnecessary because the Supreme Court has repeatedly held that the Constitution does not "prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial."  *Lockhart v. McCree*, 476 U.S. 162, 165 (1986); *see also Morgan v. Illinois*, 504 U.S. 719, 733 (1992); *Buchanan v. Kentucky*, 483 U.S. 402, 415 (1987).

Accordingly, Carruth's underlying claim has no merit.  Because Carruth makes no additional arguments for his ineffective assistance claim, that claim is due to be dismissed as well because counsel could not have been deficient for failing to press a meritless issue and their performance could not have been prejudicial for the same reason.  All claims in this section are due to be dismissed.

**G.**   **Alleged Juror Misconduct**

**1.**   *Hidden Bias of a Juror*

In voir dire, prospective juror Grant testified that he could "be fair." (Doc. # 21-18 at 23.)  He testified that he could consider both possible sentences and would not automatically impose the death penalty just because Carruth's case involved the murder of a child. (Doc. # 21-18 at 25–26.)  He also agreed that he could set aside any information that he received from pretrial media. (Doc. # 21-18 at 31.)  Grant was ultimately selected to serve on the jury. (Doc. # 21-4 at 94.)

Carruth claims that "[t]he responses given by Grant during voir dire . . . were false."  He asserts that "Grant intentionally provided false answers on voir dire in order to ensure that he was selected to serve on the jury.  His plan going into jury selection was to convict Carruth and sentence him to death." (Doc. # 34 at 67, ¶ 159.)  He argues that Grant's false responses "served to deny Carruth a fair trial," deprived Carruth of the opportunity to exercise a peremptory strike, and ran afoul of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Doc. # 34 at 65–70, ¶¶ 156–64.)

As support for his accusation of perjury, Carruth states:

[W]hen penalty phase deliberations began, one female juror wanted to vote for a sentence of life without parole, but Grant took immediate action and told this juror no, a life without parole sentence was not acceptable.  This behavior confirms Grant's preconceived notions about the appropriate sentence in the case and his desire from the outset to see the sentence imposed.

(Doc. # 34 at 67, ¶ 159.)

Carruth raised this claim in the second amendment to his Rule 32 petition.
(Doc. # 21-32 at 4.)   At the evidentiary hearing, no evidence was admitted to
support this claim.   Carruth's Rule 32 counsel stated that a subpoena was issued for
Grant, but he had passed away before the evidentiary hearing:

> Mr. Grant was interviewed by some investigators back in 2007.   Of
> course, I don't think that now he's passed away those investigators'
> interview with him would be admissible under any hearsay exception.
> . . .   As a proffer for the record for what it's worth, we believe that we
> would have been able to establish the allegations in those paragraphs
> had Mr. Grant survived through the date of this hearing, but I cannot
> at this point.

(Doc. # 21-33 at 35–36.)   The Rule 32 court dismissed the claim without comment.
(Doc. # 21-32 at 153.)   Carruth did not raise the claim before either the Court of
Criminal Appeals, (Doc. # 21-35 at 11), or the Alabama Supreme Court.   (Doc. #
21-36 at 117–34.)

Because Carruth did not pursue this claim in his Rule 32 appeal, the claim is
procedurally defaulted.   And since Carruth has not presented any grounds to
excuse the default, the claim is barred by 28 U.S.C. § 2254(b)(1).   Even if it were
exhausted, no clearly established Supreme Court precedent requires a
postconviction court to grant relief on a claim without evidence, and Carruth

provides no convincing[42] argument that any infirmity occurred in the Rule 32 proceedings.

Even taking the only nonconclusory allegation in Carruth's petition as true, Grant's advocating for the death penalty for Carruth *during jury deliberations after the close of the penalty phase* is certainly not evidence that Grant had made up his mind even before the trial had started.  A jury retires to deliberate, not just to vote.  Discussion is expected in that final phase of trial—including, of course, deliberation on the most appropriate verdict.  *See generally Allen v. United States*, 164 U.S. 492, 501 (1896).

This claim is due to be dismissed as unexhausted and unsupported by the record.

## 2.   *Premature Deliberations by the Jury*

Carruth next alleges that his convictions and sentence ought to be overturned because the jury engaged in premature deliberations.  (Doc. # 34 at 27–34, ¶¶ 65–86.)   Specifically, Carruth alleges that five members of the sequestered jury prematurely deliberated Carruth's case in the evenings of the trial while playing a tile-based game called Rummikub.[43]  (Doc. # 34 at 28, ¶ 70.)  Carruth alleges that

---

[42] *Martinez* does not apply beyond claims of ineffective assistance of trial counsel. *Davila*, 582 U.S. at ___, 137 S. Ct. at 2063.

[43] Also referred to in the record as "rummy cube."

these premature deliberations included discussions of the evidence, whether Carruth was guilty of the crime, and whether Carruth should get the death penalty. (Doc. # 34 at 28–29, ¶ 71.)

Carruth also separately alleges that every member of the jury "discussed the case during breaks in the trial" and prematurely "decided that Carruth was guilty and deserved the death penalty." (Doc. # 34 at 29, ¶ 72.) Carruth alleges that "some of the jurors who participated in the premature deliberations had made up their minds that Carruth was guilty and should receive a death sentence after the testimony of the prosecution's very first witness." (Doc. # 34 at 30, ¶ 76.)

Carruth first raised this claim in the first amendment to his Rule 32 petition. (Doc. # 21-27 at 157–64.) The trial court dismissed the claim as insufficiently pleaded but granted leave to amend. (Doc. # 21-31 at 191.) Carruth amended the claim in the second amendment to his Rule 32 petition. (Doc. # 21-31 at 195–Doc. # 21-32 at 4.)

At the evidentiary hearing, three jurors were called. The first, Morris, testified that the jury was sequestered in a local hotel, with two jurors assigned to each room. (Doc. # 21-33 at 12.) Morris recalled that her roommate brought a Rummikub set to the hotel, (Doc. # 21-33 at 13), and four to eight other jurors would come to Morris's room to play Rummikub in the evenings. (Doc. # 21-33 at 14.) Morris testified that she had not heard any discussion of the facts of the case

either at the hotel or during breaks at the courthouse.  (Doc. # 21-33 at 15–20

("Absolutely not.  The judge told us not to discuss it.  We did not.").)

The second juror called was Thurmond, one of the two alternate jurors.

Thurmond recalled some discussion of the evidence:

> COUNSEL FOR THE PETITIONER:  Do you have a recollection of any discussions that were had among the jurors during breaks in the trial?
>
> THURMOND:  No.
>
> Q:  Do you recall whether or not any evidence was discussed by the jury before you were allowed to leave at the end of the trial?
>
> THURMOND:  What—  I'm confused.
>
> . . .
>
> Q:  During the time that you were participating in that process in the trial, was there ever any discussion among the jury while they were on a break in that room concerning the evidence that they had heard during the course of the trial?
>
> THURMOND:  Well, it was discussed during that break while we were at trial.
>
> Q:  Okay.
>
> THURMOND:  We were told that we could do that.
>
> Q:  You were told that you could discuss the evidence?
>
> THURMOND:  Okay.  I'm just so—
>
> Q:  I understand.
>
> THURMOND:  I'm going to be honest with you.  I have tried to totally forget this case.

Q: Yes, ma'am.

THURMOND: It took me the longest amount of time to get rid of it. Basically, when we went back to that room, everybody was just— silence. You know, that was the majority of the time. Actually, really discussing it, I really don't think there was any discussion about it. Everybody was just so disturbed over the evidence . . . that we had gotten.

Q: Was there ever any discussion about what penalty should be imposed on Michael Carruth?

THURMOND: No.

. . .

Q: Do you recall giving a statement . . . that the jurors discussed the evidence in the jury room during the course of the trial and that all of the jurors were strongly in favor of the death penalty before the trial ended?

. . .

THURMOND: Like I said, I've tried to forget it. It was in 2003. If we ever discussed it, it was in the break room during the trial. We never communicated after we went back to the hotel.

Q: Okay. So are you— Is it your testimony today, that during the course of the trial while the jury was on breaks and in the jury room, that the evidence was discussed while you were a member of the jury?

THURMOND: Yes.

Q: And was there a discussion, any discussion, about the question of guilt or innocence before the trial ended?

THURMOND: I can't recall any of us saying at that time that it's guilty. There was times that we would say, well, he did this, I think Brooks was the one, Brooks did this. You know, that's where the evidence was leading to. I never recall anytime anybody say that he was guilty, that he needs to be sentenced or anything to that effect.

161

Q:  [W]as there any discussion about what people's opinions were concerning the appropriate penalty or anything like that?

THURMOND:  No.

. . .

Q:  Your recollection is fairly faded about the trial at this point?

THURMOND:  I've tried to fade it.

Q:  You tried—  You've tried to push it out of your memory?

THURMOND:  Yes.  It was hard.

(Doc. # 21-33 at 23–31.)

The last juror to testify was Horne, the foreman of the jury.  Horne testified as follows:

COUNSEL FOR THE PETITIONER:  [T]here's been some testimony in this case about a game called Rummikub.  What do you remember about that?

HORNE:  I do recall there was some people playing a game of Rummikub.

Q:  And did you participate in that game?

HORNE:  I did.

Q:  And how many other jurors would you say played that game?

HORNE:  Three others, maybe.  I mean, I think three others.  Yes.

Q:  Were there any discussions that were taking place among the jurors during the evenings at the hotel while y'all were playing Rummikub?

HORNE:  Yes, but not in depth.

Q:  Okay.  About the trial itself?

HORNE:  Uh-huh.

Q:  Do you recall what the discussions were?

HORNE:  Not in detail, no.

Q:  When you say not in depth, what do you mean?

HORNE:  There was no—  I'm not sure what my words want to be, but we might have mentioned that a piece of evidence was unusual or something we didn't expect.  And I think, for example, one of them did say, I wasn't expecting to see an image of the boy at the morgue, so—

Q:  Okay.

HORNE:  Something along those lines.

. . .

Q:  [W]ere those discussions taking place on one night or more than one night?

HORNE:  I played Rummikub two nights.  On those two nights there wasn't a focus on that trial.  I mean, I believe I asked more questions about how to play Rummikub than anything else.  But, yes, somewhere along the way somebody might have mentioned something about, like I said, "I wasn't expecting to see the video, that was kind of shocking," or "I can't believe the amount of evidence"—because there was just a lot of evidence.

Q:  All right.

HORNE:  But we weren't talking about it in depth.

. . .

Q:  I am not certain what you meant [when you said the jurors discussed the case], but can you please explain that again:

163

HORNE:  They weren't cohesive in the end to make a full thought or angle on a decision to be made.  It was one comment about maybe the video and a comment about something totally unrelated to the video, so it wasn't like an end to end, pieced together, series of events to make a decision out of.  So it was really never debated to an extent.  I hope I'm saying it right.

. . .

Q:  So it would be fair to say that there were a smaller number of jurors playing the game and talking about the case or the evidence that was heard at the same time?

HORNE:  That is to some degree true, but when I played it, I had never played the game.  I think I spent more time asking about how to play the game than talking about the case.

. . .

Q:  Was there any discussion about the effect of that evidence on the question of guilt?

HORNE:  There was never a discussion on that to my knowledge.

Q:  Do you recall being interviewed by two investigators . . . ?

HORNE:  I do.

. . .

Q:  Did you tell the investigators . . . that [the jurors] talked about what evidence made Michael Carruth guilty?

HORNE:  I don't recall.

Q:  I am going to show you [an affidavit signed by Horne] . . . .

Q:  [D]id you and . . . any of the other jurors talk about the evidence and its impact on the decision or the issue of the guilt or innocence of Michael Carruth?

HORNE:  We would make comments at times about the evidence, but I don't recall us ever saying that he was innocent or guilty without a doubt.

Q:  Was there a discussion between yourself and any of the other jurors about what sentence he would receive or should receive?

HORNE:  I don't—  I don't recall for sure back then.  It's— It's just been a while.

Q:  Okay.  All right.  Do you recall your statement . . . : "When we talked about the trial, we also talked about what sentence Michael Carruth should get."  Did you give that statement?

HORNE:  I see that I did now.

. . .

COUNSEL FOR THE STATE:   Mr. Horne, did you write the affidavit Mr. Davidson has showed you today?

HORNE:  I have—  I mean, I did not write it.

. . .

Q:  You testified a moment ago that you did not discuss Mr. Carruth's guilt during the Rummikub games and you did not discuss his—the appropriate punishment in this case?

HORNE:  That's my recollection.

Q:  And . . . did you, yourself, arrive at a decision on guilt prior to the end of the evidence being taken?

HORNE:  No.  I mean, I had my developing thoughts, but I hadn't heard all the arguments.

. . .

Q:  Same question with regard to appropriate penalty.  Did you arrive at a decision prior to the taking of evidence?

HORNE:  No.  I had no experience with this, so I had to wait for how to do it.

Q:  So would it be fair to say that the discussions that happened during Rummikub were just passing comments on the evidence?

HORNE:  That is how I feel they were.

Q:  And did these discussions compare at all to the discussions you had after evidence was received in the jury room deliberating the case?

HORNE:  No.  They were just passing comments.

. . .

COUNSEL FOR THE PETITIONER:  Did you read [the affidavit before you signed it]?

HORNE:  I did read the document.

Q:  And did you sign the document on page eight?

HORNE:  Yes, I did.

(Doc. # 21-33 at 126–40.)

Horne's affidavit was admitted by the Rule 32 court as impeachment evidence, but not as substantive evidence.   (Doc. # 21-33 at 141.)   Horne's affidavit contained the following statements:

When we got back to the hotel after dinner some of the jurors would get together in a room to talk and play a game. . . . When some of the jurors got together at night to play . . . , we left the hotel room door open so that anyone could come and join us. . . . When we sat in the room at night playing rummy cube, we talked about what we heard in court.  It was a really good way to discuss the evidence at the end of

each day.  I'm glad we were able to have predeliberations[44] at night because we could talk about the evidence we heard that day.  It was better to talk about the evidence while we were playing rummy cube at the hotel because then we wouldn't forget anything by the end of the trial.

. . .  When we played rummy cube and talked about the trial on the third and fourth nights of the trial, we talked about what evidence made Michael Carruth guilty of capital murder.  When we played rummy cube and talked about the trial on the third and fourth nights of the trial, we also talked about what sentence Michael Carruth should get.

When we played rummy cube and talked about the case, not all of the jurors were in the hotel room.  I think it was good to have our predeliberations because we could discuss the evidence when it was fresh in our memory from that day.  It was also good to have our predeliberations because then we kind of knew how each other felt about Michael Carruth's guilt before our deliberations at court.

. . .

I have read and had read to me this eight page statement.  I have had the opportunity to make any changes, deletions, or additions that I please.  I have told all I know and have left nothing out.

(Doc. # 21-32 at 199–Doc. # 21-33 at 6.)

Excluded from Horne's live testimony was his commentary on how the nightly discussions affected the verdict.  (Doc. # 21-33 at 129–30.)  This testimony was excluded because Alabama evidence law does not permit a juror to testify "as to any matter or statement occurring during the course of the jury's deliberations or

---

[44] At the Rule 32 hearing, Horne testified that he did not recall using the word "predeliberations" and stated that it is not a word he ordinarily uses.  (Doc. # 21-33 at 136.)

to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith."  Ala. R. Evid. 606(b).[45]

After the conclusion of the evidentiary hearing, the trial court denied Carruth's claim, stating its findings:  "Some jurors at most may have made 'passing comments' concerning the nature of some of the evidence.  No juror testified that discussions concerning the petitioner's guilt or possible sentence were ever made or heard until the case was turned over to the jury to begin deliberations after being properly instructed."  (Doc. # 21-32 at 153.)

Carruth raised this claim on appeal, saying that Horne's testimony and written statement contradicted the trial court's finding.  (Doc. # 21-35 at 11, 66–72.)  The Court of Criminal Appeals disagreed, saying:

> At the hearing, [Horne] testified that the discussions at the hotel were never in-depth but were merely "passing comments" about certain pieces of evidence.  Although [Horne]'s written statement indicated that the jurors discussed Carruth's guilt and a possible sentence before formal deliberations began, that statement was only offered for impeachment purposes.  The [trial] court chose to give greater weight to [Horne]'s in-court testimony and this Court must give that decision great deference.
>
> . . .

---

[45] *See generally Warger v. Shauers*, 574 U.S. 40, 44–51 (2014); *Tanner v. United States*, 483 U.S. 107, 123–26 (1987); *Gavin*, 40 F.4th at 1270–72.

> The [trial] court's order is not contradicted by the testimony presented at the evidentiary hearing.  Rather, the [trial] court chose to give little weight to [Horne]'s written statement and resolved any contradictions in favor of [Horne]'s in-court testimony.   The [trial] court's determination is entitled to great weight on appeal and this Court does not find it to be contrary to the evidence.  Accordingly, we find that the [trial] court did not abuse its discretion in denying this claim.

(Doc. # 21-36 at 108–09.)  *Carruth*, 165 So. 3d at 653–54 (citations omitted).

Carruth again raised the claim in his petition for writ of certiorari to the Alabama Supreme Court.  (Doc. # 21-36 at 117, 155–56.)  The claim is therefore exhausted.  Regardless, the claim is due to be dismissed as lacking merit.

It is commonplace to instruct the jurors at the beginning of a trial, as the trial court did, that they "can't talk to each other about the case until [they] begin [their] deliberations."  (Doc. # 21-21 at 96.); *see, e.g.*, Pattern Jury Instructions, Criminal Cases, Eleventh Circuit (2020), Preliminary No. 1 (instruction to jurors that they are not "to talk among themselves about the case until the court tells them to begin deliberations, because premature discussions can lead to a premature final decision").  However, a violation of this or a similar instruction is not, by itself, sufficient to merit habeas corpus relief.  This court can overturn the judgment of the Alabama courts only if it conflicted with non-dicta language of the United States Supreme Court applicable to state prosecutions.   In his attempt to constitutionalize his claim, Carruth cites only inapplicable precedent from the Eleventh Circuit or dicta from the Supreme Court—too little to merit relief.

First, the Supreme Court has held that a juror can be removed for cause during jury selection if the juror forms an opinion on the case before trial and cannot set aside that opinion. *Irvin*, 366 U.S. at 723. This holding is distinguishable on the simple basis that we are not talking about jury selection. Carruth does not cite any Supreme Court precedent that holds that a juror must refrain from forming an opinion during the course of the trial. Indeed, asking a juror not to think about or mention the evidence during the many long hours of evidentiary presentation—to consider the issues for the first time only when the doors of the deliberation room are safely closed—is unrealistic. *See United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974) ("No normal honest Americans ever worked together in a common inquiry for any length of time with their mouths sealed up like automatons or oysters." (quoting *Winebrenner v. United States*, 147 F.2d 322, 330 (8th Cir. 1945) (Woodrough, J., dissenting))). One could argue that the premature *expression* of an opinion can improperly harden a juror into the stated opinion in a way that creates an *Irvin*-like problem, but the Supreme Court has never discussed this issue as it relates to jurors in the midst of a trial.[46]

---

[46] The lack of Supreme Court precedent on this issue was also recognized by the Eastern District of Michigan in *Richards v. Berghuis*, No. 13-13763, 2014 WL 3708978, at *2 (E.D. Mich. July 28, 2014).

To be clear, many federal courts of appeals have condemned premature deliberation by jurors—though most cases have held that the error may be harmless and that the defendant must show prejudice to obtain relief. *See United States v. Dominguez*, 226 F.3d 1235, 1243 (11th Cir.

Second, juror contact with evidence that does not "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" is presumptively prejudicial. *Turner v. Louisiana*, 379 U.S. 466, 473 (1965); *see also Remmer v. United States*, 347 U.S. 227, 229 (1954).   Once a defendant demonstrates that jurors had contact with extrinsic evidence, the prosecution bears the burden of rebutting the presumption by showing that the jurors' consideration of the extrinsic evidence was harmless to the defendant. *Remmer*, 347 U.S. at 229.

However, the Supreme Court has never held that another juror's opinion is extrinsic evidence within the ambit of this rule.  Even if the expression of a juror's opinion were extrinsic evidence, the record supports the conclusion that Carruth

---

2000); *United States v. Resko*, 3 F.3d 684, 689 (3d Cir. 1993); *United States v. Wiesner*, 789 F.2d 1264, 1269 & n.3 (7th Cir. 1986); *United States v. Yonn*, 702 F.2d 1341, 1345 n.1 (11th Cir. 1983); *United States v. Edwards*, 696 F.2d 1277, 1282 (11th Cir. 1983); *United States v. Lemus*, 542 F.2d 222, 224 (4th Cir. 1976); *Myres v. United States*, 174 F.2d 329, 335 (8th Cir. 1949); *Winebrenner*, 147 F.2d at 329.  Two courts of appeals have affirmed cases where the trial judge failed to instruct the jury not to discuss the case because there was no showing of prejudice. *United States v. Carter*, 430 F.2d 1278, 1279 (10th Cir. 1970); *United States v. Viale*, 312 F.2d 595, 602 (2d Cir. 1963).  Even a trial judge's instruction *permitting* jurors to discuss the case has survived review.  *Meggs v. Fair*, 621 F.2d 460, 463 (1st Cir. 1980) (habeas review); *United States v. Lemus*, 542 F.2d 222, 224 (4th Cir. 1976) (direct review).

This body of appellate precedent is inapplicable on habeas review.  *Yarborough*, 541 U.S. at 660–61.  But even if it did apply, there is little to no evidence that any juror did express an opinion on an ultimate issue in Carruth's case, and the testimony given at the evidentiary hearing demonstrates that the jurors carefully weighed the evidence at the end of the case without any deference to prejudice or preconception.  (Doc. # 21-33 at 13–39.)  Carruth has not shown that the jurors' discussions brought about any fixed opinions on the evidence or that the jurors disregarded the instruction to impartially weigh the evidence at the close of trial.  Without a showing of prejudice, the claim would fail anyway.

was not harmed by the discussions.  The evidence admitted during the evidentiary hearing[47] shows that any premature reference to evidence was brief and not attached to an opinion about Carruth's guilt or innocence or the proper punishment. Morris was adamant that no premature discussions were held.  Thurmond was clear that any premature discussions would have been only brief comments on the evidence—though she could be impeached with her intentionally faded memory of the trial.  Horne testified largely in agreement with Thurmond—though he could be impeached with his affidavit to the contrary.  While it was certainly not the only conclusion that could have been drawn from the evidence, the finding of the trial court was not unreasonable:  Carruth was not harmed by any minor discussions that may have occurred.

The adjudication of this claim did not run afoul of the sparse Supreme Court precedent in this area, and it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court hearing.  With neither evidence nor Supreme Court precedent to support this claim, it is due to be dismissed.

---

[47] While Carruth does attempt to salvage his claim by accusing his postconviction counsel of failing to develop sufficient evidence to support this claim, *Martinez* does not apply beyond claims of ineffective assistance of trial counsel.  *Davila*, 582 U.S. at ___, 137 S. Ct. at 2063.

H.    **Alleged Prosecutorial Misconduct**

Carruth alleges that several instances of prosecutorial misconduct occurred during his trial that rendered the trial fundamentally unfair and violated his right to due process.  (Doc. # 34 at 81–85, ¶¶ 188–95.)  Some of Carruth's claims of prosecutorial misconduct are connected to evidentiary issues discussed in the following section.  In this section are the standalone claims of prosecutorial misconduct—those relating to the alleged assertion of facts not in evidence, (Doc. # 34 at 81–82, ¶ 189), the alleged improper arguments in the guilt/innocence phase, (Doc. # 34 at 82–84, ¶¶ 191, 193), and the alleged improper arguments in the penalty phase, (Doc. # 34 at 83–84, ¶ 193).

When one of the specific guarantees of the Constitution, such as the right to confront witnesses or the privilege against compulsory self-incrimination, is at issue, the Supreme Court "has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  But when only due process is at issue, the question is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*  In making this inquiry, the trial record must be assessed as a whole. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *United States v. Young*, 470 U.S. 1, 12–13 (1985); *Berger*, 295 U.S. at 89. "Isolated or ambiguous or unintentional remarks must be viewed with lenity."

173

*Romine v. Head*, 253 F.3d 1349, 1369 (11th Cir. 2001) (alteration adopted) (quoting *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985)); *see also Donnelly*, 416 U.S. at 647; *Greer v. Miller*, 483 U.S. 756, 766 (1987).

To analyze such claims, the Eleventh Circuit[48] has developed a two-part test, directing the district courts "to determine first whether particular arguments by a prosecutor were improper and if so, to determine what the probable effect of the improper argument was on the jury." *Wilson v. Kemp*, 777 F.2d 621, 623 (11th Cir. 1985).   To determine the effect on the jury, the Eleventh Circuit has "borrowed what has become known as the prejudice prong of *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984), and asked whether there was 'a reasonable probability that, in the absence of the offending remarks, the . . . outcome would have been different.'" *Tucker v. Kemp*, 802 F.2d 1293, 1295 (11th Cir. 1986) (quoting *Tucker v. Kemp*, 762 F.2d 1480, 1483 (11th Cir.), *cert. granted, judgment vacated*, 474 U.S. 1001 (1985)).   "If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair." *Id.* at 1296.

---

[48] Of course, to the extent a claim was addressed on the merits by the Alabama courts, that decision will be overturned only if it conflicted with a test used by the Supreme Court. *Williams*, 529 U.S. at 365; *Lockyer*, 538 U.S. at 71–72. So long as the Alabama courts met that bar, any conflict with the Eleventh Circuit's test is irrelevant. *See Lopez*, 574 U.S. at 2; *Parker v. Matthews*, 567 U.S. 37, 49 (2012).

1.   *Assertion of Facts Not in Evidence*

At trial, Officer Tommy Pell testified that he took dirt samples from the grave site.   He testified that the dirt was mixed with "a grayish granule-type substance," and that he "believed it to be lime or something possibly to cover up the bodies—the odor of the bodies."   In response to this testimony, counsel for the state asked:   "In the course and performance of your duties as a police officer, have you had occasion or had training to indicate to you that sometimes perpetrators use lime to cover up the odor of a decaying body or to speed the decomposition process?"   Pell answered in the affirmative.   (Doc. # 21-23 at 51.)   Counsel for the state later asked Pell:   "[I]n your search of this hole, did you recover any inanimate objects other than dirt and, apparently, lime?"   (Doc. # 21-23 at 53.)   Then, in closing argument, counsel for the state mentioned lime a third time:

> [L]adies and gentlemen, we submit, as Officer Pell told you, we think that was the lime in those bags.   They're probably going to argue, well, they didn't test it, they didn't send it to the lab.   I tell you, it doesn't matter.   What's important about those bags is they're already out there waiting.   They didn't go back to the car, no trunks open, no trunks close.   The bags are like the shovel: pre-positioned.

(Doc. # 21-25 at 14–15.)

Forrest Bowyer testified that Carruth and Brooks had each used a knife to slash Forrest Bowyer's throat, (Doc. # 21-21 at 160, 165; Doc. # 21-22 at 12–14), though only a knife belonging to Brooks was later recovered and admitted into evidence.   (Doc. # 21-22 at 163–65.)   In his rebuttal argument, counsel for the state

commented on these facts while discussing his theory as to why Carruth had

directed Brooks not to shoot Forrest Bowyer:

> You know, I'm glad the mayor's here today. Listening to [Carruth's trial counsel], I think maybe he ought to go back to the council on Tuesday and recommend a proclamation for Mr. Carruth for being such a fine fella, a real hero, that was going to save this man's life that he just threw in that hole. Why didn't he want him to shoot any more? The same reason that they didn't go there with a gun, ladies and gentlemen. They went there not just with one knife. Who says it was one knife? We just happen to get one knife two weeks, three weeks later. Where is the other knife? I don't know. I suspect it's wherever those gloves are, but I don't know. But we got one knife. . . . They were going to use a knife because a knife doesn't make any noise, ladies and gentlemen. . . . That's why he said don't shoot anymore, you know, this is nighttime out here in the woods. A game warden's around and there's people. If they hear shots, they might call the game warden. Don't shoot any more, he's done for.

(Doc. # 21-25 at 87–88.)

Carruth's trial counsel did not object at any of these junctures, but repeatedly

emphasized in his closing argument that the state had never tested the substance

found in the grave and claimed that there was "no evidence" that lime was used.

(Doc. # 21-25 at 37–38, 51–52, 72.) Carruth's trial counsel also argued that there

was only one knife, saying that before Carruth cut Forrest Bowyer's throat,

"Carruth must have gotten the knife from Jimmy [Brooks]." (Doc. # 21-25 at 41,

60, 77.)

Carruth alleges that prosecutorial misconduct occurred because the

prosecutor "repeatedly refer[red] to the granular substance found at the crime scene

as lime," and "argu[ed] that there were two knives used in the crime." Carruth also alleges that the prosecutor improperly pointed out to the jury that the mayor was present in the courtroom. (Doc. # 34 at 81–82, ¶ 189.) Carruth asserts that his trial counsel, (Doc. # 34 at 49–50, ¶ 122), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), provided ineffective assistance in addressing this alleged prosecutorial misconduct.

These claims were raised for the first time in Carruth's Rule 32 petition. (Doc. # 21-27 at 33, 45–47, 63–64, ¶¶ 52, 79, 111.) The trial court dismissed the underlying claims because they should have been raised in the original trial-level proceedings and dismissed the claims of ineffective assistance of counsel as insufficiently pleaded. (Doc. # 21-31 at 188, 190.) Carruth did not raise the underlying claim on appeal, but he did raise the claims of ineffective assistance of counsel. (Doc. # 21-35 at 11, 48, 62–63.) The Court of Criminal Appeals disagreed with Carruth as to the lime and knives because the record did support the prosecutor's comments:

> A review of the record reveals that, during the State's case-in-chief, Tommy Pell, a deputy with the Russell County Sheriff's Department, testified that he took soil samples from the grave in which the victims were thrown. Pell stated that there was a "grayish granule type substance" mixed with the dirt that he believed "to be lime or something possibly to cover up the bodies, the odor of the bodies."
>
> During closing arguments, the prosecutor made the following statement: "[Carruth and Brooks] go over and get some bags, and, again, ladies and gentlemen, we submit, as Officer Pell told you, we

think that was the lime in those bags."   Thus, the record refutes
Carruth's contention.   Officer Pell testified that he *believed* that the
substance he discovered was lime and the prosecutor stated that "we
*think* that was lime in those bags."   Accordingly, there was nothing
improper about the prosecutor's comment and trial counsel could not
have been ineffective for failing to object.

Similarly, the record supports the prosecutor's comment regarding the
existence of two knives.  . . .

Testimony at trial revealed that both Carruth and Brooks used a knife
in an attempt to murder Forest Bowyer by cutting his throat.  Thus, it
was a legitimate inference for the prosecutor to argue that the
perpetrators each used a different knife. Accordingly, counsel was not
ineffective for failing to raise a meritless objection.

(Doc. # 21-36 at 96–97.)  *Carruth*, 165 So. 3d at 641–42 (citations omitted).

The Court of Criminal Appeals affirmed the dismissal of Carruth's mayoral

claim for different reasons:

Carruth made only a bare assertion that the prosecutor's reference to
the mayor's presence put undue pressure on the jury.  He failed to
plead any specific facts suggesting that the jury was actually
influenced by this isolated comment. Accordingly, Carruth failed to
plead facts that, if true, would have entitled him to relief.  Therefore,
the [trial] court was correct to summarily dismiss this claim.

Moreover, a review of the record reveals that the comment in question
was made during the State's rebuttal to Carruth's closing argument
and did not suggest that there was additional "official interest" in
Carruth's case.  During Carruth's closing argument, defense counsel
suggested that Carruth was actually trying to prevent the victims from
being killed by telling Butch Bowyer to "go to sleep" after cutting
Bowyer's throat.   The prosecutor was merely responding to that
suggestion by stating:  "You know, I'm glad the mayor's here today.
Listening to [defense counsel], I think maybe he ought to go back to
the council on Tuesday and recommend a proclamation for Mr.
Carruth for being such a fine fella, a real hero, that was going to save

178

> this man's life that he just threw in that hole." Accordingly, the
> record does not support Carruth's claim and the [trial] court was
> correct to summarily dismiss it.

(Doc. # 21-36 at 97–98.) *Carruth*, 165 So. 3d at 642 (citations omitted). Carruth

did not raise either the underlying claim or the claim of ineffective assistance of

trial counsel in his petition for writ of certiorari, only briefly raising the claim of

ineffective assistance of appellate counsel without any supporting argument. (Doc.

# 21-36 at 127, 131–32.)

It is questionable whether Carruth's brief mention of his ineffective

assistance of appellate counsel claim served to exhaust that claim. *See Taylor*, 157

So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6). Even

if it did, that claim has no merit standing alone: Appellate counsel could not have

raised these issues because they were not raised in the trial court. *See Williams*,

710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301.

In any event, none of these claims has merit. The prosecutor's arguments on

lime and knives had an arguable basis in the testimony, and the Court of Criminal

Appeals was not unreasonable in so concluding. It was therefore not improper

argument. The mention of the mayor was possibly improper argument by the

prosecutor, but Carruth has failed to demonstrate any prejudice resulting from the

brief comment. The comment was a rhetorical flourish that, on its face, did not

suggest that the jurors should base their verdict on the presence of the mayor. The

only possible prejudicial effect was in letting the jurors know that there was official interest in the case, which was already obvious to the jurors because the case was a capital murder case and because every juror was informed in voir dire that there was substantial media coverage of the case. Assessing the record as a whole, there is no support for the contention that the brief comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *see also Darden*, 477 U.S. at 181; *Young*, 470 U.S. at 12–13; *Berger*, 295 U.S. at 89. The Court of Criminal Appeals was not unreasonable in so concluding.

Because none of the underlying claims has merit, Carruth's trial counsel could not have been deficient for failing to raise them, and the failure to raise them could not have been prejudicial for the same reason.

Each claim in this section is due to be dismissed.

### 2. *Improper Argument in the Guilt/Innocence Phase*

Carruth raises two issues with the prosecution's guilt/innocence phase arguments. The first contested statement occurred toward the beginning of the state's rebuttal argument. The second occurred toward the end of the rebuttal argument.

The first statement responded to a comment made by counsel for the defense:

180

> [Counsel for the defense] said it's scary that they sell those cars, you know, those old police cars, and it's scary that they sell agent badges over in Columbus, Georgia.  He's right, it is.  You know why it is?  Because there are animals out there like him on the street who will use those things for their evil purpose, and that's what he did in this case.

(Doc. # 21-25 at 85.)

Carruth claims that "referr[ing] to Carruth as an animal" was improper argument, prosecutorial misconduct, and grounds for reversal of his convictions.  (Doc. # 34 at 83–84, ¶ 193.)  Carruth's trial counsel did not object to this statement, and no issue with this statement was raised in Carruth's direct appeal.  Carruth therefore alleges that his trial counsel, (Doc. # 34 at 60, ¶ 146), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective for failing to address this issue.

Carruth first raised these three claims in his Rule 32 petition.  (Doc. # 21-27 at 43, 45–47, 65–66, ¶¶ 73, 79, 115.)[49]  The trial court dismissed the underlying claim because it should have been raised in the original trial-level proceedings, and it dismissed the ineffective assistance claims as insufficiently pleaded.  (Doc. # 21-31 at 188, 190.)  Carruth did not raise the underlying claim on appeal, but he did

---

[49] This claim is grouped with Carruth's claims regarding the prosecutor's penalty-phase arguments in multiple places throughout the record.  This is most likely because Carruth cites page 2303 of the transcript to support this claim—a page close to the prosecutor's penalty-phase argument—rather than the correct page, page 2203, which is in the prosecutor's guilt/innocence phase argument.  Because the statement in fact occurred during the guilt/innocence phase arguments, it is addressed here.

raise the claims of ineffective assistance of counsel, arguing only that the claims "were sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. # 21-35 at 11, 52–53, 62–63.)  The Court of Criminal Appeals disagreed:

> Carruth did not allege why he believed these statements were improper nor did he state the grounds on which he believed counsel should have objected.  Additionally, Carruth failed to plead any facts to suggest how these statements prejudiced him.  Carruth merely alleged that the statements were improper and prejudicial.  Such a bare allegation is insufficient to meet the pleading and specificity requirements of [the applicable Alabama pleading rules].

(Doc. # 21-36 at 99.)  *Carruth*, 165 So. 3d at 644.  Carruth did not raise either the underlying claim or the claim of ineffective assistance of trial counsel in his petition for writ of certiorari, only briefly raising the claim of ineffective assistance of appellate counsel without any supporting argument.  (Doc. # 21-36 at 127, 131–32.)

It is questionable whether Carruth's brief mention of his ineffective assistance of appellate counsel claim served to exhaust that claim.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).  Even if it did, that claim has no merit standing alone:  Appellate counsel could not have raised this issue because it was not raised in the trial court.  *See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301.

The Supreme Court has clearly established that calling a defendant an animal is error. *Darden*, 477 U.S. at 179–80 (saying that the use of the word "animal" to describe a defendant is "deserv[ing of] condemnation" and "undoubtedly . . . improper"). However, the Court of Criminal Appeals was correct in holding that this comment did not prejudice Carruth. The comment was a brief, isolated remark made in a hurried response to a comment made by Carruth's trial counsel, not a serious, planned comparison between Carruth and an animal. *Donnelly*, 416 U.S. at 647; *Greer*, 483 U.S. at 766; *Romine*, 253 F.3d at 1369. It cannot be said that the brief comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. And, naturally, the Court of Criminal Appeals could not have been unreasonable in so concluding. Thus, this claim has no merit. The related claims of ineffective assistance of counsel similarly fail because counsel could not have been deficient for failing to raise a meritless point, nor could their performance have been prejudicial.

The second issue that Carruth raises with the state's rebuttal argument concerns an exchange that occurred toward the end of the argument:

> COUNSEL FOR THE STATE:  I'm going to ask you to convict this man of those capital counts, the only punishment for which are life without parole or the death penalty, something that you're not even considering now, but if you convict him of those capital counts, we'll get to that phase later.  Any other charge other than those four capital counts does not carry that punishment.

> COUNSEL FOR THE DEFENSE:  I'm going to object to that statement, Your Honor.
>
> THE COURT:  Noted.

(Doc. # 21-25 at 90–91.)  After the jury had retired for deliberations, Carruth's trial counsel raised the issue again:

> COUNSEL FOR THE DEFENSE:  I just want to get on record in terms of my grounds for my objection during [counsel for the state]'s closing argument.  He stated to the jury that the capital murder counts carry death or life without parole, quote:  "The other indictments do not carry that penalty."  And, Judge, I submit that this is prosecutorial misconduct during closing arguments.  He commented on the sentencing provisions of the non-capital counts.  He's trying to invoke the passion and prejudice of the jury by telling them that the penalty would not be as severe on the other indictments in trying to get a conviction on the capital counts, and I just want to note my objection on the record to that.
>
> THE COURT:  Response?
>
> COUNSEL FOR THE STATE:  Judge, we stated what the law was. We've already been told that 55 times last week when we qualified—death qualified this jury.  I didn't tell this jury that.  I didn't mention anything about the possibility of parole or probation or anything else. I told them what the law is.
>
> THE COURT:  All right.  So noted.
>
> THE DEFENSE:  Thank you, Your Honor.

(Doc. # 21-25 at 141–42.)   Carruth did not mention these exchanges in his appellate brief; and as discussed above, he did not file a petition for writ of certiorari in his direct appeal.

Carruth raised the issue for a second time in his Rule 32 petition, where he also raised new claims that his trial and appellate counsel were ineffective in their handling of this issue. (Doc. # 21-27 at 33, 45–47, 65, ¶¶ 52, 79, 113.) These are the same three claims that he raises in his petition for writ of habeas corpus. (Doc. # 34 at 49–50, 6263, 82–83, ¶ 122, 152, 191.) The trial court dismissed the underlying claim because it was raised in the original trial-level proceedings and should have been raised on appeal. (Doc. # 21-31 at 190.) It dismissed the claims of ineffective assistance of counsel as insufficiently pleaded. (Doc. # 21-31 at 188.)

Carruth did not raise the underlying claim in the Court of Criminal Appeals, but he did raise the claims of ineffective assistance of counsel. (Doc. # 21-35 at 11, 48, 62–63.) The Court of Criminal Appeals affirmed dismissal, saying:

> Carruth failed to allege that the jury was actually affected by this statement. Rather, Carruth made a bare allegation that this comment rendered his trial "fundamentally unfair in violation of his right to due process." For the reasons stated in the previous subsection [regarding the comment on the mayor's presence], this claim was not sufficiently specific. Accordingly, the [trial] court was correct to summarily dismiss it.

> Moreover, a review of the record reveals that the prosecutor did not ask the jury to consider punishment during the guilt phase as Carruth claimed. During his closing argument, the prosecutor stated:

> "I'm going to ask you to convict this man of those capital counts, the only punishment for which are life without parole or the death penalty, something that you're not even considering now, but if you convict him of those capital counts, we'll get to that phase later. Any

other charge other than those four capital counts does not carry that punishment."

Thus, the record refutes Carruth's contention that the jury was asked to consider punishment during its guilt-phase deliberations. Accordingly, the circuit court was correct to summarily dismiss this claim.

(Doc. # 21-36 at 98.)  *Carruth*, 165 So. 3d at 642–43 (citations omitted).

In Carruth's petition for writ of certiorari, he raised again the underlying claim of prosecutorial misconduct.  (Doc. # 21-36 at 120–21, 161.)  Carruth did not raise the claim of ineffective assistance of trial counsel in his petition for writ of certiorari, and only briefly raised the claim of ineffective assistance of appellate counsel without any supporting argument.  (Doc. # 21-36 at 127, 131–32.)  The ineffective assistance of trial counsel claim is not exhausted.  It is questionable whether Carruth's brief mention of his ineffective assistance of appellate counsel claim served to exhaust that claim, *see Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6), and there are even more serious reasons to doubt that Carruth properly exhausted the underlying claim.[50] Regardless, all claims fail because the underlying claim does not have merit.

---

[50] Carruth did not raise the issue in the Court of Criminal Appeals before raising it in his petition for writ of certiorari.  Of course, the deeper issue is that Carruth could not have exhausted the federal claim in a proceeding where he was not permitted to even raise the claim: When Carruth brought this issue to the Rule 32 court, the claim was dismissed because it should have been brought in the original trial-level proceedings.  The applicability of this claims-processing rule is not intertwined with the constitutional question, and Carruth has not provided any allegations tending to show that this rule was applied in an arbitrary manner.  Thus, the rule

It is disconcerting to see any mention of punishment in the guilt/innocence phase, especially when the trial court's guilt/innocence phase instructions did not direct the jurors to ignore punishment in their decisionmaking; however, it cannot be said that the brief comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *see also Darden*, 477 U.S. at 181; *Young*, 470 U.S. at 12–13; *Berger*, 295 U.S. at 89.

First, it should be noted that the comment did not reveal anything to the jurors that they did not already know. Statements made by the court and by counsel during the week-long jury selection clearly communicated that the crimes at issue in this case, unlike most crimes, carry the possibility of a death sentence. It was known from the start that "capital crimes" can carry the death penalty, whereas other crimes do not. It was also explained to each juror that, if Carruth was found guilty of capital murder, a penalty phase "mini-trial" would follow to decide between a sentence of death or a sentence of life without the possibility of parole.

---

can serve as an independent and adequate basis for adjudicating the claim. *See Frazier*, 661 F.3d at 524. The state courts "clearly and expressly" relied on the rule in rejecting Carruth's claims. *See Johnson*, 938 F.2d at 1173; *see also Harris*, 489 U.S. at 262. The reasoning of the Alabama Supreme Court can be inferred from the decision of the trial court. *Wilson*, 584 U.S. at ___, 138 S. Ct. at 1194. Because this claims-processing rule was the real issue in Carruth's Rule 32 proceeding and not the underlying federal issue, Carruth never properly exhausted the federal issue. *See Walker*, 562 U.S. at 316.

The only prejudice that could have resulted to Carruth was the possibility that a reminder of these facts would encourage the jurors to include punishment in their guilt/innocence deliberations. However, the record as a whole demonstrates that this could not have risen to the level of a *Donnelly* violation because the prosecutor also told the jury that punishment was not at issue at that stage—that punishment is "something that you're not even considering now." This had some ameliorative effect. Because the prosecutor's comment did not infect the trial with unfairness, the underlying claim has no merit. Certainly, the Court of Criminal Appeals was not unreasonable in so concluding.

Because the underlying claim does not have merit, the claims of ineffective assistance of counsel are also meritless because counsel could not have been deficient in failing to raise a meritless point and their performance could not have been prejudicial for the same reason.[51]

All claims related to the prosecution's guilt/innocence phase arguments are due to be dismissed.

### 3.    *Improper Argument in the Penalty Phase*

Carruth next complains about several statements made by the prosecutor in his closing arguments in the penalty phase. The first contested statement occurred

---

[51] The claim of ineffective assistance of trial counsel is also meritless because the underlying claim *was* addressed by Carruth's trial counsel through an objection. Carruth has not suggested any better way to have handled this issue.

at the end of the prosecution's opening penalty-phase argument, when he said: "I
do not make it a practice, and have not made it a practice over the last twenty-five
years, to beg a jury for the death penalty. I won't do that today. I will try to
present to you what I believe . . . ." (Doc. # 21-25 at 172–73.) The other contested
statements occurred in the prosecution's rebuttal, when he said:

> I'm not eloquent enough to hope to convey to you the terror, the
> hopelessness, that must have gone through the minds of these two
> innocent people. Can you imagine being trussed up with shackles and
> taken out of your house in the night down to somewhere in the dark,
> in the county, in the cold? Can you imagine a child watching what
> happened to his father? Can you imagine a child watching two men
> digging a hole—digging a hole, ladies and gentlemen, that he knows
> he's going to be in in just a minute? If that isn't cruel and atrocious
> and heinous, I don't know what the definition of those words could
> possibly be.
>
> . . .
>
> I'm not a regular church attendee. I was when I was a child, but I
> haven't been for a long time. That's not good and I wish I were, but I
> don't want to be—seem to be something that I'm not when I read you
> a passage from the Bible. In Matthew, the disciples came to Christ
> and said, "Who is the greatest of these?" And Matthew said in 18:6:
> "But whosoever shall offend one of these little ones which believe in
> me, it were better for him that a millstone were hanged about his neck
> and that he would drown in the depth of the sea."

(Doc. # 21-25 at 181–83.)

Carruth claims that the prosecutor's "point[ing]to his twenty-five years of
experience in asking for the death penalty," "rel[ying] on authority from the Bible,
rather than the law, in arguing that Carruth should be sentenced to death," and

"ask[ing] the jury to put themselves in the place of the victim and imagine this happening to them," were all improper arguments, prosecutorial misconduct, and grounds for reversal of his sentence.  (Doc. # 34 at 83–84, ¶ 193.)  Carruth's trial counsel did not object to any of these statements, and no issue with these statements was raised in Carruth's direct appeal.  Carruth therefore alleges that his trial counsel, (Doc. # 34 at 60, ¶ 146), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective for failing to address these issues.

Carruth first raised these claims in his Rule 32 petition.  (Doc. # 21-27 at 43, 45–47, 65–66, ¶¶ 73, 79, 115.)  The trial court dismissed the underlying claims because they should have been raised in the original trial-level proceedings and it dismissed the ineffective assistance claims as insufficiently pleaded.  (Doc. # 21-31 at 188, 190.)  Carruth did not raise the underlying claims on appeal, but he did raise the claims of ineffective assistance of counsel, arguing only that the claims "were sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. # 21-35 at 11, 52–53, 62–63.)  The Court of Criminal Appeals disagreed:

> Carruth did not allege why he believed these statements were improper nor did he state the grounds on which he believed counsel should have objected.  Additionally, Carruth failed to plead any facts to suggest how these statements prejudiced him.  Carruth merely alleged that the statements were improper and prejudicial.  Such a bare allegation is insufficient to meet the pleading and specificity requirements of [the applicable Alabama pleading rules].

(Doc. # 21-36 at 99.)  *Carruth*, 165 So. 3d at 644.  Carruth did not raise either the underlying claim or the claim of ineffective assistance of trial counsel in his petition for writ of certiorari, only briefly raising the claim of ineffective assistance of appellate counsel without any supporting argument.  (Doc. # 21-36 at 127, 131–32.)

It is questionable whether Carruth's brief mention of his ineffective assistance of appellate counsel claim served to exhaust that claim.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).  Even if it did, that claim has no merit standing alone:  Appellate counsel could not have raised this issue because it was not raised in the trial court.  *See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301.

Even if they were exhausted, these claims fail to have merit under *Donnelly*.[52]  Two of the three contested comments are not even improper argument.  First, no Supreme Court precedent bans a prosecutor from merely mentioning his experience.  While the Supreme Court has clearly established that a prosecutor cannot base his argument on an assertion of personal knowledge, *Berger*, 295 U.S.

---

[52] There has been some suggestion by the Supreme Court that a standard higher than *Donnelly*'s is required by the Eighth Amendment for prosecutorial misconduct during capital sentencing proceedings.  *See Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (plurality opinion); *Sawyer v. Smith*, 497 U.S. 227, 244 (1990).  However, this rule has been cabined, only requiring a higher standard if the prosecutor incorrectly describes the role of the jury in the sentencing proceeding.  *See Romano v. Oklahoma*, 512 U.S. 1, 9 (1994); *Dugger v. Adams*, 489 U.S. 401, 407 (1989).  Outside of this context, *Donnelly* still controls.  *Romano*, 512 U.S. at 12.

at 88, the prosecutor here did not do so.  The comment mentioning twenty-five years' experience simply explained how the prosecutor intend to structure his argument.  The prosecutor did not rely on his experience in making an argument for the death penalty

Second, Carruth cites no case indicating that it is prosecutorial misconduct to invite the jury to think about themselves in the place of the victim.  Although the Eleventh Circuit has entertained such claims,[53] no Supreme Court case bans such hypotheticals.  Even under the Eleventh Circuit's test, such hypotheticals are not improper if impact on the victim is relevant to prove an aggravating circumstance, *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1292 (11th Cir. 2012); *Kennedy v. Dugger*, 933 F.2d 905, 913 (11th Cir. 1991); *Davis v. Kemp*, 829 F.2d 1522, 1528 (11th Cir. 1987), as it is under Alabama's heinous, atrocious, or cruel aggravating circumstance.  *Ex parte Rieber*, 663 So. 2d 999, 1007 (Ala. 1995); *Ex parte McWilliams*, 640 So. 2d 1015, 1017 (Ala. 1993).[54]  Because it has not been clearly established by the Supreme Court that such argument is improper, these claims lack merit.

---

[53] *See Grossman v. McDonough*, 466 F.3d 1325, 1348 (11th Cir. 2006).

[54] The Supreme Court has approved the introduction of some victim impact evidence in the penalty phase.  *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

The impropriety of the biblical argument is more obvious.  Although neither the Supreme Court nor the Eleventh Circuit has prohibited references to the Bible in closing arguments, *see Romine*, 253 F.3d at 1368 n.19, the Supreme Court's prohibitions against appealing to an irrelevant authority, *Berger*, 295 U.S. at 88, against "interjecting personal beliefs into the presentation of [the] case," *Young*, 470 U.S. at 8–9, and against "inflammatory" remarks, *id.* at 9, all combine to clearly establish that a prosecutor cannot suggest to a jury that a death sentence should be imposed because he believes that such a sentence would be appropriate under biblical law.  *See Romine*, 253 F.3d at 1366; *Cunningham v. Zant*, 928 F.2d 1006, 1020 (11th Cir. 1991); *Cobb v. Wainwright*, 609 F.2d 754, 756 n.2 (5th Cir. 1980).[55]

Nonetheless, Carruth's claim has no merit because he has failed to show how this comment—or, indeed, any of the three comments in this section—prejudiced him.  Each of the three comments was brief, did not serve as the basis for any thought-out argument for the death penalty, and was ameliorated by the trial court's clear instructions on determining whether the death penalty should be imposed.  *See Donnelly*, 416 U.S. at 647; *Greer*, 483 U.S. at 766; *Romine*, 253 F.3d at 1369.  When read in context, it cannot be said that any of the three

---

[55] *See Bonner*, 661 F.2d at 1207.

comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. The underlying claims therefore lack merit.

Because the underlying claims lack merit, the claims of ineffective assistance of counsel also lack merit because counsel could not have been deficient for failing to raise a meritless point, and their performance could not have been prejudicial for the same reason. Accordingly, all claims in this section are due to be dismissed.

## I.      **Alleged Evidentiary Errors**

Evidentiary issues, like issues of prosecutorial misconduct, are analyzed under the *Donnelly* framework. *See Romano*, 512 U.S. at 12. Unless a specific constitutional guarantee is at issue, *see, e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 53 (1987), the admission or exclusion of evidence only violates the Constitution if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *Lisenba v. California*, 314 U.S. 219, 228 (1941). Again, the record must be assessed as a whole when making this inquiry, *Romano*, 512 U.S. at 12, and relief cannot be granted if the improper evidence was only brief or ambiguous. *See Donnelly*, 416 U.S. at 647; *Greer*, 483 U.S. at 766.

### 1.   *Mention of Another Crime*

At the time of trial, Carruth was under indictment in a neighboring county for the home invasion, robbery, and murder of an elderly couple—Thurman and Katherine Ratliff.[56]   Before his trial, Carruth filed a motion *in limine* seeking to preclude any reference to the Ratliffs.  (Doc. # 21-13 at 79.)   At oral argument on the motion, counsel for the state represented that he would not attempt to introduce the evidence unless Carruth testified.  (Doc. # 21-16 at 86.)   The trial court said:

> [I]f Carruth chooses to testify, I think the State has the right to cross-examine him as to any similar acts.   And if he chooses to testify, I don't think he would be allowed to invoke the Fifth Amendment as to that, so I'm going to hear the evidence, and I'm going to reserve ruling on that motion.   The State is instructed not to bring this up unless he chooses to testify.

(Doc. # 21-16 at 87.)

An investigator named Renita Ward was called during the state's case-in-chief.  (Doc. # 21-23 at 160.)   Ward testified that she received computer hardware from law enforcement and was instructed to search the files stored on the equipment.   During Ward's testimony, the following exchange occurred:

> COUNSEL FOR THE STATE:   Now, Ms. Ward, what were you asked to look for?
>
> WARD:  I was specifically asked to look for any auto dealers, used car dealers, the name Ratcliff, any—

---

[56] The last name is also spelled as "Ratcliff" or "Radcliff" in various parts of the record.

COUNSEL FOR THE DEFENSE:  Objection, Your Honor.  I'm just going to make an objection to that, and we can take it up later.

THE COURT:  All right.

(Doc. # 21-23 at 164.)  Carruth's trial counsel did bring up Ward's testimony later, when the following exchange occurred outside the presence of the jury:

COUNSEL FOR THE DEFENSE:  Judge, just one thing:  I made an objection during the testimony of Renita Ward.  She was asked by the prosecution to, in terms of what she was asked to look for, any particular things on the computer.  She mentioned the term Ratcliff, and we all know that that is associated with the Lee County case.  I'm going to withdraw that objection, but, again, you know, I'd just like for the State to be directed at this point, unless Carruth testifies, they're not supposed to know any inferences about Jimmy Lee Brooks, anything relating to the Lee County case.  You know, I think it was inadvertent, and I don't think it's enough—anything to support any type of mistrial motion or anything like that, but I'd just like for the State to be cautioned and make sure their witnesses know not to, you know, in terms of mentioning about Jimmy Brooks' statements or anything having to do with the Lee County case.

COUNSEL FOR THE STATE:  Judge, we have scrupulously avoided any reference to the Lee County case, and we have instructed all of our witnesses to do so; however, I believe that we did overlook talking to Renita Ward about that.  It just did not occur to us, but we will certainly do that, continue to do that.

(Doc. # 21-23 at 193–94.)

At the end of the state's case-in-chief, the trial court asked whether Carruth intended to call any witnesses.  (Doc. # 21-24 at 96.)  Carruth trial counsel requested a final ruling on the use of the Ratliff charge in the cross-examination of Carruth.  (Doc. # 21-24 at 96–97.)  Carruth's trial counsel conceded that the

evidence could be admissible but queried whether Carruth could invoke his right to remain silent when asked about the charge.  (Doc. # 21-24 at 98.)  The trial court said:

> I'm not sure a defendant has a Fifth Amendment right [to remain silent] if he chooses himself to testify.  If he had been called to testify by a party in another proceeding or if he had been called to testify by the State, then he certainly has a Fifth Amendment right.  However, if he chooses to testify himself in his own defense, I think he is subject to cross examination.

(Doc. # 21-24 at 99.)  Carruth then informed the court that he still intended to take the stand and that he would invoke his right to remain silent when asked any questions about the Ratliff murders, despite the court's ruling.  (Doc. # 21-24 at 99–100, 103–04.)  After a lunch break, Carruth changed his mind.  (Doc. # 21-24 at 109–10.)  Carruth did not testify in his defense.  (Doc. # 21-24 at 187.)

No mention of the Ratliffs was made in Carruth's direct appeal.

Carruth raises two general categories of claims regarding this sequence. First, he alleges that Ward's reference to the Ratliffs rendered his trial fundamentally unfair.  (Doc. # 34 at 71–73, ¶¶ 168–70.)  He alleges that his trial counsel, (Doc. # 34 at 50, ¶ 123), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective in failing to press this point.  He also alleges that it was prosecutorial misconduct to elicit this testimony, (Doc. # 34 at 83 ¶ 192), and that his trial counsel, (Doc. #34 at 49–50, ¶ 122), and appellate counsel, (Doc. # 34

at 62–63, ¶ 152), were ineffective in failing to respond to the prosecutorial misconduct.

Second, he alleges that the trial court's ruling permitting the prosecution to use the pending charge as impeachment evidence impermissibly prevented Carruth from testifying in his own defense. (Doc. # 34 at 70–71, ¶¶ 165–67.) He claims that his appellate counsel was ineffective for failing to address this issue. (Doc. # 34 at 62–63, ¶ 152.)[57]

Each of these eight claims was first raised in Carruth's Rule 32 petition. (Doc. # 21-27 at 33, 45–47, 56–59, 65, ¶¶ 52, 53, 79, 96–100, 114.) The trial court dismissed both underlying claims and the claim of prosecutorial misconduct because the issues were raised at trial and should have been raised on appeal. (Doc. # 21-31 at 189–90.) The trial court dismissed all claims of ineffective assistance as insufficiently pleaded, (Doc. # 21-31 at 188), except the claims of ineffective assistance of trial counsel associated with Ward's reference to the Ratliffs, which proceeded to an evidentiary hearing. (Doc. # 21-31 at 189.)

At the evidentiary hearing, Carruth's trial counsel testified about the exchange with Ward. (Doc. # 21-33 at 73–76, 88–91.) He acknowledged that

---

[57] Paragraph 123 of Carruth's petition could be broadly construed to include an ineffective assistance of trial counsel claim as a counterpart to this ineffective assistance of appellate counsel claim. However, that claim would fail anyway because Carruth's trial counsel did argue that the Ratliff charges should not be used as impeachment evidence and Carruth has not suggested anything else his trial counsel could have done to press this point.

Ward did not mention any specifics, and he stated that his immediate objection to the word Ratliff was intended simply to prevent any further discussion of the Ratliff murders.  (Doc. # 21-33 at 75–76.)  He testified that a curative instruction was unnecessary and could have brought unwanted attention to the exchange, and he testified that a motion for mistrial would not have been supported by the testimony.  (Doc. # 21-33 at 90–91.)

> After the evidentiary hearing, the trial court denied the claim, saying:

> Trial counsel gave sufficient reason during the evidentiary hearing why [he did not move for a curative instruction or a mistrial]. Furthermore, there was nothing testified to at trial to even reference the petitioner to any crime involving the name "Ratliff" much less connecting the petitioner to any crime associated with the name "Ratliff."

(Doc. # 21-32 at 152.)

On appeal, Carruth raised four of his eight claims:  that his trial counsel were ineffective for failing to respond to prosecutorial misconduct, as well as all three claims of ineffective assistance of appellate counsel.  (Doc. # 21-35 at 11, 48, 62–63.)  The Court of Criminal Appeals affirmed the dismissal of the ineffective assistance of trial counsel claim without comment.  (Doc. # 21-36 at 96–98.) *Carruth*, 165 So. 3d at 641–43.  However, it discussed the underlying claims in affirming the dismissal of the ineffective assistance of appellate counsel claims:

> Carruth argued that the trial court erred by ruling that Carruth could, if he chose to testify, be cross-examined regarding pending murder charges in Lee County.  Carruth argued that this ruling denied him his

right to testify and that appellate counsel was ineffective for failing to raise this issue on direct appeal. However, a review of the record reveals that Carruth only objected to being cross-examined regarding the details of the alleged crimes from Lee County. Defense counsel stated: "I agree that the D.A. can ask if Mr. Carruth has been charged or indicted, but I don't agree that the State can go into details of that crime." Furthermore, the State sought only to ask questions regarding the details of those crimes if "that door opens up about those charges in Lee County." The trial court ruled that Carruth would only be subject to cross-examination regarding the details of those crimes "[i]f the door is opened . . . ." Accordingly, the record refutes this claim.

Additionally, Carruth argued that the trial court erred by allowing Renita Ward to testify "that she had been looking for evidence related to the Ratcliffs, making reference to the widely reported Lee County murders and connecting them to Mr. Carruth . . . ." However, the record reflects that, during Ward's testimony, the following exchange occurred:

"[Ward]: I was specifically asked to look for any auto dealers, used car dealers, the name Ratcliff, any

"__

"[Defense Counsel]: Objection, Your Honor. I'm just going to make an objection to that, and we can take it up later.

"THE COURT: All right."

The prosecutor moved on and never mentioned the topic of the Ratcliff murders again. Therefore, Ward never gave any testimony that connected Carruth to the murders in Lee County. Accordingly, this argument is also refuted by the record. Because each of the arguments from Issue V of Carruth's petition were refuted by the record, appellate counsel was not ineffective for failing to raise them on direct appeal. Accordingly, Carruth failed to state a claim for which relief could be granted and the circuit court did not err by summarily dismissing it.

(Doc. # 21-36 at 102–03.) *Carruth*, 165 So. 3d at 647–48 (citations omitted).

In his petition for writ of certiorari, Carruth only mentioned the claims of ineffective assistance of appellate counsel.  (Doc. # 21-36 at 127–29, 131–32.)  Thus, only those claims have been exhausted.  Regardless, all claims fail because the underlying claims have no merit.

Ward's brief mention of the word "Ratliff" could not have risen to the level of a *Donnelly* violation.  The word would have meant nothing to the uninformed juror; Ward's testimony certainly did nothing to explain who the Ratliffs were, that the Ratliffs were murder victims, and that Carruth was a suspect in their murder.  There is no evidence that any of the twelve primary jurors had any background knowledge of these facts, but even if they did, an off-hand mention of the name "Ratliff" could not have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 643.  Any reminder of the Ratliff accusation was too brief or ambiguous to cause prejudice to Carruth.  *See id.* at 647; *Greer*, 483 U.S. at 766.

The first underlying claim thus has no merit.  Because the first claim has no merit and because there is no indication that Ward's testimony was intentionally elicited by the prosecutor, the claim of prosecutorial misconduct has no merit.  And because neither of these claims has merit, none of the four associated claims of ineffective assistance of counsel has merit because counsel could not have been

deficient for failing to raise a meritless point, and their performance could not have been prejudicial for the same reason.[58]

As to the second claim—regarding whether the Ratliff murder charges could be used on cross-examination—the first question is whether *Donnelly* applies or whether a specific constitutional guarantee requires the imposition of a higher standard.

Carruth says that the trial court's ruling "denied Carruth his right to testify on his own behalf."  (Doc. # 34 at 71, ¶ 167.)  This right to present testimony originates in the Fifth and Sixth Amendments to the United States Constitution. *Rock v. Arkansas*, 483 U.S. 44, 52 (1987).  However, the Supreme Court has only invoked this right to require the *admission* of evidence, not the *exclusion* of evidence.  *See Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (per curiam) (collecting cases).  Unless the defendant is directly denied from offering factual evidence, the right to present evidence is not at issue.  *Ohler v. United States*, 529 U.S. 753, 759 (2000) (the right to present evidence is not at issue if the ruling "does not prevent [the defendant] from taking the stand and presenting any admissible testimony which she chooses"); *United States v. Scheffer*, 523 U.S. 303,

---

[58]  The only exhausted claim in this section—the claim of ineffective assistance of appellate counsel—is further meritless because Carruth's trial counsel withdrew his objection and appellate counsel could not have raised any claim for which there was no objection in the trial court.  *See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301.

317 (1998) (the right is not at issue because the ruling "did not preclude [the defendant] from presenting any factual evidence").  Even if the evidentiary ruling discouraged him from testifying, Carruth still had the option to do so, and he was not directly prevented from presenting any evidence.  Thus, Carruth's right to testify on his own behalf is not at issue.

Turning back to *Donnelly*, the next question is whether the ruling was in error.  At trial, Carruth's primary argument of error was that the ruling infringed on his right to remain silent.  That argument was meritless.  *See Ohler*, 529 U.S. at 759 ("[A] defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination."  (quoting *McGautha v. California*, 402 U.S. 183, 215 (1971))).

The argument that Carruth now raises is that the evidence was not proper impeachment evidence under Rules 608(b) and 609(a) of the Alabama Rules of Evidence, which prevent this kind of evidence from being used to show a character for truthfulness.[59]  However, the state did not argue that the Ratliff evidence was admissible to show a character for truthfulness.  The state said that the evidence is admissible to show "motive, plan, scheme, design, intent," (Doc. # 21-16 at 86), as

---

[59] The mere fact that the state court misapplied state law could not merit relief, of course. *See Estelle*, 502 U.S. at 71–72.  However, the admissibility under state law is relevant to show how counsel were not ineffective for failing to object to the evidence.

reflected in Rule 404(b) of the Alabama Rules of Evidence.  The state was correct:
The evidence was admissible to answer these non-character questions.[60]  Thus,
Rules 608(b) and 609(a) are irrelevant.

Even assuming that error did occur, Carruth has failed to demonstrate any
resulting prejudice from the ruling *in limine*.  Like the defendant in *Luce v. United
States*, 469 U.S. 38, 39 (1984), Carruth neither stated on the record that he would
have testified but for the ruling, nor proffered the testimony that he would have
given but for the ruling.  A ruling *in limine* is subject to change, *id.* at 41–42, and
the government may choose not to present the evidence in the end.  *Ohler*, 529
U.S. at 759.  Thus, the Supreme Court has recognized that a claim like Carruth's
"is wholly speculative."  *Luce*, 469 U.S. at 41.  With only speculation to back his
claim, it cannot be said that the ruling "so infected the trial with unfairness as to
make the resulting conviction a denial of due process."  *Donnelly*, 416 U.S. at 643.

Because this claim lacks merit, counsel could not have been deficient for
failing to raise the claim, and their performance could not have been prejudicial for
the same reason.

All claims in this section are due to be dismissed.

---

[60] In fact, if the trial court erred, it erred in not permitting the state to use the evidence in its case-in-chief.  But, of course, the state did represent that it had no intention of doing so. (Doc. # 21-16 at 86.)

### 2.   *Admission of Photographic Evidence*

Carruth next complains that "cumulative and prejudicial photographs" and video were admitted during the guilt/innocence phase of the trial, showing the victims before the offense and during Brett Bowyer's autopsy.  (Doc. # 34 at 94–96, ¶¶ 220–22.)  He claims that his trial counsel, (Doc. # 34 at 50, ¶ 124), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective in failing to deal with the photographs.  Carruth also claims that the admission of the photographs was prosecutorial misconduct, (Doc. # 34 at 82, ¶ 190), and he claims that his trial counsel, (Doc. #34 at 49–50, ¶ 122), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective in failing to address the prosecutorial misconduct.

Carruth's trial counsel filed a motion *in limine* to prevent the introduction of "several gruesome and highly prejudicial photographs of the victim."  (Doc. # 21-11 at 73.)  The motion offered to stipulate to the cause of death and stated that the photographs would have no other probative value with this stipulation made.  (Doc. # 21-11 at 74.)  The state's response contended that the photographs were admissible to show the position and location of the victim's body at the crime scene and to corroborate the pathologist's testimony as to the victim's wounds, cause of death, and proximity of the gun to the victim's head.  (Doc. # 21-12 at 198.)  The state requested that any objections to the photographs be handled at trial on a photograph-by-photograph basis.  (Doc. # 21-12 at 197.)

Carruth's trial counsel then filed two more specific motions.  The first requested that the court conduct an *in camera* inspection of each autopsy photograph.   Trial counsel stated that the prosecution had provided 108 photographs of the autopsy in discovery, and they specifically objected to two photos showing the victim's clothing as unduly prejudicial, thirteen photos of the victim's body that did not show the gunshot wounds as irrelevant, and twelve photos of "the victim's head after it has been scalped and images of the victim's brain being taken from his head" as unduly prejudicial.  (Doc. # 21-13 at 72.)  The second motion requested a limitation on the admission of photographs from the crime scene, saying that "many are cumulative in nature" and "many are completely irrelevant," but not challenging any specific photo.  (Doc. # 21-13 at 74.)

At a motions hearing before trial, Carruth's trial counsel requested that ruling on the autopsy photos be deferred and that objections be dealt with on a photograph-by-photograph basis.  The trial court deferred ruling accordingly, but said that it would like to review the photos outside the presence of the jury before they are admitted.  (Doc. # 21-16 at 38–39.)  However, the issue of the autopsy photos was resolved before the trial even began.  The doctor who conducted the autopsy was not available for trial, and the parties stipulated that the doctor's testimony would be presented by showing a videotape of his deposition.  (Doc.

# 21-13 at 69.)  Only two photos were used during the deposition, and Carruth did not object to either photo at trial.  (Doc. # 21-24 at 5–6.)  Carruth's trial counsel maintained that the defense still sought to exclude any autopsy photos "except for the ones that were admitted" during the deposition, but the state indicated that it would not seek the admission of any further autopsy photographs.  (Doc. # 21-16 at 88–89.)  Thus, no objections were made at trial to any autopsy photographs.

For the second motion, Carruth's trial counsel repeated his request to have the photos inspected *in camera* at the motions hearing, saying:  "I understand they're allowed to get some of those in.  I have no problem with that, but I just don't want continuous photographs of the same depiction continually being admitted because I think that would just highly inflame and prejudice the jury."  The state responded that it did not intend "to offer repetitive or cumulative photographs."  (Doc. # 21-16 at 91.)  The court agreed to look at the photos *in camera* before the state could admit them, (Doc. # 21-16 at 92), and ordered the state to provide the photos for an *in camera* inspection.  (Doc. # 21-21 at 67.)  After reviewing the photos, the court ruled that all the evidence could be admitted, except for one video of the crime scene.  (Doc. # 21-21 at 88.)  Carruth objected to this ruling on the basis that the photographs were "irrelevant and/or cumulative and/or prejudicial."  (Doc. # 21-21 at 89.)  Carruth re-raised his objection at multiple points throughout trial.  (Doc. # 21-21 at 162–63, 173.)

In his petition for writ of habeas corpus, Carruth identifies ten photos or videos that he believes were erroneously admitted into evidence. (Doc. # 34 at 92–93, ¶ 220.) First, he complains about the two photos that were admitted during the autopsy deposition. (Doc. # 21-24 at 5–6.) Second, he complains about several non-autopsy photos of the crime scene of the injuries to the victims, including: two photos of Forrest Bowyer's neck injuries, (Doc. # 21-21 at 162–63), two photos of Brett Bowyer's body partially laying in the shallow grave, (Doc. # 21-21 at 173; Doc. # 21-23 at 41), a two-minute video of Brett Bowyer's body before the autopsy, (Doc. # 21-22 at 118, 128–29), and two photos of blood and eyeglasses found at the scene. (Doc. # 21-23 at 44.) Lastly, Carruth complains about photos of Brett Bowyer from before the offense, including one photo of Forrest and Brett Bowyer together, (Doc. # 21-21 at 140), and one photo of Brett Bowyer in a karate uniform. (Doc. # 21-21 at 183.)

At trial, Carruth only objected to the two photos of Forrest Bowyer's injuries, (Doc. # 21-21 at 162–63), the two photos of Brett Bowyer at the crime scene, (Doc. # 21-21 at 173; Doc. # 21-23 at 41), and the two photos of blood and eyeglasses at the scene. (Doc. # 21-23 at 44.) However, even without an objection from Carruth, the court warned the jury that the two autopsy photos and the pre-autopsy video of Brett Bowyer's body would be "very graphic." (Doc. # 21-22 at 128–29; Doc. # 21-24 at 6.)

208

Carruth did not raise any issues with the photos or videos in his direct appeal. (Doc. # 21-26 at 60.) However, Carruth raised each of his current claims in his Rule 32 petition. (Doc. # 21-27 at 33–34, 45–47, 64, 86–87, ¶¶ 52, 54, 79, 112, 155–56.) The trial court dismissed the underlying claims and the claim of prosecutorial misconduct because they should have been raised in the original trial-level proceedings and on direct appeal, and it dismissed the ineffective assistance claims as insufficiently pleaded. (Doc. # 21-31 at 188, 190, 192.)

On appeal, Carruth raised three of his claims: that his trial counsel were ineffective for failing to respond to prosecutorial misconduct, as well as both claims of ineffective assistance of appellate counsel. (Doc. # 21-35 at 11, 48, 62–63.) The Court of Criminal Appeals affirmed the dismissal of each of these claims. (Doc. # 21-36 at 96–98, 104.) *Carruth*, 165 So. 3d at 641–43, 649–50. In his petition for writ of certiorari, Carruth only mentioned the claims of ineffective assistance of appellate counsel. However, he did not provide any supporting argument. (Doc. # 21-36 at 127, 131–32.) Thus, it is questionable whether even the claims of ineffective assistance of appellate counsel have been exhausted. *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6). Regardless, all claims fail because the underlying claims have no merit.

Again, the first question under *Donnelly* is whether the admission of the evidence was error. The relevant evidentiary rule is Rule 403 of the Alabama

209

Rules of Evidence, which says that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ala. R. Evid. 403.

The pictures of Brett Bowyer while he was alive were relevant to prove his age and to identify his body.[61]  The autopsy images, the pre-autopsy video, and the images of Forrest Bowyer's neck were all relevant to show the nature and extent of the victims' injuries.  The photos of the crime scene were relevant to explain the sequence of events and to corroborate Forrest Bowyer's testimony.  Each photo or video had some probative value; the only question is whether the prejudicial effects outweighed this probative value.  The trial court had a sufficient basis for concluding that the probative value outweighed the prejudicial effect of these photos and video.[62]  Thus, there was no error in admitting the photos and video.

---

[61] Contrary to Carruth's assertions, these photos were not relevant only as "victim impact evidence."

[62] The photos, but not the video, are present in the record in varying states of legibility. (Doc. # 21-13 at 167–202.)  It is Carruth's burden to show that he is entitled to relief, so any lack of legibility militates against him.  But in any event, having studied what remains of the photos, the warnings given by the trial court before the media was shown, the description of the media given by the witnesses, and the record as a whole, it is still possible to assess the prejudicial effect of the media.  Having done so, it is clear that the trial court's ruling was not unreasonable.

Even if there were some error in the decision, it cannot be said that the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. The mere fact that some evidence was shocking or disturbing does not render a criminal trial fundamentally unfair. *See Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989). Instead, the photos admitted in Carruth's trial were limited in number and did not feature heavily in the prosecutor's closing arguments. It cannot be said that the photos either infected the trial or did so unfairly.

The underlying claim thus has no merit. Because the underlying claim has no merit, the claim of prosecutorial misconduct has no merit. And because neither of these claims has merit, none of the four associated claims of ineffective assistance of counsel has merit because counsel could not have been deficient for failing to raise a meritless point and their performance could not have been prejudicial for the same reason.

All claims in this section are due to be dismissed.

### 3.    *Hearsay Statements of a Co-Conspirator*

Carruth next alleges that impermissible hearsay testimony was admitted at his trial. Specifically, he complains that Forrest Bowyer was permitted to introduce the following remarks: Jimmy Brooks's statement that Brett Bowyer "better start worrying about what's going to happen to [him] and not [his] your

daddy" when Brett Bowyer expressed concern for his father, (Doc. # 21-21 at 164–65), and Brooks's statement that "that little m-f doesn't want to die" when Brett Bowyer continued making noises after being shot.  (Doc. # 21-21 at 169.)[63]  There were no objections to these statements at trial,[64] and the statements were not raised as error on appeal.

Carruth claims that the admission of the statements was error, (Doc. # 34 at 96–98, ¶¶ 223–226), and that it was error to use the statements in sentencing, (Doc. # 34 at 98–100, ¶¶ 227–33).  He also asserts that his trial counsel, (Doc. # 34

---

[63] Carruth also alleges that his trial counsel were ineffective for failing to object to videotaped statements by Forrest Bowyer and testimony from law enforcement witnesses as to out-of-court statements by other people.  (Doc. # 34 at 51, ¶ 126.)  The first allegation is not sufficient to grant relief because Carruth cites an irrelevant portion of the record.  It seems likely that Carruth meant to reference the dashcam video from the patrol car of the officer who first made contact with Forrest Bowyer, (Doc. # 21-22 at 42–44), but it is impossible to tell what specific statements Carruth is complaining about.  It is plausible that the statements were exempted from the rule against hearsay under Rules 801(c), 803(1), (2), (3), or (4) of the Alabama Rules of Evidence and exempted from the constraints of the Confrontation Clause under *Michigan v. Bryant*, 562 U.S. 344, 359 (2011), or *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").

The other statements cited by Carruth were not objectionable.  The first was a statement by a police dispatcher telling an officer "that one person had been shot and another person had been cut and that they needed [the officer] to respond," and the second was that an officer "had stopped the vehicle matching the description of the one that we were looking for . . . ."  (Doc. # 21-22 at 69, 72.)  Those statements were not hearsay under Rule 801(c) of the Alabama Rules of Evidence and did not require confrontation pursuant to either *Bryant*, 562 U.S. at 359, or *Crawford*, 541 U.S. at 59 n.9.  Lastly, the hearsay and double hearsay from the investigator were admissible under these exceptions and the exceptions applicable to the video of Forrest Bowyer.  (Doc. # 21-24 at 19.)  In any event, the factual content in these statements was essentially conceded at trial; therefore, Carruth could not have been prejudiced by the lack of objection.

[64] Some hearsay from Brooks was the subject of a motion *in limine*, but these two statements were never at issue.  (Doc. # 21-16 at 79–83.)

at 51, ¶ 126), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective in failing to address this issue.

Each of these claims was first raised in Carruth's Rule 32 petition.  (Doc. # 21-27 at 34–35, 45–47, 67–70, ¶¶ 56, 79, 117–25.)  The trial court dismissed the underlying claims because they should have been raised in the original trial-level proceedings, and it dismissed the ineffective assistance claims as insufficiently pleaded.  (Doc. # 21-31 at 188–89.)  On appeal, Carruth only raised the claim of ineffective assistance of appellate counsel, merely stating that the claim was "sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. # 21-35 at 11, 62–63.)  The Court of Criminal Appeals affirmed dismissal. (Doc. # 21-36 at 105.)  *Carruth*, 165 So. 3d at 650.

In his petition for writ of certiorari, Carruth raised the ineffective assistance of appellate counsel claim in his statement of the issues.  But he did not provide any supporting argument, and he did not mention the hearsay argument in particular.  (Doc. # 21-36 at 127, 132.)   Thus, it is questionable whether the ineffective assistance of appellate counsel claim has been properly exhausted.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).   Even if it were exhausted, that claim is meritless standing alone; appellate counsel could not have raised this claim because it was not raised at trial.

*See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301. Regardless, all claims fail because the underlying claims have no merit.

The first question, again, is whether *Donnelly*'s standard applies or whether some particular constitutional guarantee requires a higher standard. Carruth contends that the admission of Brooks's statements violated Carruth's constitutional right to confront the witnesses against him. *See* U.S. Const. amend. VI; *Crawford v. Washington*, 541 U.S. 36 (2004). The Supreme Court has laid out a higher standard for the admission of some hearsay statements under the Confrontation Clause of the Sixth Amendment. The Confrontation Clause bars the admission of any "testimonial" hearsay statement to prove the truth of the matter asserted, *Crawford*, 541 U.S. at 51, 59 n.9, except under limited circumstances, *see Giles v. California*, 554 U.S. 353, 359 (2008).

A statement is only testimonial if its "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see also Michigan v. Bryant*, 562 U.S. 344, 361 (2011). The fact that Brooks was talking to Carruth and not to a police officer is not necessarily dispositive, but "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Ohio v. Clark*, 576 U.S. 237, 249 (2015).

This higher evidentiary standard set by the Confrontation Clause does not apply here for two reasons. First, Brooks's statements were not introduced to establish the truth of the matters asserted. It was not important whether or not Brett Bowyer actually needed to "worry about" himself or whether or not Brett Bowyer actually "want[ed] to die." The probative value of the statements was in Carruth's reaction—or, more appropriately, non-reaction—to these statements, which demonstrated Carruth's assent to Brooks's killing of Brett Bowyer.

Second, the statements were not made to facilitate the prosecution of Carruth. In a very real sense, the statements were made in an effort to *evade* prosecution because Brooks and Carruth were in the process of killing or attempting to kill the two witnesses. There is certainly no reason to believe that Brooks anticipated at the time that the statements would be used against either Carruth or Brooks in a criminal prosecution.

Because *Crawford*'s heightened standard for testimonial hearsay is inapplicable, only *Donnelly* applies here.

The next question is whether the admission of the statements was error. Carruth contends that the statements were inadmissible hearsay under Rule 802 of the Alabama Rules of Evidence. However, the statements, as explained above, were relevant for reasons other than the truth of the matters asserted and thus could have been considered non-hearsay under Rule 801(c). Even if they were admitted

to show the truth of the matter asserted, the statements might have been exempted from the rule against hearsay as a present sense impression, Ala. R. Evid. 803(1), as an excited utterance, Ala. R. Evid. 803(2), or as a statement against interest, Ala. R. Evid. 804(b)(3). Without further information, it cannot be said that the admission of these statements was error.

Even if there were some error in the decision, it cannot be said that the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. There was vast evidence that Carruth had conspired with Brooks and substantial evidence that Carruth and Brooks had planned to murder any witnesses. Brooks's statements, although heartless and horrific, were not any more heartless and horrific than the crime itself, and the jury's hearing the statements could not have been any more inflammatory than hearing the other facts of the crime. Thus, the statements did not have any substantial prejudicial effect.

Carruth fails to meet *Donnelly*'s standard, and the admission of the hearsay statements cannot merit relief.

Carruth's sentencing argument is also meritless. Brooks's comments were used by the trial court in its sentencing order to explain the facts of the case and to explain how the crime was especially heinous, atrocious, or cruel. (Doc. # 21-26 at 21, 24.) Carruth says that even if the statements were admissible, they should

216

not have been used in making a sentencing determination because the Constitution demands an individualized sentencing decision.[65]

However, the Eighth Amendment only requires that the sentencing authority "consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Miller v. Alabama*, 567 U.S. 460, 470 (2012). This rule is a rule mandating that a defendant's individual conduct must be considered in the sentencing decision, not a rule barring any other person's conduct from being considered. Brooks's comments were relevant for understanding Carruth's actions because they demonstrated Carruth's assent to the murder of Brett Bowyer and also tended to show that the killing of the witnesses was pre-planned. For these reasons, the trial court did not sentence Carruth to death based on Brooks's conduct, but instead used Brooks's conduct to explain the seriousness of Carruth's own offense. This is acceptable under the Eighth Amendment.

---

[65] Carruth also briefly argues that the use of Brooks's statements in his sentencing was unconstitutional because the Carruth did not have an opportunity to challenge the evidence. (Doc. # 34 at 98–99, ¶¶ 229, 231.) Carruth cites *Gardner v. Florida*, 430 U.S. 349, 360 (1977), *Chandler v. Moore*, 240 F.3d 907, 918 (11th Cir. 2001), and *Proffitt v. Wainwright*, 685 F.2d 1227, 1254 (11th Cir. 1982). *Chandler* and *Proffitt*, however, are inapplicable because they are Eleventh Circuit cases and because they were interpreting the Supreme Court's Confrontation Clause test, which, as explained above the line, does not apply to these statements. *Gardner* dealt with a Florida procedure that permitted judges to consider non-record evidence in a sentencing decision. *Garner* is distinguishable because Brooks's statements were in evidence. Even if the Supreme Court had clearly established the rule that Carruth now advances, Carruth did have the opportunity to challenge Brooks's statements by taking the stand and testifying as to his version of the events.

Because none of the underlying claims has any merit, Carruth's trial and appellate counsel could not have been ineffective for failing to raise the claims, and their performance could not have been prejudicial for the same reason.

All claims in this section are due to be dismissed.

## J.    <u>**Alleged Errors in the Jury Instructions**</u>

### 1.    *Definition of Burglary*

Carruth alleges that the trial court improperly instructed the jury by telling it that an individual who acquires a gun as loot in a robbery is considered to be armed with a deadly weapon.  Carruth alleges that Alabama statutes dictate an opposite instruction.  (Doc. # 34 at 73–74, ¶ 171.)  This instruction was given in the guilt/innocence phase without objection.  (Doc. # 21-25 at 114, 137 ("If an accused or an accused accomplice acquires a gun as loot during the commission of a burglary, the accused, for the purpose of this section, is considered to be armed with a deadly weapon.").)  Accordingly, Carruth alleges that his trial counsel were ineffective for failing to object.  (Doc. # 34 at 60–61, ¶ 148.)

Carruth raised these issues for the first time in his Rule 32 petition.  (Doc. # 21-27 at 43–44, 75–76, ¶¶ 74, 135.)  The trial court dismissed the underlying claim because it should have been raised in the original trial-level proceedings, and it dismissed the ineffective assistance claim as insufficiently pleaded.  (Doc. # 21-

31 at 188, 190.)  On appeal, Carruth only raised the ineffective assistance claim. (Doc. # 21-35 at 11, 52–53.)

The Court of Criminal Appeals reviewed Carruth's ineffective assistance claim and concluded that Carruth's trial counsel were not ineffective because there was no error in the jury instruction.  (Doc. # 21-36 at 100.)  *Carruth*, 165 So. 3d at 644–45.  Carruth did not mention the burglary instruction in his petition for writ of certiorari.[66]  Thus, neither claim in this section has been exhausted.

Even if they were exhausted, these claims have no merit.  First, of course, any state law issue with the instruction cannot find relief in this proceeding: "[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Estelle*, 502 U.S. at 71–72.  Carruth's trial counsel could not have been ineffective for failing to raise any state law issue with the instruction because the Court of Criminal Appeals has said that there was no basis for such an objection.  That conclusion must be accepted by this court.  *Id.*

Without any state law error in the instruction, Carruth bears an "especially heavy burden" to show that Constitutional error occurred.  *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009).  "Even if there is some 'ambiguity,

---

[66] Carruth did mention paragraph 74, the relevant paragraph of his Rule 32 petition, but not the burglary instruction in particular.  His petition for writ of certiorari was structured in a way that seemed to indicate that the burglary instruction was *not* at issue, as the petition for writ of certiorari provided separate arguments on other claims from paragraph 74 but omitted any argument on or mention of the burglary claim.  (Doc. # 21-36 at 122–24, 163–65.)

219

inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation." *Id.* (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)). "Rather, the defendant must show both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. *Id.* at 190–91 (quoting *Estelle*, 502 U.S. at 72). Like under *Donnelly*, the trial record must be assessed as a whole and relief cannot be granted unless "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).

Carruth only identifies one possible federal basis for an objection, alleging that the instruction "impermissibly lowered the State's burden of proof." (Doc. # 34 at 73–74, ¶ 171). Carruth cites *In re Winship*, 397 U.S. 358, 364 (1970), and *Sandstrom v. Montana*, 442 U.S. 510, 520 (1979). *Winship* requires that any fact defined as an element of a crime must be submitted to a jury and proven beyond a reasonable doubt. 397 U.S. at 361. *Sandstrom* is an application of *Winship* and bars the use of mandatory presumptions in criminal jury instructions. *See Francis v. Franklin*, 471 U.S. 307, 314–15 (1985); *Cnty. Ct. of Ulster Cnty. v. Allen*, 442 U.S. 140, 157 (1979). States still have broad authority to define the elements of crimes and to determine what evidence is satisfactory to prove those elements—

they are only restricted from using certain presumptions and from assigning the burden of proof to the defendant. *See Montana v. Egelhoff*, 518 U.S. 37, 54 (1996).

Alabama has chosen to define "armed with a deadly weapon" to include possession of a weapon obtained as loot. This did not lower the prosecution's burden of proof or introduce any presumptions because the prosecution still had to prove beyond a reasonable doubt that the weapon was obtained as loot. The jury was not told to presume that anyone was armed, only that the statute's definition of "armed" includes those who obtained the weapon as loot.

*Winship* and *Sandstrom* are inapplicable, and this instruction did not fall short of *Estelle*'s standard for jury instructions. Accordingly, there was no federal basis for an objection. Without a state or federal basis for an objection, Carruth has failed to demonstrate that his trial counsel's performance was deficient or prejudicial.

Both claims are due to be dismissed.

## 2.   *Definition of the "Heinous, Atrocious, or Cruel" Aggravating Circumstance*

The trial court defined the "heinous, atrocious, or cruel" aggravating circumstance as follows:

> The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked and violent. The term cruel means designed to inflict a high degree of pain with utter

indifference to or even enjoyment of the suffering of others. What is intended to be included in this aggravating circumstance is only those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.

For a capital offense to be especially heinous, atrocious, or cruel, it must be a consciousless or pitiless crime which is unnecessarily tortuous to the victim. All capital offenses are heinous, atrocious, and cruel to some extent, but not all capital offenses are especially heinous, atrocious, or cruel compared to other capital offenses. You should not find or consider this aggravating circumstance unless you find that this particular capital offense involved a consciousless or pitiless crime which was unnecessarily tortuous to the victim.

(Doc. # 21-25 at 190–91.)

Carruth alleges that this language is unconstitutionally vague because the language asks the jury to compare the crime to "the norm of capital offenses" without defining that term. (Doc. # 34 at 74–75, ¶¶ 172–74.) Carruth also alleges that his trial counsel's performance was ineffective for failing to raise this point. (Doc. # 34 at 60–61, ¶¶ 147–48.)

Carruth first raised these two claims in his Rule 32 petition. (Doc. # 21-27 at 43–44, 76–78, ¶¶ 74, 136–38.) The trial court dismissed the underlying claim because it should have been raised in the original trial-level proceedings, and it dismissed the ineffective assistance claim as insufficiently pleaded. (Doc. # 21-31 at 188, 190.) On appeal, Carruth only raised the ineffective assistance claim. (Doc. # 21-35 at 11, 52–53.)

The Court of Criminal Appeals reviewed Carruth's ineffective assistance claim and concluded that Carruth's trial counsel were not ineffective because there was no error in the jury instruction. (Doc. # 21-36 at 100.) *Carruth*, 165 So. 3d at 645. In particular, the Court of Criminal Appeals cited its own decision in *Broadnax v. State*, where it held that similar language was constitutional because the comparative language helped to narrow the category of capital offenses included in the aggravating circumstance and the rest of the language sufficed to clear up any vagueness in the comparative language. 825 So. 2d 134, 210 (Ala. Crim. App. 2000), *aff'd sub nom. Ex parte Broadnax*, 825 So. 2d 233 (Ala. 2001).

Carruth raised only the claim of ineffective assistance of counsel in his petition for writ of certiorari. (Doc. # 21-36 at 122–23, 163–64.) Therefore, only that claim has been exhausted. However, that claim is meritless for a simple reason: Carruth's trial counsel did challenge this aggravating circumstance. He argued that the jury should not be instructed on it and that the aggravating circumstance must be limited "to include only those consciousless or pitiless homicides which are unnecessarily tortuous to the victim," citing some of the same legal principles that Carruth now cites. (Doc. # 21-25 at 161–69.) When the trial court agreed to give this language, Carruth's trial counsel indicated that Carruth was satisfied. (Doc. # 21-25 at 202.) Carruth has not explained what else his trial counsel should have argued or why this argument was insufficient.

First, of course, any state law issue with the instruction cannot find relief in this proceeding: "[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71–72. Carruth's trial counsel could not have been ineffective for failing to raise any state law issue with the instruction because the Court of Criminal Appeals has said that there was no basis for such an objection. That conclusion must be accepted by this court. *Id.*

Carruth primarily relies on *Maynard v. Cartwright*, 486 U.S. 356 (1988), to support his federal-law argument.[67] *Maynard*, reviewing Oklahoma's capital jury instructions, held that the mere words "heinous, atrocious, or cruel" were not sufficiently specific to limit the category of murders that are eligible for the death penalty—a constitutional requirement that emerged from the depths of the concurrences in *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). In striking down Oklahoma's aggravating circumstance, the Court noted that the aggravating circumstance would be acceptable if it were limited to crimes involving "torture or serious physical abuse." *Maynard*, 486 U.S. at 365.

A year after *Maynard* was handed down, the Eleventh Circuit considered whether Alabama's "heinous, atrocious, or cruel" aggravating circumstance

---

[67] Carruth also cites Justice Marshall's concurrence in *Shell v. Mississippi*, 498 U.S. 1, 3 (1990) (per curiam). However, a concurrence cannot clearly establish a constitutional rule and is therefore irrelevant.

complied with the Supreme Court's test.   The Eleventh Circuit held that it did comply:

> Alabama appellate courts have confined the application of the "heinous, atrocious or cruel" aggravating factor to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."   The class of cases that are "unnecessarily torturous to the victim" is not too indefinite to serve the narrowing function mandated by the Eighth Amendment.

*Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir. 1989).[68]

The language used in Carruth's instructions was the language approved by *Lindsey*; therefore, this court is bound to conclude that the language used was constitutionally satisfactory.   Because *Lindsey* holds that the instruction is sufficient, the underlying claim has no merit.   Because the underlying claim has no merit, Carruth's trial counsel could not have been deficient in failing to further challenge the instruction, and their performance could not have been prejudicial for the same reason.

Both claims are due to be dismissed.

---

[68] A plurality of the Supreme Court had previously ruled that identical language under Florida law was sufficient.  *See Proffitt v. Florida*, 428 U.S. 242, 255 (1976) (plurality); *see also Bertolotti v. Dugger*, 883 F.2d 1503, 1527 (11th Cir. 1989).

### 3.  *Explanation of the Balancing Test*

Carruth next alleges that the trial court's explanation of the balancing test in the penalty phase was erroneous.  The following are the relevant portions of the jury instructions:

> Now, ladies and gentlemen, if, after a full and fair consideration of all the evidence in this case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and that the aggravating circumstance outweighs the mitigating circumstances, your verdict should [recommend death].  . . .
>
> However, if, after a full and fair consideration of all the evidence in this case, you determine that the mitigating circumstances outweigh any aggravating circumstances that exist, or you are not convinced beyond a reasonable doubt and to a moral certainty that at least one aggravating circumstance does exist, your verdict would be to recommend punishment of life imprisonment without parole . . . .

(Doc. # 21-25 at 200–01.)

Carruth alleges that this instruction was improper under Alabama law and federal law because it created a presumption of death.  (Doc. # 34 at 75–77, ¶¶ 175–77.)  Carruth's trial counsel did not object to the instruction, (Doc. # 21-25 at 202), and so Carruth also alleges that his trial counsel provided ineffective assistance.  (Doc. # 34 at 60–61, ¶¶ 147–48.)

Carruth first raised these two claims in his Rule 32 petition.  (Doc. # 21-27 at 43–44, 78, ¶¶ 74, 139.)  The trial court dismissed the underlying claim because it should have been raised in the original trial-level proceedings, and it dismissed the ineffective assistance claim as insufficiently pleaded.  (Doc. # 21-31 at 188, 190.)

On appeal, Carruth only raised the ineffective assistance claim. (Doc. # 21-35 at 11, 52–53.)

The Court of Criminal Appeals reviewed Carruth's ineffective assistance claim and concluded that Carruth's trial counsel were not ineffective because there was no error in the jury instruction. (Doc. # 21-36 at 100–01.) *Carruth*, 165 So. 3d at 645–46. In particular, the Court of Criminal Appeals cited the Alabama Supreme Court's decision in *Ex parte McNabb*, which held that similar language was acceptable because "the jury . . . was not invited to recommend a sentence of death without finding any aggravating circumstance," and said that

> although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error seriously affected the fairness, integrity or public reputation of these judicial proceedings so as to require a reversal of the sentence.

887 So. 2d 998, 1004 (Ala. 2004) (alterations adopted) (quotation marks omitted) (citation omitted).

Carruth raised only the claim of ineffective assistance of counsel in his petition for writ of certiorari. (Doc. # 21-36 at 124–25, 164–65.) Therefore, only that claim has been exhausted. Regardless, both claims fail because the underlying claim has no merit.

First, of course, any state law issue with the instruction cannot find relief in this proceeding: "[T]he fact that the instruction was allegedly incorrect under state

law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71–72. Carruth's trial counsel could not have been ineffective for failing to raise any state law issue with the instruction because the Court of Criminal Appeals has said that there was no basis for such an objection. That conclusion must be accepted by this court. *Id.*

The question then turns to whether some federal error is present in the instruction and, if so, whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72.

Carruth cites one Supreme Court case to support his claim: *Blystone v. Pennsylvania*, 494 U.S. 299 (1990). In *Blystone*, the Supreme Court upheld a Pennsylvania death penalty scheme, noting approvingly that the scheme permitted the imposition of a death penalty "only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." *Id.* at 305.

However, the Supreme Court later said that this was not the real reason why Pennsylvania's statute survived scrutiny. Instead, the Court claimed that the statute survived because it "did not prevent the sentencing jury from considering and giving effect to all relevant mitigating evidence." *Kansas v. Marsh*, 548 U.S. 163, 178 n.5 (2006) (alterations adopted) (quotation marks omitted) (quoting *Blystone*, 494 U.S. at 305). Thus, it appears that the relevant language from

*Blystone* must be considered dicta in light of *Marsh*.  Dicta, of course, will not suffice when AEDPA applies.  *See Yarborough*, 541 U.S. at 660–61; *Lockyer*, 538 U.S. at 71–72.

Even if *Blystone*'s language is controlling, there is no conflict between *Blystone* and the jury instruction in this case.  The trial court's instructions did not tell the jury to impose the death penalty in any situation other than one where the aggravating circumstances outweigh the mitigating circumstances.  The instructions did omit any guidance on what to do if the aggravating and mitigating circumstances were found to weigh equally, but there is no reason to believe that such a balance was found in this case and that the jurors assumed that a death sentence should be the default.  In short, there is no reason to conclude that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72.[69]

*Blystone* is inapplicable, and this instruction did not fall short of *Estelle*'s standard for jury instructions.  Accordingly, there was no federal basis for an

---

[69] A similar instruction was approved in *Boyde v. California*, 494 U.S. 370, 374 (1990) ("If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.  However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole." (emphasis omitted)), though the exact issue Carruth now raises does not appear to have been raised in *Boyde*.

objection.  Without a state or federal basis for an objection, Carruth has failed to demonstrate that his trial counsel's performance was deficient or prejudicial.

Both claims are due to be dismissed.

### 4.    *Double-Counting Kidnapping, Burglary, and Robbery*

Carruth next objects to the "double-counting" of kidnapping, burglary, and murder in the penalty phase instructions.  (Doc. # 34 at 104–06, ¶¶ 242–44.)  The following is the relevant portion of the instructions:

> The aggravating circumstances which you may consider in this case, if you find from the evidence that they may have been proven beyond a reasonable doubt, are as follows: . . . The capital offense was committed while the defendant was engaged in or was an accomplice in the commission of or in attempt to commit robbery, burglary, or kidnapping. . . .

(Doc. # 21-25 at 189.)

Carruth notes that these aggravating circumstances were also the elements of three of the capital offenses.  He argues that this double-counting violated the Double Jeopardy Clause of the Fifth Amendment, an Alabama statute, and "Carruth's rights to due process, a fair trial, and a reliable sentencing hearing under the Fifth, Sixth, Eighth and Fourteenth Amendments."  (Doc. # 34 at 104–05, ¶ 243.)  Carruth also accuses his trial counsel, (Doc. # 34 at 60–61, ¶ 147–48), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), of ineffective assistance for failing to raise the double-counting.

Each of these claims made its first appearance in Carruth's Rule 32 petition. (Doc. # 21-27 at 43–47, 82, ¶¶ 74, 79, 147.)   The trial court dismissed the underlying claim because it should have been dealt with in the initial proceedings, (Doc. # 21-31 at 191),[70] and it dismissed the ineffective assistance claims as insufficiently pleaded.  (Doc. # 21-31 at 188.)  On appeal, Carruth raised only the claims of ineffective assistance of counsel, asserting that these claims "were sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. #

---

[70] Actually, the Rule 32 court dismissed the claim in part on the grounds that it *was* raised at trial.  (Doc. # 21-31 at 191.)  This appears to be an error that originated in Carruth's Rule 32 petition, which stated that the trial court permitted the double-counting "over defense objection." (Doc. # 21-27 at 82, ¶ 147.)  The state's answer to Carruth's Rule 32 petition parroted this allegation, saying that this issue was raised at trial.  (Doc. # 21-27 at 128–29.)  As support for this contention, both Carruth and the state cited the location in the record where the trial judge gave the relevant instruction.  (Doc. # 21-25 at 189–90.)  However, no objection is made in that part of the record.

When Carruth appealed his ineffective assistance of trial counsel claim, the Court of Criminal Appeals affirmed dismissal because, "according to Carruth's petition, trial counsel did object to this jury charge."  (Doc. # 21-26 at 101.)  Carruth tried to set the record straight in his petition for writ of certiorari, saying:  "The record reflects no objection by defense counsel to the defective jury charge.  The lower appellate court seized on an innocent oversight in the drafting of Mr. Carruth's petition to deny review and relief . . . ."  (Doc. # 21-36 at 125–26.)  Yet, in his petition for writ of habeas corpus, Carruth inexplicably repeats the same allegation that the double-counting was allowed "over defense objection."  (Doc. # 34 at 104, ¶ 242.)

This court has reviewed the record and can find no instance where Carruth's trial counsel objected to this instruction.  In fact, Carruth's trial counsel made multiple statements at trial that seemed to approve the double-counting.  (Doc. # 21-25 at 157–58.)  Whether a trial objection was raised has no effect on the exhaustion of the underlying claim because it was not raised on direct appeal.  However, the court will accord *de novo* review to Carruth's claim of ineffective assistance of trial counsel to the extent it was exhausted because the state courts based their adjudication of that claim on an unreasonable determination of the facts.  *See Adkins*, 710 F.3d at 1250.  Nevertheless, the claim fails for the reasons stated above the line.

21-35 at 11, 53, 62–63.)  The Court of Criminal Appeals affirmed dismissal of the ineffective assistance claims.  (Doc. # 21-26 at 105.)  *Carruth*, 165 So. 3d at 650.

In his petition for writ of certiorari, Carruth raised both ineffective assistance claims in his statement of the issues, though his grounds for reversal on the ineffective assistance of appellate counsel claim, as discussed above, was merely a one-sentence formulaic argument that failed to specifically mention double-counting in particular.  (Doc. # 21-36 at 125–26, 132.)  Thus, although the ineffective assistance of trial counsel claim is exhausted, it is questionable if the same can be said of the ineffective assistance of appellate counsel claim.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).

In any event, all claims fail because the underlying claim has no merit.  The Supreme Court has specifically permitted an element to reappear later as a sentencing factor.  *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) ("[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm."); *see also United States v. Chandler*, 996 F.2d 1073, 1093 (11th Cir. 1993), *as modified* (Sept. 30, 1993).  Indeed, it would be ridiculous to say that a sentencer must ignore the facts of the crime in his sentencing decision because those facts were already considered at the guilt-innocence stage.

Because the underlying claim has no merit, Carruth's trial and appellate counsel were not ineffective for failing to raise the claim, and their performance could not have been prejudicial for the same reason.  All claims in this section are due to be dismissed.

## K.      Alleged Unconstitutionality of Alabama's Capital Sentencing Scheme

Carruth alleges that Alabama's capital sentencing scheme is unconstitutional.  Specifically, Carruth says that the *jury* must find the existence of the aggravating circumstances beyond a reasonable doubt and must find that those aggravating circumstances outweigh the mitigating circumstances.  Carruth says that this did not occur in his case because the *judge* ultimately made these findings.  (Doc. # 34 at 100–01, ¶¶ 234–35.)  Carruth argues that the trial court cannot make such findings because it is impossible for the trial court to tell which aggravating circumstances were found beyond a reasonable doubt by the jury and therefore which aggravating circumstances may be permissibly relied upon.  (Doc. # 34 at 101–102, ¶¶ 235, 237.)   Carruth also argues that the application of the "especially heinous, atrocious, or cruel" aggravating circumstance was unconstitutional because it must be treated as an element of the offense and therefore should have been alleged in the indictment.  (Doc. # 34 at 101, ¶ 236.)  Lastly, Carruth argues that telling the jurors that their sentence was merely a recommendation and permitting the trial court to do its own balancing of the

aggravating and mitigating circumstances was unconstitutional. (Doc. # 34 at 102–03, ¶¶ 238–39.)

Carruth also alleges that his trial counsel, (Doc. # 34 at 60–61, ¶ 147–48), and appellate counsel, (Doc. # 34 at 62–63, ¶ 152), were ineffective for failing to raise these issues.

Carruth first brought these claims in his Rule 32 petition. (Doc. # 21-27 at 43, 45–47, 83–86, ¶¶ 74, 79, 148–54.) The trial court dismissed the underlying claim because it should have been raised in the original trial-level proceedings, and it dismissed the ineffective assistance claims as insufficiently pleaded. (Doc. # 21-31 at 188, 192.)

Carruth did not raise the underlying claim on appeal, but he did raise both ineffective assistance claims. (Doc. # 21-35 at 11, 52, 62–63.) Again, Carruth only presented a one-sentence argument claiming that his claims "were sufficiently specific to warrant further proceedings and stated a claim which would have entitled Carruth to relief under *Strickland v. Washington* if proven." (Doc. # 21-35 at 52, 62–63.) The Court of Criminal Appeals affirmed the dismissal of the ineffective assistance claims because the underlying claims had no merit. (Doc. # 21-26 at 99–101, 105.)

In his petition for writ of certiorari, Carruth generally referenced the paragraphs of his Rule 32 petition in which his ineffective assistance claims were

laid out.  (Doc. # 21-36 at 124–25, 127, 132, 165–67.)  However, he only argued that it was error to tell the jurors that their sentence was only a recommendation and to permit the trial court to do its own balancing of the aggravating and mitigating circumstances.  (Doc. # 21-36 at 165–67.)

The underlying claim is not exhausted.  To the extent that Carruth failed to argue some aspects of his ineffective assistance claims before the Alabama Supreme Court, it is questionable whether he properly exhausted those aspects of his claims.  *See Taylor*, 157 So. 3d at 140–45; *Rowe*, 139 F.3d at 1382 n.1; and Ala. R. App. P. 39(d)(6).  In any event, his claims of ineffective assistance of counsel are due to be dismissed because they are meritless.

As mentioned previously, any fact defined as an element of a crime must be submitted to a jury and proven beyond a reasonable doubt.  *Winship*, 397 U.S. at 361.  Once the facts constituting the elements of a crime are proven, a sentencing range, generally defined by statute, is opened, and the trial judge has broad discretion in determining the appropriate sentence within that range.  When making this determination, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."  *United States v. Tucker*, 404 U.S. 443, 446 (1972).  In other words, the judge need not rely solely on the facts found beyond a reasonable doubt by the jury.

That is not to say that the realm of sentencing is completely exempt from *Winship*'s command. The Supreme Court has held that the difference between an element and a sentencing factor cannot simply be reduced to the labels given by statute. If the existence of a sentencing factor changes the range of permissible sentences, then it has the same function as an element. Thus, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999); *see also Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) (applying this requirement to state prosecutions); *United States v. Akwuba*, No. 2:17-CR-511-WKW, 2022 WL 1620429, at *4 (M.D. Ala. May 23, 2022) (Watkins, J.).

Accordingly, the jury must be responsible for the factfinding for any fact that raises the maximum permissible punishment from life imprisonment without parole to death. *Ring v. Arizona*, 536 U.S. 584, 602 (2002) ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt."). The ultimate sentencing decision can still be left to a judge. *See McKinney v. Arizona*, 589 U.S. ___, ___, 140 S. Ct. 702, 707 (2020) ("[I]n a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating

and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range.").

Just a few years prior to *Apprendi* and *Ring*, the Supreme Court reviewed Alabama's capital sentencing scheme, holding that it's scheme requiring both the jury and the judge to weigh aggravating and mitigating circumstances was "[c]onsistent with established constitutional law," *Harris v. Alabama*, 513 U.S. 504, 511 (1995), and agreeing that a sentencing judge does not need to give any particular weight to the advisory verdict. *Id.* at 512, 514–15.

Before Carruth's trial, the Alabama Supreme Court had an opportunity to review the application of *Apprendi* and *Ring* to Alabama law. *See Ex parte Waldrop*, 859 So. 2d 1181, 1188 (Ala. 2002). In *Waldrop*, the Alabama Supreme Court held that the jury need only find one aggravating circumstance beyond a reasonable doubt, and that finding can be implicit either in the jury's guilt-phase finding or in its recommendation of death. *Id.* at 1188. The Alabama Supreme Court also held that "the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense," and thus that the final balancing of the circumstances could be done by a judge. *Id.* at 1190. The court specifically defended Alabama's use of advisory verdicts in the penalty phase. *Id.* at 1190–91.

It was against this legal backdrop that Carruth's trial, appeal, and Rule 32 proceedings were held.

To be clear, some of Carruth's arguments were later vindicated.  In 2016, the Supreme Court in *Hurst v. Florida* extended *Ring* and *Apprendi*.  Taking a new look at Florida's capital sentencing scheme, the Supreme Court overruled several prior opinions approving the Florida scheme "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty."  *Hurst*, 577 U.S. 92, 102.  The Supreme Court specifically held that Florida's advisory verdicts could not serve to prove an aggravating circumstance beyond a reasonable doubt, *id.* at 100, but rather that a separate finding is needed as to each aggravating or mitigating circumstance.  *Id.* at 99–100.

But the fact that constitutional jurisprudence has eventually shifted in Carruth's favor does not mean that he is entitled to relief from his sentence.  First, *Hurst* only analyzed Florida's sentencing scheme.  Though *Hurst* sheds significant doubt on the continued constitutionality of Alabama's sentencing scheme, *see Brooks v. Alabama*, 577 U.S. 1115, 1115 (2016) (Sotomayor, J., concurring), the Supreme Court has never overruled the on-point case—*Harris v. Alabama*, 513 U.S. 504 (1995)—which found Alabama's scheme constitutional.  *See Miller v. Comm'r, Ala. Dep't of Corr.*, 826 F. App'x 743, 749 (11th Cir. 2020) ("[A]s a

lower court we must follow an on-point Supreme Court decision even if we believe that later cases have eroded or even abrogated it."), *cert. denied sub nom. Miller v. Dunn*, 142 S. Ct. 123 (2021); *see also Ex parte Bohannon*, 222 So. 3d 525, 532 (Ala. 2016) ("Our reading of *Apprendi*, *Ring*, and *Hurst* leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment.").

Second, even if *Hurst* invalidated the Alabama capital sentencing scheme, it does not apply retroactively on collateral review. *See Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1337 (11th Cir. 2019). Because *Hurst* was decided after Carruth's conviction became final, it could not have been used in Carruth's Rule 32 proceedings, nor can it be used in these proceedings.

Lastly, *Hurst* does not apply because the constitutionality of Alabama's sentencing scheme is not the issue here. That claim was never exhausted. The question at hand is whether Carruth has a viable claim of ineffective assistance of counsel. More specifically, the question at hand is whether the Alabama courts unreasonably applied the then-existing Supreme Court precedent when they concluded that Carruth's trial[71] counsel were not unconstitutionally ineffective for failing to raise the constitutionality of Alabama's sentencing scheme. "When

---

[71] Carruth's appellate counsel was not ineffective for the same reasons. Additionally, appellate counsel could not have raised this issue because it was not raised in the trial-level proceedings. *See Williams*, 710 So. 2d at 1293; *Eaton*, 675 So. 2d at 1301.

§ 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; *see also Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

Considering the state of the law at the time of Carruth's trial, a challenge to Alabama's sentencing scheme would have bordered on frivolous. The United States Supreme Court had approved the scheme just eight years prior, and the Alabama Supreme Court approved the scheme one year prior. Alabama law requires the jury to find an aggravating factor beyond a reasonable doubt before returning a recommendation of death, so it is reasonable to conclude that all facts necessary to sentence Carruth to death were found by a jury beyond a reasonable doubt in compliance with *Apprendi* and *Ring*. Carruth's trial counsel would have had next to nothing to base his arguments on. It would be difficult to find that Carruth's trial counsel were deficient, much less conclude that the *only* reasonable application of then-existing Supreme Court precedent was to so find.

Two other points must be addressed in this section. First, because Alabama uses advisory verdicts, it was not inaccurate for the jury to be told that its verdict in the penalty phase was advisory, and therefore no constitutional violation occurred. *Adams*, 489 U.S. at 407. Second, because only one aggravating factor is needed to place death within the range of permissible punishments, only one aggravating

240

factor needs to be alleged in the indictment.  *United States v. LeCroy*, 441 F.3d 914, 922 (11th Cir. 2006).  The indictment included notice of the other three aggravating circumstances, (Doc. # 21-25 at 189–91), and therefore sufficed even without invoking the heinous, atrocious, or cruel aggravating circumstance.  Counsel could not have been ineffective for failing to raise these two points.

Considering the limited scope of federal habeas review and considering the total lack of support for Carruth's claims at the time they were decided, this court must conclude that Carruth's claims of ineffective assistance of counsel do not merit relief under AEDPA.  Thus, all claims in this section are due to be dismissed.

**L.**   <u>**Alleged Unconstitutionality of Alabama's Method of Execution**</u>

Lastly, Carruth argues that "Alabama's current method of execution, lethal injection, [is] unconstitutional."  Carruth asserts that the drugs used by Alabama subject an inmate to "intolerable pain" and constitute a cruel and unusual punishment in violation of the Eighth Amendment.  (Doc. # 34 at 106–24, ¶¶ 245–303.)

An extended analysis of the history of this claim is unnecessary because relief is impossible.  It is well-settled that challenges to a method of execution must be brought in a civil action under 42 U.S.C. § 1983, not in a petition for writ of habeas corpus.  *Nance v. Ward*, 597 U.S. ___, ___, 142 S. Ct. 2214, 2219 (2022); *Hill v. McDonough*, 547 U.S. 573, 580 (2006); *Nelson v. Campbell*, 541 U.S. 637,

644–647 (2004); *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006).  The underlying claim must therefore be dismissed.

Carruth also raises an adjunct claim, asserting that his trial counsel were "ineffective for failing to challenge the method of execution used by the State of Alabama." (Doc. # 34 at 61, ¶ 149.)  This claim has been exhausted.  (Doc. # 21-27 at 44, ¶ 76; Doc. # 21-35 at 52–53; Doc. # 21-36 at 126–27.)

While it is true that a challenge to Alabama's method of execution could have been raised in the original trial proceedings, *see Hooks v. State*, 822 So. 2d 476, 481 (Ala. Crim. App. 2000), Carruth's claim of ineffective assistance suffers from two serious flaws.  First, the Supreme Court has never clearly established that the Sixth Amendment right to counsel includes the assistance of counsel in challenging an anticipated method of execution.  Second, no prejudice can be traced to trial counsel's failure to do so:  A challenge to the injection protocol in place at the time would have been fruitless in state court, as evidenced by the Alabama Supreme Court's later endorsement of the protocol in *Ex parte Belisle*, 11 So. 3d 323, 339 (Ala. 2008).  Even if that were not true, Alabama's injection protocol changed on April 26, 2011.  (Doc. # 34 at 108, ¶ 249.)  Since the only possible relief for a method of execution challenge is a different method of

execution, *see Saunders*, 10 So. 3d at 112, it is not clear how a successful challenge to the old protocol would have served Carruth any good today.

Carruth's claim of ineffective assistance of counsel must also be dismissed.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that Carruth's amended petition for writ of habeas corpus (Doc. # 34) is DISMISSED without an evidentiary hearing.

An appropriate final judgment will follow.

DONE this 20th  day of September, 2022.

_____/s/   W. Keith Watkins_____
UNITED STATES DISTRICT JUDGE
